ORAL ARGUMENT NOT YET SCHEDULED

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## No. 25-3115

---

## UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

**v.**

## KEVONTAE STEWART,
*Defendant-Appellant.*

---

## APPEAL FROM THE UNITED STATES
## DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

## APPENDIX FOR APPELLANT

---

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

MATTHEW L. FARLEY
Asst. Federal Public Defender
625 Indiana Avenue, NW
Suite 550
Washington, D.C. 20004
(202) 208-7500
Matthew_Farley@fd.org

District Court
Cr. No. 25-MJ-00225 (ZMF)

# Appendix
# Table of Contents

Docket .................................................................................. A001

Complaint ............................................................................ A010
   09/18/25 [ECF No. 1]

Arrest Warrant..................................................................... A016
   09/18/25 [ECF No. 3]

Report of Grand Jury's Failure to Concur in an Indictment ..... A017
   09/26/25 [ECF No. 9]

Order of Detention Pending Trial............................................. A020
   09/19/25 [ECF No. 10]

Order on Briefing .................................................................. A024
   09/29/25 [ECF No. 12]

Government's Emergency Request to Vacate Order.................. A027
   10/02/25 [ECF No. 15]

Government's Supplement to Emergency Request.................... A045
   10/03/25 [ECF No. 16]

Government's Response to Briefing Order............................... A085
   10/03/25 [ECF No. 17]

Defendant's Response to Briefing Order ................................. A086
   10/07/25 [ECF No. 21]

Government's Reply to Defendant's Response .......................... A099
   10/08/25 [ECF No. 23]

Order Rejecting Indictment ...................................................... A108
   10/09/25 [ECF No. 24]

Government's Request for Review ............................................. A120
   10/14/25 [ECF No. 25]

Defendant's Response to Government's Request ....................... A137
   10/20/25 [ECF No. 28]

Government's Reply in Support of Request for Review ............. A169
   10/23/25 [ECF No. 29]

Government's Notice of Exhibit .............................................. A175
   10/23/25 [ECF No. 30]

Order Granting Government's Request for Review ................... A180
   11/20/25 [ECF No. 37]

Memorandum Opinion ............................................................. A181
   11/20/25 [ECF No. 38]

Defendant's Motion for Stay of Order ...................................... A196
   11/21/25 [ECF No. 39]

Government's Opposition to Defendant's Motion ...................... A199
   11/21/25 [ECF No. 40]

Notice of Appeal ..................................................................... A202
   11/26/25 [ECF No. 41]

Defendant's Motion for Stay Pending Appeal ........................... A203
   11/26/25 [ECF No. 42]

Government's Opposition to Defendant's Motion for Stay ......... A210
   12/02/25 [ECF No. 44]

Order Granting Defendant's Motion for Stay ........................... A215
   12/09/25 [ECF No. 45]

Status Hearing - Transcript ................................................... A217
   09/29/25

Hearing on Grand Jury Return - Transcript.............................. A230
  09/29/25

Hearing on Motion - Transcript................................................... A239
  10/03/25

Hearing on Motion - Transcript................................................ A256
  10/28/25

APPEAL

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:25-mj-00225-ZMF All Defendants

Case title: USA v. STEWART                    Date Filed: 09/18/2025

Assigned to: Magistrate Judge Zia M. Faruqui

Appeals court case number: 25-3115

**Defendant (1)**

**KEVONTAE STEWART**            represented by   **H. Heather Shaner**
LAW OFFICES OF H. HEATHER SHANER
1702 S Street, NW
Washington, DC 20009
(202) 265-8210
Fax: (202) 332-8057
Email: hhsesq@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Farley**
FEDERAL PUBLIC DEFENDER
625 Indiana Ave NW
Suite 550
Washington, DC 20004
202-208-7500
Email: matthew_farley@fd.org
*ATTORNEY TO BE NOTICED*

**Michelle M. Peterson**
FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF COLUMBIA
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004
(202) 208-7500 ext 125
Fax: (202) 208-7515
Email: shelli_peterson@fd.org
*ATTORNEY TO BE NOTICED*

**Pending Counts**                    **Disposition**

None

**A001**

## Highest Offense Level (Opening)

None

## Terminated Counts
                            **Disposition**

None

## Highest Offense Level (Terminated)

None

## Complaints
                            **Disposition**

COMPLAINT in violation of 18:922(g)(1)

---

## Plaintiff

**USA**                           represented by    **Caelainn Carney**
DOJ-USAO
601 D Street NW
Ste 3.235
Washington, DC 20004
202-714-6433
Email: caelainn.carney@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Jonathan R. Hornok**
U.S. DEPARTMENT OF JUSTICE
Narcotic and Dangerous Drug Section
145 N Street, NE
Ste 2e300
Washington, DC 20530
202-913-4796
Email: jonathan.hornok@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/18/2025 | 1 | COMPLAINT as to KEVONTAE STEWART (1). (Attachments: # 1 Statement of Facts) (zmcg) (Entered: 09/18/2025) |
| 09/18/2025 | | Arrest of KEVONTAE STEWART. (znjb) (Entered: 09/18/2025) |
| 09/18/2025 | 3 | Arrest Warrant Returned Executed on 9/18/2025 as to KEVONTAE STEWART. (znjb) (Entered: 09/18/2025) |
| 09/18/2025 | | MINUTE ORDER as to KEVONTAE STEWART: As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland and its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges and |

| | | |
|---|---|---|
| | | contempt proceedings. Signed by Magistrate Judge Zia M. Faruqui on 9/18/2025. (znjb) (Entered: 09/18/2025) |
| 09/18/2025 | 5 | NOTICE OF ATTORNEY APPEARANCE: H. Heather Shaner appearing for KEVONTAE STEWART (Shaner, H.) (Entered: 09/18/2025) |
| 09/18/2025 | | ORAL MOTION to Appoint Counsel by KEVONTAE STEWART. (znjb) (Entered: 09/19/2025) |
| 09/18/2025 | | ORAL MOTION for Temporary Detention by USA as to KEVONTAE STEWART. (znjb) (Entered: 09/19/2025) |
| 09/18/2025 | | Minute Entry for proceedings held before Magistrate Judge Zia M. Faruqui: Return on Arrest Warrant/Initial Appearance as to KEVONTAE STEWART held on 9/18/2025. The Court advised the Government of its Due Process Obligations under Rule 5(f). Oral Motion to Appoint Counsel as to KEVONTAE STEWART; heard and granted. Oral Motion by the Government for Temporary Detention (3 day hold) as to KEVONTAE STEWART; heard and granted. Detention Hearing set for 9/19/2025 at 1:30 PM in Courtroom 7- In Person before Magistrate Judge Matthew J. Sharbaugh. Medical/Mental Health Alert issued to the Department of Corrections Medical Unit as to KEVONTAE STEWART. Bond Status of Defendant: Defendant Held Without Bond; Court Reporter: FTR- GOLD; FTR Time Frame: CRTM 4: [3:50:39-4:03:40]; Defense Attorney: Heather Shaner; US Attorney: Caelainn Carney; Pretrial Officer: Britney Dahlkoetter. (znjb) (Entered: 09/19/2025) |
| 09/19/2025 | 6 | MEMORANDUM in Support of Pretrial Detention by USA as to KEVONTAE STEWART (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5) (Carney, Caelainn) (Entered: 09/19/2025) |
| 09/19/2025 | | ORAL MOTION to Commit Defendant to Custody of Attorney General by USA as to KEVONTAE STEWART. (znjb) (Entered: 09/19/2025) |
| 09/19/2025 | | ORAL MOTION for Release from Custody by KEVONTAE STEWART. (znjb) (Entered: 09/19/2025) |
| 09/19/2025 | | ORAL MOTION for Speedy Trial by USA as to KEVONTAE STEWART. (znjb) (Entered: 09/19/2025) |
| 09/19/2025 | | Minute Entry for proceedings held before Magistrate Judge Matthew J. Sharbaugh: Detention Hearing as to KEVONTAE STEWART held on 9/19/2025. Oral Motion by the Government to Commit Defendant to Custody of Attorney General as to KEVONTAE STEWART; heard and granted. Oral Motion for Release from Custody as to KEVONTAE STEWART; heard and denied. Oral Motion by the Government for Speedy Trial as to KEVONTAE STEWART; heard and denied. Preliminary Hearing set for 9/30/2025 at 9:30 AM in Courtroom 4- In Person before Magistrate Judge Zia M. Faruqui. Medical/Mental Health Alert issued to the Department of Corrections Medical Unit as to KEVONTAE STEWART. Bond Status of Defendant: Defendant Committed/Commitment Issued; Court Reporter: FTR- GOLD; FTR Time Frame: CRTM 7: [1:39:48-2:11:39][RECESS: 2:11:40-2:30:10][2:30:11-2:44:10]; Defense Attorney: Heather Shaner; US Attorney: Caelainn Carney; Pretrial Officer: Lakeisha Forbes; Witness: Proposed 3rd Party Custodian: Tara Heard- Cousin. (znjb) (Entered: 09/19/2025) |
| 09/19/2025 | 10 | ORDER OF DETENTION PENDING TRIAL - Defendant Held Without Bond as to KEVONTAE STEWART. Signed by Magistrate Judge Matthew J. Sharbaugh on 9/19/2025. (zltp) (Entered: 09/26/2025) |
| 09/21/2025 | 7 | NOTICE *of Discovery* by USA as to KEVONTAE STEWART (Carney, Caelainn) (Entered: 09/21/2025) |

| | | |
|---|---|---|
| 09/26/2025 | 9 | Report of a Grand Jury's Failure to Concur in an Indictment by USA as to KEVONTAE STEWART. (zltp) (Entered: 09/26/2025) |
| 09/26/2025 | | NOTICE OF HEARING as to KEVONTAE STEWART: Emergency Status Hearing set for 9/26/2025 at 3:30 PM in Telephonic/VTC before Magistrate Judge Matthew J. Sharbaugh. (zltp) (Entered: 09/26/2025) |
| 09/26/2025 | | ORAL MOTION to Dismiss Case by KEVONTAE STEWART. (zltp) (Entered: 09/26/2025) |
| 09/26/2025 | | ORAL MOTION for Release from Custody by KEVONTAE STEWART. (zltp) (Entered: 09/26/2025) |
| 09/26/2025 | | Minute Entry for proceedings held before Magistrate Judge Matthew J. Sharbaugh: Emergency Status Hearing as to KEVONTAE STEWART held on 9/26/2025. Defendant's presence waived for purposes of this matter. Oral Motion to Dismiss Case as to KEVONTAE STEWART (1); heard and denied, for reasons stated on the record. Oral Motion for Release from Custody as to KEVONTAE STEWART (1); heard and granted. Status Hearing set for 9/29/2025 at 12:30 PM in Courtroom 7- IN PERSON before Magistrate Judge Matthew J. Sharbaugh. Bond Status of Defendant: Defendant Release/Release Issued; Court Reporter: FTR Gold; FTR Time Frame: CTRM 7: [3:31:40 - 3:48:49]; Defense Attorney: Heather Shaner; US Attorney: Caelainn Carney; Pretrial Officer: Da'Shanta Lewis. (zltp) (Entered: 09/26/2025) |
| 09/29/2025 | | Minute Entry for proceedings held before Magistrate Judge Matthew J. Sharbaugh: Status Hearing as to KEVONTAE STEWART held on 9/29/2025. Defendant present in court and sworn into Conditions of Release. Preliminary Hearing set for 10/9/2025 at 11:30 AM in Courtroom 5- In Person before Magistrate Judge Moxila A. Upadhyaya. Bond Status of Defendant: Defendant remain on Personal Recognizance; Court Reporter: FTR Gold; FTR Time Frame: CTRM 7: [12:40:47 - 12:57:43]; Defense Attorney: Heather Shaner; US Attorney: Jacob Green for Caelainn Carney; Pretrial Officer: Da'Shanta Lewis. (zltp) (Entered: 09/29/2025) |
| 09/29/2025 | 11 | ORDER Setting Conditions of Release as to KEVONTAE STEWART (1): Personal Recognizance. Signed by Magistrate Judge Matthew J. Sharbaugh on 9/29/2025. (Attachments: # 1 Appearance Bond) (zltp) (Entered: 09/29/2025) |
| 09/29/2025 | 12 | ORDER as to KEVONTAE STEWART. Signed by Magistrate Judge Zia M. Faruqui on 9/29/2025. (znjb) (Main Document 12 replaced on 9/30/2025) (ztl). (Entered: 09/29/2025) |
| 10/01/2025 | 13 | TRANSCRIPT OF STATUS CONFERENCE in case as to KEVONTAE STEWART before Magistrate Judge Matthew J. Sharbaugh held on September 29, 2025; Page Numbers: 1-13. Date of Issuance: October 1, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354-3246, Transcripts may be ordered by submitting the [Transcript Order Form](#)<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

| | | |
|---|---|---|
| | | Redaction Request due 10/22/2025. Redacted Transcript Deadline set for 11/1/2025. Release of Transcript Restriction set for 12/30/2025.(Reeves, Sonja) (Entered: 10/01/2025) |
| 10/02/2025 | 14 | TRANSCRIPT OF GRAND JURY RETURN in case as to KEVONTAE STEWART before Magistrate Judge Zia M. Faruqui held on September 29, 2025; Page Numbers: 1-9. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 10/23/2025. Redacted Transcript Deadline set for 11/2/2025. Release of Transcript Restriction set for 12/31/2025.(Reeves, Sonja) (Entered: 10/02/2025) |
| 10/02/2025 | 15 | RESPONSE TO ORDER OF THE COURT by USA as to KEVONTAE STEWART re 12 Order *(Emergency Request to Vacate)* (Hornok, Jonathan) (Entered: 10/02/2025) |
| 10/02/2025 | | MINUTE ORDER as to KEVONTAE STEWART (1) re 15 Response to Order of the Court filed by USA : The Court ORDERS a hearing set for October 3, 2025, at 02:30 PM in Courtroom 22A- In Person before Chief Judge James E. Boasberg. So ORDERED by Chief Judge James E. Boasberg on 10/3/2025. (znbn) (Entered: 10/02/2025) |
| 10/03/2025 | 16 | SUPPLEMENT by USA as to KEVONTAE STEWART re 15 Response to Order of the Court (Attachments: # 1 Exhibit The transcript of the grand jury return proceeding before Magistrate Judge Zia M. Faruqui on September 29, 2025, # 2 Exhibit The New York Times article titled In Unusual Move, Prosecutors Secure Federal Charges From Local Grand Jury: A judge, Zia M. Faruqui, said that what appeared to be a kind of grand jury forum shopping seemed to have broken decades-long norms and the rule of law, which was published on September 20, 2025, and which quotes Judge Faruqui, # 3 Exhibit The New York Times article titled Judges Openly Doubt Government as Justice Dept. Misleads and Dodges Orders: Legal experts say the actions causing concern from the bench could have a more systemic effect, eroding the healthy functioning of the courts, which was published on August 4, 2025, and which quotes Judge Faruqui, # 4 Exhibit The federal indictment returned by a Superior Court grand jury in United States v. Seals, No. 95-CR-0284 (D.D.C. Oct. 31, 1995), ECF 1, # 5 Exhibit The federal indictment returned by a Superior Court grand jury in United States v. Clark, No. 18-cr-338 (D.D.C. Nov. 15, 2018), ECF 6, # 6 Exhibit The federal indictment returned by a Superior Court grand jury in United States v. Clark, No. 18-cr-338 (D.D.C. Nov. 15, 2018), ECF 6)(Hornok, Jonathan) (Entered: 10/03/2025) |
| 10/03/2025 | | MINUTE ORDER as to KEVONTAE STEWART (1): As this is a criminal proceeding, no public access line will be available. Members of the public may attend the hearing in person. So ORDERED by Chief Judge James E. Boasberg on 10/3/2025. (znbn) (Entered: 10/03/2025) |
| 10/03/2025 | | Minute Entry for Motion Hearing held on 10/3/2025 before Chief Judge James E. Boasberg: As set forth on the record after oral argument, the Court will DENY 15 Response to Order of the Court filed by USA. Bond Status of Defendant: NOT |

| | | |
|---|---|---|
| | | PRESENT/PRESENCE WAIVED; Court Reporter: Tammy Nestor; Defense Attorney: Michelle Peterson; US Attorney: Jonathan Hornok. (znbn) (Entered: 10/03/2025) |
| 10/03/2025 | 17 | RESPONSE TO ORDER OF THE COURT by USA as to KEVONTAE STEWART re 12 Order (Hornok, Jonathan) (Entered: 10/03/2025) |
| 10/07/2025 | 18 | NOTICE OF ATTORNEY APPEARANCE: Michelle M. Peterson appearing for KEVONTAE STEWART (Peterson, Michelle) (Entered: 10/07/2025) |
| 10/07/2025 | 19 | NOTICE OF ATTORNEY APPEARANCE: Matthew Farley appearing for KEVONTAE STEWART (Farley, Matthew) (Entered: 10/07/2025) |
| 10/07/2025 | 20 | NOTICE *of Discovery* by USA as to KEVONTAE STEWART (Carney, Caelainn) (Entered: 10/07/2025) |
| 10/07/2025 | 21 | RESPONSE TO ORDER OF THE COURT by KEVONTAE STEWART re 12 Order (Farley, Matthew) (Entered: 10/07/2025) |
| 10/08/2025 | | Set/Reset Hearings as to KEVONTAE STEWART: Preliminary Hearing set for 10/9/2025 at 11:30 AM in Courtroom 4- In Person before Magistrate Judge Zia M. Faruqui. (ztl) (Entered: 10/08/2025) |
| 10/08/2025 | 22 | MOTION for Disclosure *6(e) permission* by USA as to KEVONTAE STEWART. (Carney, Caelainn) (Entered: 10/08/2025) |
| 10/08/2025 | 23 | REPLY by USA as to KEVONTAE STEWART re 21 Response to Order of the Court (Hornok, Jonathan) (Entered: 10/08/2025) |
| 10/09/2025 | | Minute Entry for proceedings held before Magistrate Judge Zia M. Faruqui: Status Hearing as to KEVONTAE STEWART held on 10/9/2025. The Government will seek an appeal before the Chief Judge. The Preliminary Hearing will be 'STAYED' pending appeal. Opinion forthcoming. Bond Status of Defendant: Defendant Remain on Personal Recognizance; Court Reporter: FTR-GOLD; FTR Time Frame: CTRM 4: [11:52:32-12:07:11]; Defense Attorney: Heather Shaner, Shelli Peterson, Matthew Farley; US Attorney: Caelainn Carney; Pretrial Officer: Da'Shanta Lewis; Court Reporter: Christine Asif. (ztl) (Entered: 10/09/2025) |
| 10/09/2025 | 24 | ORDER as to KEVONTAE STEWART. Signed by Magistrate Judge Zia M. Faruqui on 10/9/2025. (znjb) (Entered: 10/09/2025) |
| 10/14/2025 | | MINUTE ORDER as to KEVONTAE STEWART: At the October 9, 2025 hearing, the Pretrial Services Agency informed the court that the defendant was no longer requesting to change his place of residence to North Carolina. As such the conditions of supervision are modified to remain as initially ordered. Defendant is to stay at the residence where he is currently residing. All other conditions of release remain as originally ordered. Signed by Magistrate Judge Zia M. Faruqui on 10/14/2025. (zltp) (Entered: 10/14/2025) |
| 10/14/2025 | 25 | MOTION TO REVIEW JUDGE FARUQUIS ORDER REFUSING TO ACCEPT A GRAND JURY RETURN by USA as to KEVONTAE STEWART re 24 Order *(Request for review by the Chief Judge)* (Hornok, Jonathan) Modified event type and text on 10/15/2025 (zmcg). (Entered: 10/14/2025) |
| 10/15/2025 | 26 | NOTICE *of Proposed Briefing Schedule* by KEVONTAE STEWART (Farley, Matthew) (Entered: 10/15/2025) |
| 10/16/2025 | | MINUTE ORDER as to KEVONTAE STEWART (1): Pursuant to the 26 Proposed Briefing Schedule, the Court ORDERS that: 1) Defendant shall file any response to the Government's 25 Motion by October 20, 2025; 2) The Government shall file any reply by October 23, 2025; and 3) The parties shall appear for a hearing on October 28, 2025, at |

**A006**

| | | |
|---|---|---|
| | | 2:30 p.m. So ORDERED by Chief Judge James E. Boasberg on 10/16/2025. (znbn) (Entered: 10/16/2025) |
| 10/17/2025 | 27 | NOTICE *of Discovery* by USA as to KEVONTAE STEWART (Carney, Caelainn) (Entered: 10/17/2025) |
| 10/20/2025 | 28 | RESPONSE by KEVONTAE STEWART re 25 MOTION to Review (Farley, Matthew) (Entered: 10/20/2025) |
| 10/23/2025 | 29 | REPLY in Support by USA as to KEVONTAE STEWART re 25 MOTION to Review (Hornok, Jonathan) (Entered: 10/23/2025) |
| 10/23/2025 | 30 | NOTICE *of Exhibit* by USA as to KEVONTAE STEWART re 29 Reply in Support (Hornok, Jonathan) (Entered: 10/23/2025) |
| 10/28/2025 | 31 | MOTION Waive IN Person Apperance at Hearing by KEVONTAE STEWART. (Shaner, H.) (Entered: 10/28/2025) |
| 10/28/2025 | | MINUTE ORDER as to KEVONTAE STEWART (1), GRANTING 31 Motion Waive in Person Appearance at Hearing. So ORDERED by Chief Judge James E. Boasberg on 10/28/2025. (znbn) (Entered: 10/28/2025) |
| 10/28/2025 | | Minute Entry for proceedings held before Chief Judge James E. Boasberg: Motion Hearing as to KEVONTAE STEWART (1) held on 10/28/2025 re 25 MOTION to Review filed by USA. Oral argument heard; motion taken under advisement. Bond Status of Defendant: NOT PRESENT / PRESENCE WAIVED; Court Reporter: Tammy Nestor; Defense Attorney: Matthew Farley and Michelle Peterson; US Attorney: Jonathan Hornok. (znbn) (Entered: 10/28/2025) |
| 10/29/2025 | 32 | TRANSCRIPT OF PROCEEDINGS in case as to KEVONTAE STEWART before Chief Judge James E. Boasberg held on 10/28/25; Page Numbers: 1-28. Court Reporter/Transcriber Tammy Nestor, tammy_nestor@dcd.uscourts.gov, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 11/19/2025. Redacted Transcript Deadline set for 11/29/2025. Release of Transcript Restriction set for 1/27/2026.(Nestor, Tammy) (Entered: 10/29/2025) |
| 11/12/2025 | 33 | Consent MOTION for Protective Order *Grand Jury* by USA as to KEVONTAE STEWART. (Carney, Caelainn) (Entered: 11/12/2025) |
| 11/12/2025 | 34 | MOTION for Bond *Modification to Permit Travel for Thanksgiving* by KEVONTAE STEWART. (Shaner, H.) (Entered: 11/12/2025) |
| 11/12/2025 | 35 | ORDER as to KEVONTAE STEWART (1), granting 33 Motion for Protective Order. Signed by Chief Judge James E. Boasberg on November 12, 2025. (znbn) (Entered: 11/12/2025) |

| | | |
|---|---|---|
| 11/12/2025 | 36 | ORDER as to KEVONTAE STEWART (1), granting 22 Motion for Disclosure. Signed by Chief Judge James E. Boasberg on November 12, 2025. (znbn) (Entered: 11/13/2025) |
| 11/13/2025 | | NOTICE OF HEARING as to KEVONTAE STEWART: Motion Hearing set for 11/14/2025 at 11:00 AM in Courtroom 7- In Person before Magistrate Judge Matthew J. Sharbaugh. (znjb) (Entered: 11/14/2025) |
| 11/14/2025 | | Minute Entry for proceedings held before Magistrate Judge Matthew J. Sharbaugh: Motion Hearing as to KEVONTAE STEWART held on 11/14/2025. Defense 34 Motion for Bond Modification to Permit Travel for Thanksgiving as to KEVONTAE STEWART; heard and granted. Minute Order to be issued. Bond Status of Defendant: Defendant remain on Personal Recognizance/HISP; Court Reporter: FTR- GOLD; FTR Time Frame: CRTM 7: [11:02:54-11:15:40]; Defense Attorney: Heather Shaner; US Attorney: Caelainn Carney; Pretrial Officer: Da'Shanta Lewis; Witness: Tequanitha Stewart- Mother. (znjb) (Entered: 11/14/2025) |
| 11/14/2025 | | MINUTE ORDER as to KEVONTAE STEWART (1): For the reasons stated in the motion and on the record, the Court GRANTS Defendant's 34 motion to permit travel. Mr. Stewart's conditions of release are modified for the limited and temporary purpose of permitting him to travel to his mother's residence in Concord, North Carolina for the upcoming Thanksgiving holiday, leaving November 25 and returning to Washington, DC on November 30, 2025. Mr. Stewart must coordinate in advance with PSA concerning his departure and arrival times on the dates of travel. SO ORDERED. Signed by Magistrate Judge Matthew J. Sharbaugh on 11/14/2025. (znjb) (Entered: 11/14/2025) |
| 11/20/2025 | 37 | STAYED PURSUANT TO THE MINUTE ORDER ISSUED ON 11/24/2025.....ORDER as to KEVONTAE STEWART (1): As set forth in the accompanying Memorandum Opinion, the Court ORDERS that: 1) The Government's 25 Motion to Review the Order Refusing to Accept a Grand Jury Return is GRANTED; and 2) The Magistrate Judge on criminal duty shall accept the indictment in this matter. Signed by Chief Judge James E. Boasberg on November 20, 2025. (znbn) Modified on 11/24/2025 (znbn). (Entered: 11/20/2025) |
| 11/20/2025 | 38 | MEMORANDUM OPINION as to KEVONTAE STEWART re 37 Order. Signed by Chief Judge James E. Boasberg on November 20, 2025. (znbn) (Entered: 11/20/2025) |
| 11/21/2025 | 39 | MOTION to Stay *Order of the Court* by KEVONTAE STEWART. (Farley, Matthew) (Entered: 11/21/2025) |
| 11/21/2025 | | MINUTE ORDER as to KEVONTAE STEWART (1): The Court ORDERS that the Government shall file any Response to Defendant's 39 Motion to Stay by November 24, 2025, at 12:00 noon. So ORDERED by Chief Judge James E. Boasberg on November 21, 2025. (znbn) (Entered: 11/21/2025) |
| 11/21/2025 | 40 | Memorandum in Opposition by USA as to KEVONTAE STEWART re 39 MOTION to Stay *Order of the Court and Government's Motion for Hearing* (Carney, Caelainn) (Entered: 11/21/2025) |
| 11/24/2025 | | MINUTE ORDER as to KEVONTAE STEWART (1) : The Court ORDERS that Defendant's 39 Motion for Stay is GRANTED, and the Court's 37 Order shall be STAYED through December 1, 2025. The Court agrees with Defendant that the factors articulated in Nken v. Holder, 556 U.S. 418, 434 (2009), militate in favor of a brief stay. So ORDERED by Chief Judge James E. Boasberg on November 24, 2025. (znbn) (Entered: 11/24/2025) |
| 11/26/2025 | 41 | NOTICE OF APPEAL (Interlocutory) by KEVONTAE STEWART re 37 Order on Motion for Review,. Fee Status: No Fee Paid, Defendant is Represented by FPD. Parties have been notified. (Farley, Matthew) Modified text on 11/26/2025 (zmcg). (Entered: 11/26/2025) |

| | | |
|---|---|---|
| 11/26/2025 | 42 | MOTION to Stay *Pending Appeal* by KEVONTAE STEWART. (Peterson, Michelle) (Entered: 11/26/2025) |
| 11/26/2025 | 43 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The fee was not paid as the defendant is represented by FPD as to KEVONTAE STEWART re 41 Notice of Appeal - Interlocutory. (zmcg) (Entered: 11/26/2025) |
| 12/01/2025 | | MINUTE ORDER as to KEVONTAE STEWART (1): As the Government has indicated to chambers that it plans to file an opposition to Defendant's 42 Motion to Stay Pending Appeal by December 3, 2025, the Court ORDERS that its Stay shall be extended through December 8, 2025, so that the Court may rule on the Motion. So ORDERED by Chief Judge James E. Boasberg on December 1, 2025. (znbn) (Entered: 12/01/2025) |
| 12/02/2025 | 44 | Memorandum in Opposition by USA as to KEVONTAE STEWART re 42 MOTION to Stay *Pending Appeal* (Carney, Caelainn) (Entered: 12/02/2025) |
| 12/03/2025 | | USCA Case Number as to KEVONTAE STEWART 25-3115 for 41 Notice of Appeal - Interlocutory filed by KEVONTAE STEWART. (zmcg) (Entered: 12/04/2025) |
| 12/09/2025 | 45 | ORDER as to KEVONTAE STEWART (1): The Court, accordingly, ORDERS that: 1) Defendant's 42 Motion to Stay is GRANTED; and 2) The case is STAYED pending the issuance of the Mandate from the Court of Appeals. See attached Order for full details. Signed by Chief Judge James E. Boasberg on December 9, 2025. (znbn) (Entered: 12/09/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/30/2026 16:26:05 | | | |
| **PACER Login:** | dcxfp0112 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-mj-00225-ZMF |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| United States of America<br>v.<br>KEVONTAE STEWART<br>DOB: xx/xx/xxxx-PDID: xxx-xxx<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case: 1:25-mj-00225
Assigned To: Judge Faruqui, Zia M.
Assign. Date: 9/18/2025
Description: COMPLAINT W/ARREST WARRANT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____September 17, 2025_____ in the county of _____ in the _____ District of _____Columbia_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable of Imprisonment for a Term Exceeding One Year |

This criminal complaint is based on these facts:

SEE ATTACHED STATEMENT OF FACTS

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Samuel Zambrano-Mora, Officer, MPD
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by Telephone (specify reliable electronic means).

Date: _____09/18/2025_____

_____
*Judge's signature*

City and state: _____Washington, DC_____

Zia M. Faruqui, U.S. Magistrate Judge
*Printed name and title*

A010

## STATEMENT OF FACTS

On Wednesday, 09/17/2025, Officers of the Seventh District's Special Missions Unit (SMU) were working the initiative known as "Operation Law Enforcement Surge/DC Safe & Beautiful Task Force" along with Federal Agents from the ATF, FBI, DSS and U.S. Marshals. The following offenses occurred on the listed date and within the District of Columbia.

At approximately 2350 hours, Officers were patrolling the Unit block of Forrester Street S.W. when they observed a red Jeep SUV, bearing D.C. tag of JK0513, parked on the side of the street in front of 46 Forrester Street S.W. As officers drove closer to the Jeep, they noticed that it was idling, and upon stopping next to the vehicle, they observed the sole occupant of the vehicle taking a draw from what they recognized as a possible hand-rolled marijuana cigarette.

Officers exited their vehicle and made contact with Kevontae STEWART (hereinafter, STEWART) who was occupying the driver's seat of the Jeep. As STEWART rolled down the driver's window, Officers could see that the interior of the vehicle was filled with smoke, and they could smell the odor of burnt marijuana emanating from the vehicle. STEWART was advised that he cannot consume marijuana in public, which he acknowledged, and proceeded to discard the lit marijuana cigarette out of the window and onto the sidewalk.

STEWART was asked to exit the vehicle, and as he stepped out, ATF Agent N. Eltzroth asked STEWART if he has any weapons on him. STEWART immediately took flight on foot down Forrester Street toward South Capitol Street. Officers pursued STEWART and observed him reaching his arms toward the front of his body, near his beltline area. It should be noted that while some officers pursued STEWART, others remained with the Jeep to secure and preserve any possible evidence.

As MPD Officers Zumbrun and Zambrano chased STEWART, they observed him lose balance while running and fall to the ground, at which point he dropped a black pistol from his right hand. Officers then observed STEWART quickly reach over with his right hand and pick up the weapon, tossing it across South Capitol Street.

A011



*The Defendant Right After Tossing the Firearm*

Officers detained STEWART without further incident and secured the discarded firearm. The firearm information is the following:

Make: Smith and Wesson

Model: M&P 45

Serial Number: HVT1113

Caliber: .45 Auto

Ammunition: 11 total (10 from a 10-round magazine + 1 from the chamber)

**A012**



*Image of the Firearm on the Ground Where it Was Recovered*



*Image of Firearm in Officer's Hand*



*Image of the Magazine with Ammunition Inside*

The firearm appeared to be fully functional, able to be fired with one hand, had a barrel length less than 12 inches, and capable of expelling a projectile by means of explosion.

Through further investigation, officers learned that STEWART does not have a license to carry a pistol in the District of Columbia and does not have any registered firearms in this jurisdiction.

During the search incident to arrest of STEWART, Officer Killoran located a clear bag, tied up, containing what appeared to be white rock-like substance in STEWART's left cargo pocket. This substance was later field tested by Officer Killoran and yielded a positive color reaction for cocaine base. The total weight of this substance was 6.47 grams with packaging. The search incident to arrest also yielded U.S. Currency, in various small-bill denominations, totaling 350.00 U.S. Dollars. A black portable digital scale was also found on STEWART which had white rocky and powdery residue. Lastly, an I-Phone cellphone and a flip-style phone were also found on STEWART's person.

A search of the Jeep STEWART was occupying yielded a North Carolina driver's license in the center console with STEWART's biographical information and a Samsung phone that was plugged into the vehicle.

STEWART identified himself verbally and his identity was confirmed with law enforcement databases as well as the North Carolina driver's license in the vehicle he was occupying.

**A014**

A search of STEWART's criminal history revealed that in February of 2025, he received a suspended sentenced of over eight years in reference to Maryland case # C-08-CR-17-000209, making it unlawful for him to possess firearms. Accordingly, STEWART would have been aware that he was previously convicted of a crime punishable by a term of imprisonment exceeding one year at the time he was possessing the firearm and ammunition.

Your affiant is aware there are no firearm or ammunition manufacturers in the District of Columbia. Therefore, the ammunition described above necessarily traveled in interstate commerce before they were recovered in the District of Columbia.

As such, your affiant submits that probable cause exists to charge Kevontae STEWART with violation of 18 U.S.C. 922(g)(1) **(Unlawful Possession of a Firearm and Ammunition By a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year).**



Officer Samuel Zambrano-Mora
Metropolitan Police Department

Subscribed and sworn by telephone pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September 18, 2025.

Honorable Zia M. Faruqui
United States Magistrate Judge

**A015**

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

FID 10385278

**RECEIVED**
By USMS District of Columbia District Court at 1:20 pm, Sep 18, 2025

for the

District of Columbia

| | |
|---|---|
| United States of America<br>v.<br>KEVONTAE STEWART<br><br>*Defendant* | ) Case: 1:25-mj-00225<br>) Assigned To: Judge Faruqui, Zia M.<br>) Assign. Date: 9/18/2025<br>) Description: COMPLAINT W/ARREST WARRANT<br>) |

## ARREST WARRANT

To:      Any authorized law enforcement officer

YOU ARE COMMANDED to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     KEVONTAE STEWART                                                                                            ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment        ☐ Superseding Indictment        ☐ Information        ☐ Superseding Information        ☑ Complaint
☐ Probation Violation Petition        ☐ Supervised Release Violation Petition        ☐ Violation Notice        ☐ Order of the Court

This offense is briefly described as follows:
  18 U.S.C. § 922(g)(1) - Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable
  by Imprisonment for a Term Exceeding One Year

Date:   09/18/2025

                                                                                         *Issuing officer's signature*

City and state:     Washington, DC                              Zia M. Faruqui, U.S. Magistrate Judge
                                                                                              *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* 09/18/25 , and the person was arrested on *(date)* 9/18/25 at *(city and state)* Washington DC . |
| Date: 9/18/25 |
| *Arresting officer's signature* |
| D. Stallman · DUSM |
| *Printed name and title* |

**A016**

AO 191 (Rev. 01/09)  Report of a Grand Jury's Failure to Concur in an Indictment

# UNITED STATES DISTRICT COURT
## for the
District of Columbia

United States of America )
v. )
Kevontae Stewart )   25-mj-225
)
)
_____ )

*Defendant*

## REPORT OF A GRAND JURY'S FAILURE TO CONCUR IN AN INDICTMENT

As the foreperson of the grand jury of this court at a session held at  _25-3_____  on

___09/26/2025_____ , I report that 12 or more grand jurors did not concur in finding an indictment in this case.

Under Fed. R. Crim. P. 6(c), this record is being filed with the court clerk and will *not* be made public unless the court orders otherwise.

Date:    09/26/2025_____

_____
*signature*

**A017**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on June 6, 2025

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | MAGISTRATE NO. 25-MJ-00225 |
| | : | |
| KEVONTAE STEWART, | : | VIOLATIONS: |
| | : | 18 U.S.C. § 922(g)(1) |
| Defendant. | : | (Unlawful Possession of a Firearm and |
| | : | Ammunition by a Person Convicted of a Crime |
| | : | Punishable by Imprisonment for a Term |
| | : | Exceeding One Year) |
| | : | |
| | : | FORFEITURE: |
| | : | 18 U.S.C. § 924(d); 21 U.S.C. § 853(p); and 28 |
| | : | U.S.C. §  2461(c) |
| | : | |

INDICTMENT

The Grand Jury charges that:

## COUNT ONE

On or about September 17, 2025, within the District of Columbia, **KEVONTAE STEWART**, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in the Circuit Court for Charles County Maryland, Criminal Case No. C-08-CR-17-000209, did unlawfully and knowingly receive and possess a firearm, that is, a Smith & Wesson M&P 45, .45 caliber semi-automatic pistol, and did unlawfully and knowingly receive and possess ammunition, that is, .45 caliber ammunition, which had been possessed, shipped and transported in and affecting interstate and foreign commerce.

(**Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year,** in violation of Title 18, United States Code, Section 922(g)(1))

**A018**

## FORFEITURE ALLEGATION

1.      Upon conviction of the offenses alleged in Count One of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), any firearms and ammunition involved in or used in the knowing commission of the offenses, including but not limited to a Smith & Wesson M&P 45, .45 caliber semi-automatic pistol and .45 caliber ammunition.

2.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    (a)      cannot be located upon the exercise of due diligence;

    (b)      has been transferred or sold to, or deposited with, a third party;

    (c)      has been placed beyond the jurisdiction of the Court;

    (d)      has been substantially diminished in value; or

    (e)      has been commingled with other property that cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

    **(Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 924(d), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c))

JEANINE FERRIS PIRRO                                        A TRUE BILL:
UNITED STATES ATTORNEY


By: _____                                        FOREPERSON.
GAURI GOPAL
ASSISTANT UNITED STATES ATTORNEY

2

**A019**

AO 472 (Rev. 11/16; DC 1/19) Order of Detention

# UNITED STATES DISTRICT COURT
for the
District of Columbia ▾

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Kevontae Stewart | ) Case No.    25-mj-225 |
| | ) |
| *Defendant* | ) |

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

Upon the

☑ Motion of the Government attorney pursuant to 18 U.S.C. § 3142(f)(1), or

❏ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted. This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II - Findings of Fact and Law as to Presumptions under § 3142(e)

❏ **A. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** *(previous violator)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

❏ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

❏ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

❏ **(b)** an offense for which the maximum sentence is life imprisonment or death; **or**

❏ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

❏ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; **or**

❏ **(e)** any felony that is not otherwise a crime of violence but involves:
**(i)** a minor victim; **(ii)** the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250; **and**

❏ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; **and**

❏ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a Federal, State, or local offense; **and**

❏ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

**A020**

AO 472 (Rev. 11/16; DC 1/19) Order of Detention

❒ **B. Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** *(narcotics, firearm, other offenses)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

   ❒ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

   ❒ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

   ❒ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

   ❒ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

   ❒ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

❒ **C. Conclusions Regarding Applicability of Any Presumption Established Above**

   ❒ The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis, with the evidence or argument presented by the defendant summarized in Part III.C.

   ❒ The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted for the reasons summarized in Part III.

   **OR**

   ❒ The defendant has not presented sufficient evidence to rebut the presumption. Moreover, after considering the presumption and the other factors discussed below, detention is warranted for the reasons summarized in Part III.

**Part III - Analysis and Statement of the Reasons for Detention**

A. After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven:

   ☑ By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

   ❒ By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

B. In addition to any findings made on the record at the hearing, the reasons for detention include the following:

   ☑ Weight of evidence against the defendant is strong

   ☑ Subject to lengthy period of incarceration if convicted

   ☑ Prior criminal history

   ☑ Participation in criminal activity while on probation, parole, or supervision

Page 2 of 4

**A021**

AO 472 (Rev. 11/16; DC 1/19) Order of Detention

☑ History of violence or use of weapons
❐ History of alcohol or substance abuse
❐ Lack of stable employment
❐ Lack of stable residence
❐ Lack of financially responsible sureties
❐ Lack of significant community or family ties to this district
❐ Significant family or other ties outside the United States
❐ Lack of legal status in the United States
❐ Subject to removal or deportation after serving any period of incarceration
❐ Prior failure to appear in court as ordered
❐ Prior attempt(s) to evade law enforcement
❐ Use of alias(es) or false documents
❐ Background information unknown or unverified
☑ Prior violations of probation, parole, or supervised release

## C.  OTHER REASONS OR FURTHER EXPLANATION:

The defendant's evidence/arguments for release:

As stated on the record.

Nature and circumstances of offense:

As stated on the record.

The strength of the government's evidence:

As stated on the record.

**A022**

The defendant's history and characteristics, including criminal history:

As stated on the record.

The defendant's dangerousness/risk of flight:

As stated on the record.

**Part IV – Directions Regarding Detention**

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date: _____09/19/2025 *nunc pro tunc*_____     _____

<div align="center">

United States Magistrate Judge
The Honorable Matthew J. Sharbaugh

</div>

<div align="center">

**A023**

</div>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 25-mj-225 (ZMF)** |
| **KEVONTAE STEWART,** | |
| **Defendant.** | |

## <u>ORDER</u>

A federal grand jury refused to return an indictment in this case. *See* ECF 9. This was once unheard of, but has become common as of late.[1]

Typically, when a *federal* grand jury refuses to return an indictment in a case, either the government takes the message as a warning to go no further or, hopefully in only the rarest of cases, presents the indictment again to another *federal* grand jury.

To this judge's knowledge, what has never happened before is doing an end run around the federal grand jury completely. Yet that is what has happened today.

---

[1] Until last week, the Court was unaware that a form even existed for this filing. That is because prior to a month ago, there was never a need to repeatedly return no bill indictments. What has changed between now and then are the types of cases prosecutors are bringing to federal court— many with apparent Constitutional violations. *See, e.g.*, *United States v. Torez Riley*, 25-mj-154. Indeed, earlier this month, the government indicted a case via a federal grand jury months after prosecutors refused to formally charge it. At the detention hearing, the prosecutor admitted that the reason for the initial declination was the self-evident "Fourth Amendment issues." *See United States v. Richard Thompson*, 25-cr-271. Even there, the government followed longstanding norms and Rule 6 by taking its chances with a federal grand jury.

**A024**

Today, prosecutors again presented a single count federal indictment against the defendant, but this time before a Superior Court grand jury. After receiving a true bill from that local grand jury, prosecutors sought to return the federal indictment in federal court. At a minimum, this is very unseemly; more than likely, it is unlawful. Not to mention, this only deepens the growing mistrust of the actions of prosecutors. That is a sentiment that was once unthinkable, but the irregular is now the regular. *See Fed. Educ. Ass'n v. Trump*, No. 25-1362, 2025 WL 2355747, at *11 (D.D.C. Aug. 14, 2025) (Judge Friedman, a renowned former prosecutor and judge, recently collected cases addressing this topic, and concluded that "[i]n just six months, the President of the United States may have forfeited the right to [] a presumption of regularity."). Prosecutors used to not look for loopholes. They sought justice and respected the decisions of juries, favorable or not.[2]

The preliminary hearing in this matter is set for October 9, 2025. Multiple federal grand juries sit between now and then.[3] Why not go back before one of those federal grand juries?

"Historically, [the grand jury] has been regarded as the primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." *Wood v. Georgia*, 370 U.S. 375, 390 (1962).

---

[2] Indeed, the ABA Model Code of Professional Responsibility EC 7-13 states that "[t]he responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict." It is particularly surprising that the government was willing to sacrifice its credibility for an indictment at any cost in a run-of-the-mill case such as this.

[3] At the hearing, the government noted that they previously relied on Superior Court grand juries to charge federal cases when federal grand juries were unavailable during the COVID-19 pandemic. This is a far cry from what happened today. Here, federal grand juries—plural—were available, unlike during COVID-19 when there were none at times. And in none of those cases had a federal grand jury already refused to return an indictment.

**A025**

These words from the Supreme Court are haunting given what is before the Court today. The undersigned will not rubberstamp the breaking of decades-long norms and the rule of law. As such, the Court refused to take the grand jury return—another first in this District.

The parties are hereby ORDERED to provide briefing as to whether this Court has jurisdiction to return a federal indictment on only federal charges returned by a local grand jury. The government shall file its brief in support by October 3, 2025. Defense counsel shall file any objections by October 7, 2025.[4] The Court will hold a hearing on this matter on October 9, 2025, at 11:30 a.m.

Date: September 30, 2025

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

---

[4] Because this is a novel matter raising complex questions, the Court appoints the Federal Public Defender's Office, despite its already crushing caseload, to act as co-counsel in this matter.

**A026**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**KEVONTE STEWART,**<br>**Defendant.** | **Case No. 1:25-MJ-225** |

### EMERGENCY REQUEST TO VACATE MAGISTRATE JUDGE FARUQUI'S SEPTEMBER 29 ORDER REFUSING TO ACCEPT A GRAND JURY RETURN (ECF 12)

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, for the reasons described below, respectfully requests emergency review by the Chief Judge of the erroneous and legally unsupported order by Magistrate Judge Zia M. Faruqui, dated September 29, 2025, in which he "refused to take [a] grand jury return" from the foreperson of a Superior Court grand jury, ECF 12 at 3, and wrongfully accused the government, in front of the foreperson, of misconduct and unlawfulness.

Magistrate Faruqui's actions are legally unsupported, are inflammatory, have already interfered with and tainted the community's grand juries, and show a clear bias against the Government that is not based in rational or objective facts. To the contrary, the U.S. Attorney's Office has used Superior Court grand juries to return federal indictments for decades and the practice is well-supported in black-latter law. Simply put Judge Faruqui has chosen to ignore the law.

The United States requests that this Court vacate Judge Faruqui's order, strike it from the record, and order him to receive the indictment returned by the Superior Court grand jury in this case. The United States further requests that this Court cure Judge Faruqui's inflammatory misstatements of law and improper conduct by including the following in its order to vacate, which can be presented to the now tainted Grand Jury: (1) the request by the U.S. Attorney's Office for the Superior Court grand jury to return a federal indictment was entirely legal and has been a proper practice for decades; (2) the U.S. Attorney had the authority to represent the matter to any grand jury in this district after another grand jury declined to return an indictment; (3) the U.S. Attorney's Office had no duty to inform the grand jury of the actions of any prior grand jury that had considered the case; and (4) Judge Faruqui's comments before the grand jury foreperson were improper, legally and factually unsupported, and should be disregarded.

This Court has the authority to vacate Judge Faruqui's Order and order Judge Faruqui to accept the returned indictment pursuant to Local Rule 57.14. The D.C. Circuit held in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), that pursuant to D.C. Code § 11-1916 a Superior Court grand jury is empowered to return an indictment to this Court. Judge Faruqui has unlawfully usurped the Article III power of District Court Judges to review and dismiss indictments, the Article II power of the Executive to present cases to whatever competent grand jury it wishes, and the

power that the Congress[1] gave to the Superior Court grand jury to "take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts," D.C. Code § 11-1916.

This matter is ripe for emergency review because the adversarial briefing and appointment of amicus curiae ordered by Judge Faruqui are not authorized by the Federal Rules of Criminal Procedure and the holdings of the Supreme Court. The law contemplates a grand jury returning an indictment to a federal magistrate judge, Fed. R. Crim. P. 6(f), the defendant being arraigned on that indictment, Fed. R. Crim. P. 10, the defendant filing any motions to dismiss the indictment, Fed. R. Crim. P. 12, and the assigned District Judge ruling on any dispositive motions, *United States v. Raddatz*, 447 U.S. 667, 676 (1980). Ignoring the law, Judge Faruqui has invented a procedure whereby he, as a magistrate judge can, *sua sponte*, refuse to accept an indictment returned by a grand jury and, *sua sponte*, order adversarial briefing and appoint co-counsel to address a dispositive matter before the case reaches the bench of a District Judge. This Court cannot allow this improper practice to proceed any further.

Judge Faruqui's order and on-the-record comments, in front of the grand jury foreperson, also violate the cannons of judicial conduct and require curative action to remedy his widely disseminated, disparaging comments. The foreperson of the Superior Court grand jury heard Judge Faruqui's comments in open court, which

---

[1] The Congress granted the Superior Court grand juries this authority in 1986. An Act to establish an independent jury system for the Superior Court of the District of Columbia, Pub. L. No. 99-650, § 1916, 100 Stat. 3635 (1986).

certainly tainted the grand jury, and other grand jurors in this district have certainly read Judge Faruqui's false accusation that the U.S. Attorney's Office has "[m]ore than likely" acted "unlawfully," which was published in the New York Times.[2] Judge Faruqui's order and comments suggest that his "impartiality might reasonably be questioned." Pursuant to cannon 3(B)(6) of the Code of Conduct for United States Judges, this Court has a duty to "take appropriate action upon receipt of reliable information indicating the likelihood that [Judge Faruqui's] conduct contravened this Code."[3]

## I. BACKGROUND

On September 18, 2025, Judge Faruqui issued the criminal complaint in this case, finding that there was probable cause to believe that the defendant unlawfully possessed a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). ECF 1. The same day, the defendant appeared before Judge Faruqui for his initial appearance. The next day, September 19, 2025, Magistrate Judge Matthew J. Sharbaugh ordered the defendant detained, finding him to be a danger to the community, and set a preliminary hearing in this matter for Tuesday, September 30, 2025, at 9:30 AM.

On Friday, September 26, 2025, Grand Jury 25-3 in the United States District Court declined to return an indictment charging the defendant with the violation of

---

[2] Alan Feuer, *In Unusual Move, Prosecutors Secure Federal Charges From Local Grand Jury*, NY Times (Sept. 30, 2025), *available at* https://www.nytimes.com/2025/09/30/us/politics/federal-charges-grand-jury-dc.html.

[3] CODE OF CONDUCT FOR UNITED STATES JUDGES, 3(B)(6), *available at*, https://www.uscourts.gov/administration-policies/judiciary-policies/ethics-policies/code-conduct-united-states-judges#b Canon 3(B)(5) (the "Canons").

18 U.S.C. § 922(g)(1). ECF 9. The same day, the foreperson appeared in Court before Judge Sharbaugh to report the lack of concurrence pursuant to rule 6(f) of the Federal Rules of Criminal Procedure. And then Judge Sharbaugh held an emergency status hearing and released the defendant at defense counsel's request. In light of the defendant's release, the government requested that the preliminary hearing be moved from September 30, 2025, to October 8 or 9, 2025. *See* Fed. R. Crim. P. 5.1(c). The Court declined to do so at that time, but set a hearing on Monday, September 29, 2025, at 12:30 PM, to swear the defendant into release conditions and consider the government's request.[4] Also on Friday, September 26, 2025, the government contacted the clerk's office and Judge Faruqui's chambers, advising that it expected to present the case to a grand jury empaneled in the Superior Court for the District of Columbia and requesting that the court be prepared to receive an indictment if one was returned. The government cited D.C. Code § 11-1916 as the basis for its request.

On September 29, 2025, the government presented the case to Superior Court grand jury September 4, pursuant to D.C. Code § 11-1916, and the grand jury voted to return the indictment. That same afternoon, the government appeared before Judge Faruqui with the foreperson to return the indictment. During the hearing, the AUSA presented the legal authority for the Superior Court grand jury to return the indictment, including D.C. Code § 11-1916, *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), *United States v. Brown*, No. 07-75, 2007 WL 2007513, at *1 (D.D.C. July

---

[4] On the afternoon of September 29, 2025, the Court continued the preliminary hearing to October 9, 2025.

9, 2007), *United States v. Allen*, 729 F. Supp. 120 (D.D.C. 1989), and the federal indictment returned to this Court by a Superior Court grand jury in *United States v. Clark*, 18-cr-338 (D.D.C. Nov. 15, 2018). Transcript, *United States v. Stewart*, 25-mj-225 (D.D.C. Sept. 29, 2025), at 2–4. After taking a recess to consider the legal authorities presented by the Unitied States, Judge Faruqui resumed the bench and declined to accept the return. Then in front of the foreperson, Judge Faruqui made multiple inflammatory comments, including stating, "Before today, before three weeks ago, if this would have happened, I wouldn't even have given it a second thought, but I am now in the unfortunate situation, as I have said before, I no longer trust that when prosecutors are coming forward, they are doing things because their managers want the right thing to be done." *Id*. at 8.

In his written order, Judge Faruqui reiterated his inflammatory points, appointed the Federal Public Defender as co-counsel, and ordered briefing. ECF 12.[5] Refusing to acknowledge any of the legal authority the United States cited, Judge Faruqui accused the United States of acting "very unseemly" and "more than likely . . . unlawful[y]" and of breaking "decades-long norms and the rule of law." *Id*. at 2–3. The sad irony is that this practice is entirely lawful, has been accepted by Magistrate Faruqui's colleagues without incident, and has been used for over thirty-five years.

---

[5] The order questions why the government did not wait longer to seek an indictment and points to the October 9, 2025, date for the preliminary hearing. But Judge Faruqui ignores the fact that the United States sought to appear in the grand jury on September 29, 2025, before the preliminary hearing was moved to October 9, 2025.

## II. ARGUMENT

### A. *This Court has authority to review the order.*

The Rules of the United States District Court for the District of Columbia delineate the role of the Chief Judge in reviewing decisions of the magistrate judges and handling matters related to the grand jury. Local rule 57.14(b) states that "one of the duties of the Chief Judge is to empanel the grand jury and hear and determine all matters relating to proceedings before the grand jury." D.D.C. Ct. R. 57.14(b). It also assigns to the Chief Judge the duty to "hear and determine requests for review of rulings by magistrate judges in criminal matters not already assigned to a district judge." *Id.* at 57.14(e). Here, because the magistrate judge has issued an order and the underlying matter is not already assigned to a district judge, the Chief Judge should review it. Moreover, since the order directly implicates the grand jury's functioning, the Chief Judge is within his authority to "determine all matters relating to proceedings before the grand jury." *Id.* at 57.14(b).[6]

### B. *The Congress empowered Superior Court grand juries to return indictments to this Court.*

Rule 6(f) provides that following a vote to indict, "[t]he grand jury—or its foreperson or deputy foreperson—must return the indictment to a magistrate judge in open court." Fed. R. Crim. P. 6(f). Once the foreperson appears in open court to submit the return, the role of the grand jury is complete. *United States v. Michael,*

---

[6] This request is also consistent with the judicial canons applicable to any judge supervising a different judge. Canon 3(B)(5) provides that a "judge with supervisory authority over other judges should take reasonable measures to ensure that they perform their duties timely and effectively."

180 F.2d 55, 56 (3d Cir. 1949). The Rules of the United States District Court for the District of Columbia set forth in clear terms the "duty" of the magistrate judge to "receive indictments returned by the grand jury." D.D.C. Ct. R. 57.17(a)(5).

D.C. Code § 11-1916(a) states that "[a] grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts."

In *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), the D.C. Circuit held that section 1916 permitted a Superior Court grand jury to return an indictment to this Court. In that case, the United States secured an indictment alleging violations of federal law before a grand jury empaneled in the Superior Court. *See* Indictment, *United States v. Seals*, No. 95-cr-284 (D.D.C. Oct. 31, 1995), ECF 1. The defendant moved to dismiss the indictment on the basis that section 1916 was unconstitutional and that it "deprive[d] them of the constitutional safeguards associated with Article III supervision of federally-indicting grand juries." *Seals*, 130 F.3d at 456 n.3. The D.C. Circuit rejected this argument. The court acknowledged that "section 1916(a) is applicable only to the unique federal enclave." *Id.* at 457 (internal quotation marks omitted). But the court reasoned that "the power to supervise a federally-competent grand jury cannot fairly be described as an essential attribute of the judicial power of the United States." *Id.* at 459 (internal quotation marks omitted). The court concluded, "While the grand jury arrangement in the District of Columbia may be unique, 'our constitutional principles of separated powers are not violated . . . by mere anomaly or innovation.'" *Id.* at 460 (quoting *Mistretta v. United States*, 488 U.S. 361,

385 (1989)). More recently, section 1916 allowed a grand jury empaneled in the Superior Court for the District of Columbia to return an indictment in federal court. *See, e.g.,* Indictment, *United States v. Monroe*, 24-cr-321 (D.D.C. July 15, 2024), ECF 1; Indictment, *United States v. Clark*, 18-cr-338 (D.D.C. Nov. 15, 2018), ECF 6.

Judge Faruqui had no legal basis to decline to accept the indictment returned by the Superior Court grand jury pursuant to D.C. Code § 11-1916. The Superior Court grand jury—empaneled from the same body of citizens in the District of Columbia as the grand juries that sit in the federal courthouse, *see Seals*, 130 F.3d at 460—heard the evidence in the case and voted to indict the defendant. Consistent with rule 6(f), the foreperson appeared before Judge Faruqui on September 29, 2025, to return the indictment. The attendant paperwork was submitted to the Court for review.

As described above, this procedure has been used in *Seals* and in *Clark*. Any suggestion that the presentation of this case to a Superior Court grand jury amounts to forum shopping simply ignores the fact that the Congress, in section 1916, granted Superior Court grand juries the power to "take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts" and that the grand jurors empaneled in Superior Court and District Court come from the same pool of people.

Bottom line, Judge Faruqui attempts to draw a distinction between a "federal" and a "local" grand jury, but the Congress and the D.C. Circuit have held that there

is no such distinction. This Court should accordingly order Judge Faruqui to receive the indictment the Superior Court grand jury voted to return.

### C. Judge Faruqui has seized Article III power reserved for district judges.

"Congress made clear . . . that the magistrate acts subsidiary to and only in aid of the district court. Thereafter, the entire process takes place under the district court's total control and jurisdiction." *United States v. Raddatz*, 447 U.S. 667, 681 (1980); *see also Gonzalez v. United States*, 553 U.S. 242, 245 (2008). Thus, the power of the magistrate judge is limited. *United States v. Garcia*, 936 F.3d 1128, 1136 (10th Cir. 2019). Dispositive matters, such as the decision whether to dismiss an indictment, are within the purview of the Article III judge. *See Raddatz*, 447 U.S. at 676. A magistrate judge does not have the power to "dismiss or quash an indictment." 28 U.S.C. § 636(b)(1)(A).

By refusing to allow the Superior Court grand jury to return an indictment that is legally valid on its face,[7] Judge Faruqui's order is a functional end run around the authority of a district judge to dismiss—or refuse to dismiss—an indictment. In

---

[7] *Lawn v. United States*, 355 U.S. 339, 349 (1958) (declining to allow the inspection of grand jury minutes and stating "this Court has several times ruled that one indictment returned by a legally constituted nonbiased grand jury, like an information drawn by a prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment."); *Costello v. United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.").

issuing this order, Judge Faruqui ignored that he "acts subsidiary to and only in aid of the district court." *Raddatz*, 447 U.S. at 681.

The contrary result would allow a magistrate judge to abuse his limited role, dismissing an indictment he views as unseemly before it reaches the bench of a district judge. The Congress allows a magistrate judge to perform limited functions. *Gonzalez*, 553 U.S. at 245; 28 U.S.C. § 636. Here, Judge Faruqui's function—and duty— was to "receive" the indictment. D.D.C. Ct. R. 57.17(a)(5).

And to the extent that the defendant wishes to challenge the indictment, he has a mechanism to do so: he can file a motion to dismiss pursuant to rule 12(b)(3)(A)(v) before an Article III judge, allowing our adversarial, constitutionally delineated, process to play out. *United States v. Sutton*, No. CR 21-0598, 2022 WL 4653216, at *2 (D.D.C. Sept. 30, 2022). This Court should accordingly vacate Judge Faruqui's order appointing co-counsel and inviting briefing on this matter.

### D. Judge Faruqui has invaded the Article II power of the U.S. Attorney

The Executive branch enjoys the authority to submit charges to a new grand jury after another grand jury has refused to do so. *United States v. Williams*, 504 U.S. 36, 49 (1992) (citing *Ex parte United States*, 287 U.S. 241, 250–251 (1932)); *In re U.S.*, 441 F.3d 44, 63 (1st Cir. 2006) ("As one commentator has noted, '[t]he longstanding federal rule is that resubmissions [of an indictment after one grand jury refuses to indict] are permissible, without court approval, even when the prosecutor presents no additional evidence to the second grand jury.' 4 LaFave et al., *Criminal Procedure* § 15.2(h), at 284–85 (2d ed. 1999).") "Incidental to the functions confided in Article II

is 'the power to perform them, without obstruction or impediment.'" *Trump v. Vance*, 591 U.S. 786, 810 (2020) (citation and quotation omitted).

The Supreme Court has held that a U.S. Attorney is empowered to "present[] to one grand jury charges which a previous grand jury has ignored." *See United States v. Thompson*, 251 U.S. 407, 414–15 (1920).[8] In considering whether a judge could insert himself into the process and require judicial approval before a U.S. Attorney presented charges to a second grand jury, the Court held that such action "is so incompatible with the general principles governing the subject as to cause it to be, in substance, . . . a mere disregard or repudiation of the principles themselves." *Id.* at 414. In reaching this conclusion, the Supreme Court noted that the improper "exercise of judicial discretion" in controlling grand jury presentations would "destroy[]" the "right of the grand jury to consider" cases and U.S. Attorney's "coterminous" authority to present them. *Id.* at 415. Bottom line, Judge Faruqui has no authority to infringe the U.S. Attorney's right to present and represent charges to one or more grand juries.[9]

---

[8] The Supreme Court in *Thompson* also found fault with a lower court's dismissal of an indictment because "comprehensively considering the subject, the assertion of the judicial discretion which was the basis of the judgment below is incompatible with the spirit and purpose underlying the admitted principles as to the power of grand juries, and the right of the government to initiate prosecutions for crime, since in the case stated such powers are controlled, not by a rule of law, but depend upon a mere exercise of judicial discretion." *Id.*

[9] *See also United States v. Pabian*, 704 F.2d 1533, 1537 (11th Cir. 1983) ("The decision to resubmit is a matter of prosecutorial discretion not generally subject to judicial scrutiny.") (citing, inter alia, *United States v. Batchelder*, 442 U.S. 114, 124 (1979)).

In this case, Judge Faruqui suggested that the United States should proceed before a federal grand jury despite the Congress affording the same power to Superior Court grand juries. Judge Faruqui's admonishment is contrary to black-letter law and the separation of powers. A "judge in our system does not have the authority to tell prosecutors which crimes to prosecute or when to prosecute them. Prosecutorial discretion resides in the executive, not in the judicial, branch, and that discretion, though subject of course to judicial review to protect constitutional rights, is not reviewable for a simple abuse of discretion." *United States v. Giannattasio*, 979 F.2d 98, 100 (7th Cir. 1992) (citing, inter alia, *Wayte v. United States*, 470 U.S. 598, 607–08 (1985)). Indeed, courts have been admonished for intruding into the prosecutor's prerogative to investigate and indict criminal cases.[10]

Because Judge Faruqui has attempted to substitute his own judgment for that of the Executive, his order is nothing less than an "obstruction or impediment" to the Executive's authority under Article II. *See Vance*, 591 U.S. at 810. Accordingly, this Court should vacate Judge Faruqui's order and issue an order correcting his inflammatory misstatement of law regarding the U.S. Attorney's right to present and represent cases to any grand jury in this district.

---

[10] *See, e.g.*, *In re U.S.*, 441 F.3d 44, 63 (1st Cir. 2006) ("Since Rule 6 authorizes the prosecution's use of sequential grand juries, the district court's investigation ran the risk of violating the principle of separation of powers by interfering with the constitutional prerogatives of the executive branch and of the grand jury."); *United States v. Derrick*, 163 F.3d 799, 824-25 (4th Cir. 1998) ("[T]he district court was without authority to comment upon the government's capital gains investigation. The caselaw is legend from the Supreme Court and the courts of appeals that the investigatory and prosecutorial function rests exclusively with the Executive.").

*E. Judge Faruqui's comments and order violate the judicial
canons and reasonably call into question his impartiality.*

Inherent among the duties of a member of the judiciary is adherence to a strict set of canons. Fundamental among them is Canon 2, regarding the appearance of impropriety by a member of the judiciary. Canon 2(B) states, in relevant part, "A judge should not allow . . . political . . . relationships to influence judicial conduct or judgment." In addition to the duty to set aside politics, Canon 3 requires impartial administration of duties. Canon 3 states, "The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased." Canon 3(A)(1) states, in relevant part, that a judge "should not be swayed by partisan interests, public clamor, or fear of criticism." And Canon 3(A)(3) states, "A judge should be patient, dignified, respectful, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity." Finally, Canon 3(C)(1)(a) requires a judge to disqualify himself in any matter "in which the judge's impartiality might reasonably be questioned, including . . . instances in which . . . the judge has a personal bias or prejudice concerning a party[.]" The standard for recusal is no doubt high, but is satisfied when a judge "evidence[s] such deep-seated favoritism or antagonism as would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 541 (1994).

In this case, Judge Faruqui far exceeded his authority to preside over the return of a grand jury indictment. Even more problematic, however, is the political diatribe contained within his order. For example, Judge Faruqui inappropriately opined that "[a]t a minimum, [the indictment is] very unseemly; more than likely, it

is unlawful. Not to mention, this only deepens the growing mistrust of the actions of prosecutors." ECF 12 at 2. After spending paragraphs longing for the days when prosecutors did "not look for loopholes" but instead "sought justice" and after describing "haunting" Supreme Court opinions and after expressing his "surprise[e] that the government was willing to sacrifice its credibility" and after concluding that the United States was "breaking . . . decades-long norms and the rule of law," Judge Faruqui then ordered additional legal briefing. *Id.* at 3. Glaringly absent from Judge Faruqui's consideration was the undisputed legal authority the United States gave him.

Judge Faruqui's bloviate first and consider the law later approach is just the latest example of his demonstrated prejudice against the U.S. Attorney and the Trump administration. Similar to his self-fulfilling assertion that there is a "growing mistrust of the actions of prosecutors," in a May 6, 2025, order, Judge Faruqui pointed to the resignations of Department of Justice employees and a statement of the U.S. Attorney regarding his review of prior prosecutions, concluding that "[t]rust that had been earned over generations has been lost in weeks." Order, *In re: Search of One Device and Two Individuals Under Rule 41*, 25-sw-82 (D.D.C. May 6, 2025).

And during a September 4, 2025, hearing, Judge Faruqui lamented the recent surge of law enforcement in the district, complaining that "there seems to be a complete disregard for the traumatic effect that's having not just on the city, its citizens, the court, the AUSAs who are working all night and day to satisfy some sort of, you know, whatever this fantasy is or idea that there's going to be some great

showing." Transcript of Status Hearing, *United States v. Dana*, 25-mj-152 (D.D.C. Sept. 4, 2025), at 5. Later in the hearing, Judge Faruqui complained about a social media post, press release, and press conference by the U.S. Attorney's Office. *Id.* at 8. He continued, "The rush to get statistics and numbers to impress I don't know who in the Twittersphere or the Truth Social or the social media world, that's not going to work. The court is not simply here to be a social media tool or a—some sort of way to just puff themselves up, people and the administration, to feel good that they're getting larger and larger numbers." *Id.* at 9. In a warning to the U.S. Attorney, Judge Faruqui said, "We need dedicated—what other people call the deep state, I would call principled AUSAs, principled Department of Justice employees, the ones who didn't get fired for no reason apparently." *Id.* at 13. Finally, Judge Faruqui complained, "Where is the management? Why is it that they have the time to issue the tweets and the social media and the press conferences and bring the guns over from the recent arrest that we had last week—which I had never seen in my time as an AUSA that we brought the firearms and had a press conference. There seems to be time for that. Where is the time to stand up for the line AUSAs and come to this courthouse so that they, who are working 24-hour shifts, are not the ones who are being forced to listen and be criticized." *Id.* at 14–15.

But more than creating the appearance of impartiality, his inflammatory language[11] has already led grand jurors to take Judge Faruqui at his word that they

---

[11] No doubt Judge Faruqui's picture and quips in an August 4, 2025, article in the New York Times by Alan Feuer put Judge Faruqui on notice that the same journalist would likely report his inflammatory statements. *See* Alan Feuer*, Judge*

should "mistrust . . . the actions of prosecutors." ECF 12 at 2. Members of the Superior Court grand jury that voted to return the indictment in this case met with a staff member at the U.S. Attorney's Office and told her that they read Judge Faruqui's statements in an article in the New York Times[12] and believed that the U.S. Attorney's Office had lied to them. No doubt other petite and grand jurors in this district have read the article and reached the same conclusion. Simply put, Judge Faruqui's toxic words have poisoned jurors—leading them to wrongfully conclude that the U.S. Attorney's Office is lying to grand juries and breaking the law.[13] Ordering Judge Faruqui to receive the indictment the Superior Court grand jury voted to return is not enough to un-ring the bell Judge Faruqui has been banging. This Court should accordingly state the following when it vacates Judge Faruqui's order: (1) the request by the U.S. Attorney's Office for the Superior Court grand jury to return a federal indictment was entirely legal and has been a proper practice for decades; (2) the U.S. Attorney had the authority to represent the matter to any grand jury in this district after another grand jury declined to return an indictment; (3) the

---

*Openly Doubts Government As Justice Dept. Misleads and Dodges Orders*, N.Y. Times (Aug. 4, 2025), *available at* https://www.nytimes.com/2025/08/04/us/politics/trump-justice-department-judges-courts.html.

[12] Alan Feuer, *In Unusual Move, Prosecutors Secure Federal Charges From Local Grand Jury*, NY Times (Sept. 30, 2025), *available at* https://www.nytimes.com/2025/09/30/us/politics/federal-charges-grand-jury-dc.html.

[13] Notably, during the hearing in front of the foreperson, Judge Faruqui inappropriately commented, "You can't even get grand juries returned now, because the public seems to have lost all faith in the process." (Transcript, *United States v. Stewart*, 25-mj-225 (D.D.C. Sept. 29, 2025), at 6).

U.S. Attorney's Office had no duty to inform the grand jury of the actions of any prior grand jury that had considered the case; and (4) Judge Faruqui's comments before the grand jury foreperson were improper, legally and factually unsupported, and should be disregarded.

## III. CONCLUSION

For all the foregoing reasons, and any additional points and authorities which may be cited by the government at a hearing on this motion, this Court should vacate Judge Faruqui's order, ECF 12, order Judge Faruqui to receive the indictment the Superior Court grand jury voted to return, and order Judge Faruqui to correct his inflammatory misstatements of law.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/ Jonathan R. Hornok*
JONATHAN R. HORNOK
Assistant United States Attorney
Chief of the Criminal Division

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**KEVONTE STEWART,**<br>**Defendant.** | **Case No. 1:25-MJ-225** |

### <u>SUPPLEMENT TO EMERGENCY REQUEST TO VACATE MAGISTRATE JUDGE FARUQUI'S SEPTEMBER 29 ORDER REFUSING TO ACCEPT A GRAND JURY RETURN (ECF 12)</u>

The United States of America respectfully submitted the following exhibits to supplement its request for review by the Chief Judge. The United States intends to reference these materials during the hearing scheduled this afternoon:

- Exhibit 1: The transcript of the grand jury return proceeding before Magistrate Judge Zia M. Faruqui on September 29, 2025;

- Exhibit 2: The New York Times article titled *In Unusual Move, Prosecutors Secure Federal Charges From Local Grand Jury: A judge, Zia M. Faruqui, said that what appeared to be a kind of grand jury forum shopping seemed to have broken "decades-long norms and the rule of law,"* which was published on September 20, 2025, and which quotes Judge Faruqui;

- Exhibit 3: The New York Times article titled Judges *Openly Doubt Government as Justice Dept. Misleads and Dodges Orders: Legal experts say the actions causing concern from the bench could have a more*

*systemic effect, eroding the healthy functioning of the courts*, which was published on August 4, 2025, and which quotes Judge Faruqui;

- The federal indictment returned by a Superior Court grand jury in *United States v. Seals*, No. 95-CR-0284 (D.D.C. Oct. 31, 1995), ECF 1;

- The federal indictment returned by a Superior Court grand jury in *United States v. Clark*, No. 18-cr-338 (D.D.C. Nov. 15, 2018), ECF 6; and

- The federal indictment returned by a Superior Court grand jury in *United States v. Monroe*, No. 24-cr-321 (D.D.C. July 15, 2024), ECF 1.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

*/s/Jonathan R. Hornok*
JONATHAN R. HORNOK
Assistant United States Attorney
Chief of the Criminal Division

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
       vs.                          ) CASE NO. 1:25-mj-00225-ZMF
                                    )
KEVONTAE STEWART,                   )
                                    )
            Defendant.              )
_____       )



TRANSCRIPT OF GRAND JURY RETURN
**BEFORE THE HONORABLE ZIA M. FARUQUI, U.S. MAGISTRATE JUDGE**
September 29, 2025
2:29 p.m. - 3:36 p.m.
Washington, DC



**FOR THE GOVERNMENT:**
Office of the United States Attorney
BY:  CAELAINN CARNEY
601 D Street, NW
Washington, DC 20004

_____
**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Digital Record


**A047**

(Call to Order of the Court at 2:29 p.m.)

DEPUTY CLERK:  Good afternoon, Your Honor.  We have one grand jury return before you today.  This is grand jury September 4.  The foreperson is present in the courtroom.

Please refer to defendants by initials only.  Will the assistant introduce themselves to the Court.

MS. CARNEY:  Good afternoon, Your Honor.  Caelainn Carney for the United States.

THE COURT:  All right.  We have a grand jury return today.

(Pause)

THE COURT:  Okay.  So I understand you have gone to a Superior Court grand jury.  This is a case for which the docket reflects that the federal grand jury refused to charge the case, and so can you please remind me of the authority to bring matters from a Superior Court grand jury.

MS. CARNEY:  Yes.  It is DC Code 11-1916.

THE COURT:  19 --

MS. CARNEY:  -- 16.  And I have a couple of cases that I can provide to the Court if they are helpful as well.

THE COURT:  That would be great.  Can you -- that would be super helpful.  Can you go ahead, but talk slowly.  Go ahead.

MS. CARNEY:  Okay.  First case for Your Honor is *United States versus Allen*, 729 F. Supp 120.

**A048**

THE COURT:  729 F. Supp 120.

MS. CARNEY:  Uh-huh.  And then from the Court of Appeals, *United States versus Seals*, 130 F.3d --

THE COURT:  Hold on.  130 F.3d, got it.

MS. CARNEY:  -- 451.

THE COURT:  451.

MS. CARNEY:  Yes, Your Honor.

And then not squarely on point, but I think illustrative is *United States versus Brown*.  I can give the Westlaw or Lexis cite.

THE COURT:  Westlaw.  I don't do Lexis.

MS. CARNEY:  2007 WL 2007513.

THE COURT:  200 --

MS. CARNEY:  -- 7513.

And then an example, Your Honor, of when this was done --

THE COURT:  Oh, I don't need an example.  I just want to read the cases.  That's fine for now.

I'm going to go review these cases and then return.

You can express my concerns to your management that it is troubling when federal grand juries are now, if they are returning no bills, if the solution is to just go to Superior Court.

Every day there is something new that I have not seen before this court in the decades that I have been in federal

court, but that's fine. You all have the right to do it. I'll go check it, but I will express my concern and how troubled I am by the breaking down of norms that we're --

MS. CARNEY: If I may cite one more matter, Your Honor.

THE COURT: Please.

MS. CARNEY: Just from the docket. 18-cr-338.

THE COURT: Thank you. We'll be back. We're going to recess. Let's come back about -- we'll come back at 3 o'clock.

MS. CARNEY: All right. Shall I ask the foreperson to remain?

THE COURT: Yes.

MS. CARNEY: Okay.

(Recessed from 2:34 p.m. to 3:29 p.m.)

DEPUTY CLERK: Your Honor, recalling grand jury number September 4.

THE COURT: Okay. All right. Ms. Carney, I reviewed the cases that you have presented, and I'm not going to return the indictment. I'm going to issue a briefing. I mean, it is at best -- at best I think that it is unseemly, but I am concerned that it is unlawful, what the United States Attorney's Office wants to do here, but it is certainly unseemly that they are taking, after there is a federal grand jury that said that there was not probable cause to go forward, to then take it to a Superior Court grand jury, that I can only

imagine did not know that, and then try to do it there.

We have never had federal grand juries -- I'm sorry, Superior Court grand juries return federal, other than, as you indicated, during COVID, and two of the cases you supported are ones where the superior court grand jurors were being threatened. So it makes some sense that in those cases there was unavailability of that grand jury potentially, but the law that you cited simply appears to indicate that a Superior Court matter can be returned in federal court for Superior Court charges. That is just the federal court charge. It's nothing else.

I have spoken to my colleagues. No one else can recall anything of this happening certainly in the last several years where -- and I can tell you this: It has never happened in this district, or I doubt certainly anywhere, that if it could, where it was after a no bill has happened, they forum shopped and went to another grand jury to have them bring back their case.

This desire to just at all costs get people charged and arrested is losing, every day, credibility before the court. There is a cost that happens when people are only -- when the ends justify the means. And if the ends here are simply to get more arrests and for people -- and the residents of DC have spoken in this grand jury. There are other federal grand juries. I'm not sure why you all didn't start with other

grand juries here and get no billed by the other grand juries or return true bills, but that there was a run to the Superior Court grand jury separate and apart from that is extremely concerning, it's frightening, and seems to be part of an overall plan to just at all costs get charges and arrests and convictions -- well, not convictions, because we haven't gotten that far.  In fact, you're getting further and further away from that.  You can't even get grand juries returned now, because the public seems to have lost all faith in the process.

And so I'm going to set a briefing schedule.  I'll issue a minute order today doing that.  I will not return this.  You all can do with that whatever you want and speak to your management.  I will set a quick clock on this.

As I understand it from Judge Sharbaugh that he continued the preliminary hearing in this matter.

Is it your case, Ms. Carney?

MS. CARNEY:  Yes, Your Honor.

THE COURT:  When was the preliminary hearing continued until?

MS. CARNEY:  The 9th.

I'll just note for the record, Your Honor, there is no grand jury sitting in this courthouse today.

THE COURT:  Okay.  What about tomorrow or the next day or any other day this week?  You can't seriously say there is not another grand jury sitting, correct?  What about before

**A052**

October 9th, is there another grand jury sitting, federal grand jury?

MS. CARNEY:  Yes, Your Honor.  It is our position, though, that they --

THE COURT:  I understand that it's your position.  You have that authority.  It is my position to both be frightened of what your office is doing and to seek briefing on it.

October 9th is when you have your next hearing, so we'll have this resolved before then.  You have until Friday to file whatever -- whatever points of authorities that you think support, and I will have his defense counsel file their response by the 7th.  So that gives me one day, the 8th.

What time is your hearing on the 9th?

MS. CARNEY:  I believe it's 11:00 a.m.  Let me check that, Your Honor.

THE COURT:  Great.  So you're going to need to have your foreperson available or a representative of that grand jury.  If we're going to return the indictment then, I'll go ahead and return the indictment, and, if not, then we'll have a preliminary hearing.

MS. CARNEY:  On the 9th?

THE COURT:  Yes, at 11:00 a.m.  So we'll have a hearing on this at that time.

MS. CARNEY:  It's 11:00, correct, Your Honor.

THE COURT:  There is a reason things have never been

**A053**

done before.  There are reasons there are norms.  And it's the job of supervisors and management to make sure that those norms that are appropriate and have occurred for generations don't get thrown out the window to go after one charge.

Before today, before three weeks ago, if this would have happened, I wouldn't even have given it a second thought, but I am now in the unfortunate situation, as I have said before, I no longer trust that when prosecutors are coming forward, they are doing things because their managers want the right thing to be done.

It has nothing to do with you, Ms. Carney.  I assume you do not make the decisions of what's being done in cases, because, as I have said, I had an AUSA had to run into the hallway to see if she could get permission to not object to a finding of indigency for a defendant.  As I understand it, everything has to go by management, which is baffling, because, as AUSAs, you should have the responsibility and discretion to do what you think is appropriate, but part of what is appropriate is what has happened for generations.

No one has ever, after a no bill, gone to Superior Court and then brought a case here.  The rules -- the good guys play by the rules.  That's what they are there for.  We don't need -- when you are a prosecutor, I was taught to go and just get a charge or get an arrest, because people always do bad stuff, they will keep doing bad stuff, and, you know what, you

always take the high road.

So I'm just absolutely flummoxed as to why this is being done.  Why not wait for another grand jury in federal court and see what has happened.  If grand juries won't charge cases, the solution is not to run to other grand juries.  It's to then -- perhaps there is a message to be taken that the system has been set up by the founders in Congress that says this is not a charge to go forward on.

That's it.  You're excused.  Thank you for providing authority.  Have a good day, Ms. Carney.

MS. CARNEY:  Thank you.

(Proceedings concluded at 3:36 p.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the digital record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 2nd day of October, 2025.


                    /s/ Sonja L. Reeves
                    SONJA L. REEVES, RDR-CRR
                    FEDERAL OFFICIAL COURT REPORTER

**A055**

Case 1:25-mj-00225-ZMF    Document 16-2    Filed 10/03/25    Page 1 of 4

# In Unusual Move, Prosecutors Secure Federal Charges From Local Grand Jury

A judge, Zia M. Faruqui, said that what appeared to be a kind of grand jury forum shopping seemed to have broken "decades-long norms and the rule of law."

▶ **Listen to this article · 5:31 min**  Learn more

 **By Alan Feuer**

Sept. 30, 2025

In the past month or so, federal prosecutors in Washington have been repeatedly embarrassed as nearly a dozen grand juries have rejected their efforts to secure indictments against people caught up in President Trump's plan to use federal troops and agents to crack down on local crime.

As unusual as all of this has been, there was a new and even more unusual twist to their setbacks this week: On Monday, a magistrate judge pre-emptively refused to accept an indictment after learning that prosecutors had performed what he described as an "end run" around the normal course of justice. After failing to secure an indictment from a federal grand jury, prosecutors took the federal charges to a local grand jury, which returned an indictment.

In a scathing order filed in Federal District Court in Washington, the magistrate judge, Zia M. Faruqui, told prosecutors that he had never heard of such of thing, saying that what appeared to be an example of grand jury forum shopping had broken "decades-long norms and the rule of law."

**A056**

Case 1:25-mj-00225-ZMF   Document 16-2   Filed 10/03/25   Page 2 of 4

"At a minimum, this is very unseemly," Judge Faruqui wrote. "More than likely, it is unlawful."

Jeanine Pirro, the U.S. attorney, pushed back in a statement. "Instead of being an activist judge, Judge Faruqui should spend more time focused on his cases, so that he doesn't get overruled so often," she said. "The submission of an indictment to the court is a ministerial act over which Judge Faruqui has no additional powers of judicial review."

Judge Faruqui, who once worked as a prosecutor in the office, has had extremely harsh words for his former colleagues several times in recent weeks. He has accused them of overcharging people ensnared in Mr. Trump's local crime initiative and bowing to pressure to bring criminal cases at the expense of protecting defendants' legal rights.

But the judge appeared to be particularly shocked by the grand jury switch-up, saying it had further eroded the traditional bonds of trust — known in legal jargon as the presumption of regularity — that courts have long conferred on government lawyers.

"This only deepens the growing mistrust of the actions of prosecutors," Judge Faruqui wrote. "That is a sentiment that was once unthinkable, but the irregular is now the regular."

Grand jury failures have occurred not only in Washington, where Mr. Trump has deployed the National Guard alongside a large number of federal agents, but also in Los Angeles, where he has used both troops and agents to help with immigration arrests. An influx of federal forces is now set to arrive in Memphis, raising questions about whether it, too, could result in similar problems with grand juries returning indictments against defendants caught up in the surge.

His rebuke came in the case of a man named Kevontae Stewart who was arrested on Sept. 17, after local and federal authorities approached him as he sat in a parked car on Forrester Street in Southwest Washington and smelled what they described

A057

Case 1:25-mj-00225-ZMF    Document 16-2    Filed 10/03/25    Page 3 of 4

as "the odor of burnt marijuana emanating from the vehicle," according to a criminal complaint issued in the case.

When the officers asked Mr. Stewart to get out of the car, he immediately took flight, dropping a black pistol to the ground and trying to dispose of it, the complaint asserted. The officers, it said, ultimately caught up with Mr. Stewart and found in one of his pockets a bag containing a substance that tested positive for cocaine.

On Friday, however, prosecutors informed the court that a federal grand jury had declined to indict Mr. Stewart on charges of being a felon in unlawful possession of a firearm. Because of the secretive nature of grand juries, it is impossible to know why the grand jurors did not want to charge Mr. Stewart with the felony weapons charge.

Still, it is extremely unusual for grand juries not to go along with prosecutors and return indictments — or at least it was in Washington until a few weeks ago. But what happened next in Mr. Stewart's case was, in some sense, even more unusual: Rather than trying to indict him again in front of another federal grand jury, prosecutors took his federal charge to a local grand jury in Superior Court and eventually secured the indictment they failed to get the first time.

Legal experts say that prosecutors have at times used Superior Court grand juries to return indictments on federal charges, but only under exigent circumstances. The practice happened somewhat frequently during the coronavirus pandemic, for example, when it was difficult for members of grand juries to safely sit together on a regular basis.

But Judge Faruqui found the practice highly unusual, especially because the use of the Superior Court grand jury happened only after prosecutors had failed to get an indictment from a federal grand jury.

"Typically, when a federal grand jury refuses to return an indictment in a case, either the government takes the message as a warning to go no further or, hopefully in only the rarest of cases, presents the indictment again to another

A058

Case 1:25-mj-00225-ZMF   Document 16-2   Filed 10/03/25   Page 4 of 4

federal grand jury," he wrote.

"To this judge's knowledge, what has never happened before is doing an end run around the federal grand jury completely," he went on. "Yet that is what has happened today."

As a curative measure, Judge Faruqui asked prosecutors to file him papers by Friday effectively explaining their actions and telling him whether he even had the legal authority to accept an indictment on federal charges from a local grand jury.

**Alan Feuer** covers extremism and political violence for The Times, focusing on the criminal cases involving the Jan. 6 attack on the Capitol and against former President Donald J. Trump.

A version of this article appears in print on , Section A, Page 11 of the New York edition with the headline: Judge Rebukes Prosecutors for Grand Jury Shopping in Washington Crackdown

A059

Case 1:25-mj-00225-ZMF    Document 16-3    Filed 10/03/25    Page 1 of 6

# *Judges Openly Doubt Government as Justice Dept. Misleads and Dodges Orders*

Legal experts say the actions causing concern from the bench could have a more systemic effect, eroding the healthy functioning of the courts.

---

▶ **Listen to this article · 7:31 min**  Learn more




**By Alan Feuer**

Aug. 4, 2025

Justice Department lawyers have long enjoyed a professional benefit when they appear in court. As a general rule, judges tend to take them at their word and assume they are telling the truth.

But in the past several months, as members of President Trump's Justice Department have repeatedly misled the courts, violated their orders and demonized judges who have ruled against them, some jurists have started to show an angry loss of faith in the people and the institution they once believed in most.

The dissolution of these traditional bonds of trust — known in legal circles as the presumption of regularity — goes well beyond judges' use of blunt words — "egregious," "brazen," "lawless" — to describe the various parts of Mr. Trump's power-grabbing policy agenda.

Ultimately, legal experts say, the actions that caused such doubts among judges about the department and those who represent it could have a more systemic effect and erode the healthy functioning of the courts.

**A060**

"I think people don't fully appreciate how much the ability of the legal system to work on a daily basis rests on the government's credibility," said Stephen I. Vladeck, a Georgetown University law professor. "Without that credibility, it's going to be harder for the government to do anything in court — even ordinary things. All of a sudden, you're going to have courts second-guessing things that they wouldn't have before."

While it is impossible to know for sure how deeply this distrust has set in among judges across the country, a number of judges in recent weeks have openly questioned the fundamental honesty and credibility of Justice Department lawyers in ways that would have been unthinkable only months ago.

In June, for instance, an order was unsealed in Federal District Court in Washington showing Magistrate Judge Zia M. Faruqui ripping into prosecutors after they tried to convince him that he needed to be "highly deferential" to their request to keep sealed a search warrant in an ordinary criminal case.

"Blind deference to the government?" Judge Faruqui wrote. "That is no longer a thing. Trust that has been earned over generations has been lost in weeks."

After all, as the judge pointed out, Justice Department lawyers under Mr. Trump have done much to destroy the confidence normally afforded them in court.

They have fired prosecutors who worked on Mr. Trump's two criminal cases, he said. They have attacked the charges brought against the rioters who stormed the Capitol on Jan. 6, 2021, as a witch hunt. And they have violated judicial orders in cases stemming from Mr. Trump's deportation policies and from his efforts to freeze federal grants.

"These norms being broken must have consequences," Judge Faruqui concluded. "High deference is out; trust but verify is in."

All of this echoed the explosive remarks made from the bench last month by Judge Paula Xinis, who lashed out at the Justice Department during a hearing in the case of Kilmar Armando Abrego Garcia, the immigrant wrongfully deported to El Salvador in March.

A061

Before the hearing, in Federal District Court in Maryland, Judge Xinis had spent weeks trying to get the department to comply with her orders in the case — and then to answer questions about why they had been flouted in the first place.

She finally lost all patience after some of the same lawyers failed to give her a straight answer about what the administration planned to do with Mr. Abrego Garcia after he was brought back from El Salvador to face criminal charges.

"This has been the process from Day 1," Judge Xinis told the lawyers. "You have taken the presumption of regularity and you've destroyed it in my view."

The Justice Department pushed back against such criticism in a statement issued on Monday.

"This Department of Justice makes no apologies for zealously advocating on behalf of the United States — especially to defend the policies and priorities that the American people have demanded," a department spokesman said.

Still, judges have also questioned the department's motives in a handful of politically sensitive cases that officials have sought to dismiss — sometimes against the will of the prosecutors working on them day-to-day.

In a sweeping opinion issued in April, Judge Dale E. Ho of Federal District Court in Manhattan rejected as false the reasons the department gave for dismissing bribery charges against Mayor Eric Adams of New York. While Judge Ho ultimately agreed to throw out the charges, he took a swipe at the department's credibility, saying it appeared as though officials had used their power in a quid pro quo with Mr. Adams to get him to support Mr. Trump's immigration crackdown in the city.

"Everything here smacks of a bargain," he wrote. "Dismissal of the indictment in exchange for immigration policy concessions."

A062

Case 1:25-mj-00225-ZMF   Document 16-3   Filed 10/03/25   Page 4 of 6

Judge Dale E. Ho, shown in 2019, criticized the Justice Department's credibility after dismissing bribery charges against Mayor Eric Adams of New York. J. Scott Applewhite/Associated Press

In a similar fashion, a federal judge on Long Island refused last month to take the department's word after prosecutors asked her to dismiss an indictment against Vladimir Arévalo Chávez, a leader of the violent street gang MS-13, in preparation for sending him back to El Salvador.

Instead of simply accepting the government's assertion that the case against Mr. Arévalo Chávez needed to be tossed out because of "national security" concerns, the judge, Joan M. Azrack, ordered the government to tell her more about the politics behind the case. By that, she was referring to a deal reached between the Trump administration and President Nayib Bukele of El Salvador to hold immigrants deported from the United States in a Salvadoran prison in exchange for the return of MS-13 leaders in U.S. custody.

In yet another case, a judge in Los Angeles handling a request to drop fraud charges against Andrew Wiederhorn, a Trump donor and former chief executive of the restaurant chain Fatburger, asked the Justice Department to further outline its

**A063**

Case 1:25-mj-00225-ZMF    Document 16-3    Filed 10/03/25    Page 5 of 6

reasons for wanting to do so. Late last week, the judge, R. Gary Klausner, said in an order that judges should "grant considerable deference to prosecutors" seeking to dismiss charges, but still insisted on an explanation for the dismissal by Friday.

Barbara L. McQuade, a former U.S. attorney in Detroit who teaches at the University of Michigan Law School, said that if judges continued to lose faith in the Justice Department, its lawyers would have to spend enormous time and energy backing up what are now considered to be routine courtroom assertions with witnesses or written submissions.

"If government lawyers have to prove up every statement they make at every level in every case every time they go to court, it would grind the justice system to a halt," she said.

Judges are not the only players in the legal system who have shown a measure of distrust in the Justice Department. In an almost unheard-of move, federal grand juries in Los Angeles have been refusing to indict many defendants whom prosecutors have sought to charge in connection with immigration protests, according to recent news reports.

That situation underscored how the courts can work successfully only if people outside of government — jurors and witnesses, for instance — believe that the Justice Department is acting honestly, said Daniel C. Richman, a law professor at Columbia who recently wrote in The New York Times about the "credibility crisis" the department is facing.

"When the government loses credibility, you see it clearly in the reactions of other players in the legal system," Mr. Richman said. "That's the road we're on for now — unless something changes soon."

Devlin Barrett contributed reporting.

*A correction was made on Aug. 5, 2025: An earlier version of this article misstated Andrew Wiederhorn's role with the restaurant chain Fatburger. He was previously a chief executive of the chain and founded its parent company. He did not create the restaurant chain.*

A064

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com.  Learn more

**Alan Feuer** covers extremism and political violence for The Times, focusing on the criminal cases involving the Jan. 6 attack on the Capitol and against former President Donald J. Trump.

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: More Jurists Show Loss of Faith in Justice Dept.

**A065**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on August 14, 1995

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. G.J.Original 95-0284 Violations: |
| v. | |
| WILLIAM H. BROOKS a/k/a William Seals a/k/a "Puddin", | 18 U.S.C. § 371 (Conspiracy to Commit Offenses Against the United States) |
| WILLIE L. YELVERTON GARY W. SWEATT and THEODORE Z. EDELIN | 18 U.S.C. § 1201(a) and 2 (Kidnapping) |
| | 18 U.S.C. § 1951 and 2 (Interference with Commerce by Threats and Violence) |
| | 18 U.S.C. § 924(c)(1) and 2 (Use of a Firearm During and in Relation to a Crime of Violence) |
| | 18 U.S.C. § 924(c)(1) and 2 (Use of a Firearm During and in Relation to a Crime of Violence) |
| | 18 U.S.C. § 875(b) and 2 (Interstate Transmission of Extortionate Threats) |
| | 18 U.S.C. § 875(b) and 2 (Interstate Transmission of Extortionate Threats) |

LAMBERTH, J.

B

**I N D I C T M E N T**

FILED IN OPEN COURT

OCT 3 1 1995

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

The Grand Jury charges that:

**COUNT ONE**

INTRODUCTION

At all times material to this indictment, except as otherwise indicated:

**A066**

2

1. Any Kind Check Cashing Center was a financial institution engaged in interstate commerce, located at 1401 14th Street, N.W., Washington, D.C.

2. Melanie Daley was employed as an assistant manager at Any Kind Check Cashing Center.

3. Michael Fullwood, a minor, was the son of Melanie Daley.

### THE CONSPIRACY

4. From on or about April 1995, the exact date being unknown to the Grand Jury, and continuing thereafter up to and including the 2nd day of August, 1995, within the District of Columbia and elsewhere, the defendants, WILLIAM BROOKS, (ALSO KNOWN AS WILLIAM SEALS OR "PUDDIN") (hereinafter referred to as "William Brooks"), WILLIE YELVERTON, GARY SWEATT, AND THEODORE EDELIN, together, with others known and unknown to the Grand Jury did unlawfully, willfully, and knowingly conspire, combine, and agree to commit offenses against the United States of America.

5. It was part of the conspiracy that the defendants and co-conspirators would and did willfully and unlawfully kidnap, obstruct, carry away and hold for ransom and reward Michael Fullwood, and did transport Michael Fullwood in interstate commerce from the District of Columbia into the State of Maryland, in violation of Title 18 United States Code, Section 1201(a).

6. It was further part of the conspiracy that the defendants and co-conspirators would and did willfully and unlawfully obstruct, delay and affect, and attempt to obstruct,

**A067**

3

delay and affect commerce, as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951, in violation of Title 18, United States Code, Section 1951 (a).

7.   It was further part of the conspiracy that the defendants and co-conspirators would and did use and carry firearms during and in relation to crimes of violence prosecutable in a court of the United States in violation of Title 18, United States Code, Section 924(c).

8.   It was further a part of the Conspiracy that the defendants and co-conspirators would and did with intent to extort payment transmit interstate telephone communications containing threats to injure Michael Fullwood, in violation of Title 18 United States Code Section 875(b).

### THE WAYS, MANNER AND MEANS USED BY THE CO-CONSPIRATORS TO FURTHER THE OBJECTS OF THE CONSPIRACY

9.   Among the means used by the defendants and co-conspirators to further the objects of the conspiracy were the following:

a.   The defendants and co-conspirators, while posing as law enforcement officials, kidnapped, abducted, confined, and carried away Michael Fullwood and held him against his will for ransom or reward in an effort to extort money from Any Kind Check Cashing Center through Melanie Daley, an employee of Any Kind of Check Cashing Center.

**A068**

4

b.   The defendants and co-conspirators held Michael Fullwood at an apartment located at 4463 Twenty-Third Parkway, Apartment T-1, Temple Hills, MD. and thereafter made numerous telephone calls to Melanie Daley threatening to kill or injure Michael Fullwood unless Melanie Daley delivered money, the property of Any Kind Check Cashing Center to the co-conspirators as demanded.

c.   The defendants and co-conspirators drove to Any Kind Check Cashing Center, located at 1401 14th Street, N.W., Washington, D.C., and while dressed in a Pinkerton security uniform, one of the defendants, received money form Melanie Daley and Any Kind Check Cashing Center as ransom or reward and in exchange for the release of Michael Fullwood.

d.   The defendants and co-conspirators possessed and utilized firearms, including semi-automatic pistols, to promote and accomplish the goals of the conspiracy and to protect the conspiracy.  These weapons were possessed to intimidate Any Kind Check Cashing Center's employee, Melanie Daley, to accede to their demands, and for the personal safety of the defendants and co-conspirators.

e.   The defendants and co-conspirators threatened acts of violence to promote and accomplish the goals of the conspiracy and to avoid detection by law enforcement entities.

f.   The defendants and co-conspirators sought to avoid detection, investigation by law enforcement authorities, and conviction for any criminal charges against any members of the conspiracy.  To avoid detection, investigation and conviction,

**A069**

5

among other things, members of the conspiracy: used false identification, intimidated and threatened witnesses, used a number of different vehicles, and used cellular telephones to attempt to conceal their activities.

## Overt Acts

8.   In order to further the conspiracy and to achieve its objectives, the following overt acts, among others, were committed in the District of Columbia, the State of Maryland, and elsewhere:

a.   Between on or about April 1995 and on or about the 26th day of July, 1995, William Brooks discussed repeatedly with an individual known to the Grand Jury, his plan to obtain money from Any Kind Check Cashing through use of violence or threat of violence.   William Brooks further threatened this individual not to divulge any information to anyone else concerning this plan.

b.   Between on or about April 1995 and on or about the 26th day of July, 1995, William Brooks discussed with a individual known to the Grand Jury his plan to seize or abduct a family member of Melanie Daley in order to hold him for ransom or reward from Any Kind Check Cashing and Melanie Daley.

c.   After, April 1995, but prior to on or about the 26th day of July, 1995, William Brooks and Willie Yelverton agreed to pose as law enforcement officials in an effort to kidnap, seize, confine, abduct, and carry away Michael Fullwood.

d.   Prior to on or about the 26th day of July, 1995, William Brooks obtained a valid Customs Service badge and

**A070**

6

credential folder and altered it with a photograph of himself to facilitate kidnapping, seizing, confining, abducting, and carrying away Michael Fullwood.

e.   On or about the 26th day of July, 1995, William Brooks and Willie Yelverton approached Michael Fullwood and other individuals and posed as law enforcement officials.  Under this ruse, William Brooks and Willie Yelverton kidnapped, seized, confined, abducted, and carried away Michael Fullwood against his will from the 700 block of Rock Creek Church Road, N.W., Washington, D.C.

f.   On or about the 26th day of July, 1995, William Brooks and Willie Yelverton blindfold Michael Fullwood and transported him in an automobile from the District of Columbia across state lines to an apartment located at 4463 Twenty-Third Parkway, Apartment T-1, Temple Hills, Maryland.

g.   On or about the 26th day of July, 1995, William Brooks and Willie Yelverton, while holding and confining Michael Fullwood against his will at an apartment located at 4463 Twenty-Third Parkway, Apartment T-1, Temple Hills, MD, advised Michael Fullwood of their plan to take a picture of him with a gun held to his head and to call his mother and tell her that if she did not comply with their demands to provide them money from Any Kind Check Cashing that they would kill Michael Fullwood.

h.   On or about the 26th day of July, 1995, William Brooks and Willie Yelverton told Michael Fullwood that if he tried to escape, he would be killed, and that if he were successful in

**A071**

7

escaping, they would kill Michael Fullwood and his family.

i.    Between on or about the 26th day of July, 1995 and the 2nd day of August, 1995, William Brooks, Willie Yelverton, Gary Sweatt, and Theodore Edelin participated in holding, confining, and guarding Michael Fullwood, at times blindfolded and bound, against his will at an apartment located at 4463 Twenty-Third Parkway, Apartment T-1, Temple Hills, MD.

j.    Between on or about the 26th day of July, 1995 and the 2nd day of August, 1995, William Brooks, Willie Yelverton, and Gary Sweatt possessed a semi-automatic pistol while holding and confining Michael Fullwood.

k.    On or about the 26th and 27th days of July, 1995, William Brooks discussed with Annette Roach, not charged herein as a defendant, the use of her apartment located at 4463 Twenty-Third Parkway, Apartment T-1, Temple Hills, MD. to facilitate the conspiracy.

l.    On or about the 27th day of July, 1995 and in the preceding week, William Brooks and Theodore Edelin discussed the conspiracy to obtain money from Any Kind Check Cashing Center.

m.    On or about the 27th day of July, 1995, William Brooks advised Annette Roach of his plan to kidnap someone and to obtain $200,000 from a check cashing store.  William Brooks further advised Annette Roach that defendant was part of his plan to impersonate a police officer or a security guard.

**A072**

8

n.   On or about the 27th day of July, 1995, Gary Sweatt threatened to kill Annette Roach if she did not cooperate with the conspiracy.

o.   On or about the 30th day of July, 1995, William Brooks and Theodore Edelin discussed the conspiracy, and Theodore Edelin agreed to permit his car to be used to facilitate the conspiracy. William Brooks informed Theodore Edelin that he would receive proceeds of the conspiracy for permitting his car to be used.

p.   On or about the 30th day of July, 1995, William Brooks and Theodore Edelin discussed the kidnapping conspiracy with Annette Roach.

q.   On or about the 1st day of August, 1995, William Brooks and Gary Sweatt went to Any Kind Check Cashing Center in an attempt to locate Melanie Daley.

r.   On or about the 27th day of July, 1995, William Brooks and Willie Yelverton took a polaroid photograph of Michael Fullwood, blindfolded and with a semi-automatic pistol held to his head.

s.   On or about the 1st day of August, 1995, William Brooks and Willie Yelverton caused numerous phone calls to be made to Melanie Daley ordering her, if she ever wanted to see her son alive again, to report to a phone booth on Georgia Avenue and Upshur Streets, N.W., Washington, D.C.

t.   On or about the 1st day of August, 1995, William Brooks and Willie Yelverton caused phone calls to be made to an undercover police officer posing as Melanie Daley's husband, who

**A073**

9

was stationed at the designated phone booth, in which the officer was advised of the co-conspirator's plans to obtain money from Any Kind Check Cashing. The officer was further advised that the co-conspirators demanded to speak to Melanie Daley at the phone booth.

u.     On or about the 1st day of August, 1995, William Brooks and Willie Yelverton caused phone calls to be made to Melanie Daley at the phone booth located at Georgia Avenue and Upshur Street, N.W. in which she was advised that the next morning she was to report to work at Any Kind Check Cashing Center located at 1401 14th Street, N.W., Washington, D.C., where she was an assistant manager. Ms. Daley was further advised that she was to empty all the money from the store's safes into a bag and give the money to a co-conspirator, who would arrive in a Pinkerton Security uniform. Ms. Daley was further advised that if she did not comply with these demands, her son Michael Fullwood would be killed, injured, or dismembered.

v.     On or about the 1st day of August, 1995, William Brooks and Willie Yelverton caused the polaroid photograph of Michael Fullwood, blindfolded and with a semi-automatic pistol held to his head, to be delivered to Melanie Daley and an undercover police officer at a phone booth on Georgia Avenue and Upshur Street, N.W., Washington, D.C.

w.     On or about the 1st day of August, 1995, William Brooks and Willie Yelverton caused Michael Fullwood to speak with his mother Melanie Daley over the telephone and to advise her that he

**A074**

10

would be killed if she did not comply with the co-conspirators demands and provide them with the requested money.

x.   On or about the 2nd day of August, 1995, William Brooks and Willie Yelverton caused phone calls to be made to Melanie Daley, Andre Dean, and Any Kind Check Cashing, to be certain that Melanie Daley complied with their demands.

y.   On or about the 2nd day of August, 1995, Theodore Edelin authorized William Brooks and Gary Sweatt to use his vehicle to travel to Any Kind Check Cashing, for the purpose of obtaining ransom or reward money.

z.   On or about the 2nd day of August, 1995, William Brooks, Gary Sweatt, and an unidentified co-conspirator arrived at Any Kind Check Cashing, located at 1401 14th Street, N.W., Washington, D.C. to obtain ransom or reward money.

aa.   On or about the 2nd day of August, 1995, Gary Sweatt entered Any Kind Check Cashing, located at 1401 14th Street, N.W., Washington, D.C. wearing a uniform that appeared to be a Pinkerton Security uniform.  Gary Sweatt obtained from Melanie Daley, an assistant manager, a bag of money as had been previously demanded by co-conspirators, and Gary Sweatt then fled the store into the awaiting vehicle still occupied by William Brooks and an unidentified co-conspirator.

bb.   On or about the 2nd day of August, 1995, William Brooks, Gary Sweatt, and an unidentified co-conspirator fled from law enforcement officers in an attempt to conceal their identities and make good their escape.

**A075**

11

cc. On or about the 2nd day of August, 1995, William Brooks, Gary Sweatt, and an unidentified co-conspirator possessed a semi-automatic pistol in the vehicle in which they were riding as they travelled to and from Any Kind Check Cashing, located at 1401 14th Street, N.W., Washington, D.C.

dd. On or about the 2nd day of August, 1995, Willie Yelverton telephoned Melanie Daley and Any Kind Check Cashing to confirm that the money had been delivered to the co-conspirators.

ee. On or about the 2nd day of August, 1995, Willie Yelverton drove Michael Fullwood blindfolded from 4463 Twenty-Third Parkway, apartment T-1, Temple Hills, MD to Thirty-Third Street and South Dakota Avenue, N.E., where he was released.

**(Conspiracy to Commit Offenses Against The United Sates, in violation of Title 18, United States Code, Section 371.)**

## COUNT TWO

1. On or about the 26th day of July, 1995, in the District of Columbia, and elsewhere, the defendants, WILLIAM BROOKS, (ALSO KNOWN AS WILLIAM SEALS OR "PUDDIN"), WILLIE YELVERTON, GARY SWEATT, AND THEODORE EDELIN, did willfully and unlawfully kidnap, abduct, carry away, and hold for ransom and reward Michael Fullwood and willfully transport Michael Fullwood in interstate commerce from the vicinity of Princeton and Warder Streets, N.W., Washington, D.C. to 4463 Twenty-Third Parkway, Apartment T-1, Temple Hills, in the State of Maryland.

**(Kidnapping, in violation of Title 18 United States Code, Section 1201(a) and 2.)**

**A076**

12

## COUNT THREE

1. At all times material to this Indictment Any Kind Check Cashing Center, 1401 14th Street, N.W., Washington, D.C., was engaged in the business of check cashing and currency exchange in interstate commerce, and an industry which affects interstate commerce.

2. Between on or about the 26th day of July, 1995 and the 2nd day of August, 1995 in the District of Columbia, and elsewhere, the defendants WILLIAM BROOKS, (ALSO KNOWN AS WILLIAM SEALS OR "PUDDIN"), WILLIE YELVERTON, GARY SWEATT, AND THEODORE EDELIN did unlawfully obstruct, delay and affect, and attempt to unlawfully obstruct, delay and affect, commerce as that term is defined in Title 18, United States Code, Section 1951, by extortion, as that term is defined in Title 18, United States Code, Section 1951, in that the defendants WILLIAM BROOKS, (ALSO KNOWN AS WILLIAM SEALS OR "PUDDIN"), WILLIE YELVERTON, GARY SWEATT, AND THEODORE EDELIN did obtain and attempt to obtain money, the property of Any Kind Check Cashing Center with the consent of an employee of Any Kind Check Cashing Center, having been induced by the wrongful use of actual and threatened force, violence and fear, in that the defendants did kidnap, seize, confine, abduct, and carried away Michael Fullwood against his will, with the specific intent to obtain ransom or reward in the

**A077**

13

form of an unspecified sum of U.S. currency the property of Any Kind Check Center, through Melanie Daley, a manager of the business and the mother of Michael Fullwood.

**(Interference with Commence by threats and violence in violation of Title 18, United States Code, Sections 1951 and 2.)**

## COUNT FOUR

1.  Between on or about the 26th day of July, 1995, and the 2nd day of August, 1995, in the State of Maryland and in the District of Columbia, and elsewhere the defendants, WILLIAM BROOKS, (ALSO KNOWN AS WILLIAM SEALS OR "PUDDIN"), WILLIE YELVERTON, AND GARY SWEATT, knowingly used and carried a firearm, that is a twenty-two caliber, Smith and Wesson pistol model 2214, bearing serial number TFR5238, during and in relation to a crime of violence which he may be prosecuted in a court of the United States, that is Interference with Commerce by Threats and Violence, as charged in Count Three of this Indictment.

**(Use of a Firearm During and in Relation to a Crime of Violence in violation of Title 18, United States Code, Sections 924(c)(1) and 2.**

## COUNT FIVE

1.  Between on or about the 26th day of July, 1995, and the 2nd day of August, 1995,  in the District of Columbia, and elsewhere the defendants, WILLIAM BROOKS, (ALSO KNOWN AS WILLIAM SEALS OR "PUDDIN"), WILLIE YELVERTON, AND GARY SWEATT, knowingly used and carried a firearm, that is a nine millimeter, Smith and Wesson pistol model 3914, bearing serial number TEW4424, during and in relation to a crime of violence which he may be prosecuted

**A078**

14

in a court of the United States, that is Interference with Commerce by Threats and Violence as charged in Count Three of this Indictment.

**(Use of a Firearm During and in Relation to a Crime of Violence in violation of Title 18, United States Code, Sections 924(c)(1) and 2.)**

### COUNT SIX

1. On or about the 1st day of August, 1995, and elsewhere in the District of Columbia, the defendants, WILLIAM BROOKS, (ALSO KNOWN AS WILLIAM SEALS OR "PUDDIN") AND WILLIE YELVERTON, willfully and knowingly, and with intent to extort an unspecified sum of U.S. currency from Any Kind Check Cashing Center and its employee, Melanie Daley, did transmit in interstate commerce from the State of Maryland to the District of Columbia, a telephone communication to the said Any Kind Check Cashing, Inc., through Melanie Daley, which telephone communication contained a threat to injure and continue to seize, confine, detain, and hold against his will the person of Michael Fullwood, that is, threaten to kill, dismember, and otherwise injure Michael Fullwood, and to continue to seize, confine, detain, and hold against his will Michael Fullwood.

**(Interstate Transmission of Extortionate Threats, in violation of Title 18, United States Code, Sections 875(b) and 2.)**

### COUNT SEVEN

1. On or about the 2nd day of August, 1995, in the District of Columbia, the defendants, WILLIAM BROOKS, (ALSO KNOWN AS WILLIAM SEALS OR "PUDDIN") AND WILLIE YELVERTON, willfully and knowingly, and with intent to extort an unspecified sum of U.S.

**A079**

15

currency from Any Kind Check Cashing Center and its employee, through Melanie Daley, did transmit in interstate commerce from the state of Maryland to the District of Columbia, a telephone communication to the said Any Kind Check Cashing, Inc., through Melanie Daley, which telephone communication contained a threat to injure and continue to seize, confine, detain, and hold against his will the person of Michael Fullwood, that is, threaten to kill, dismember, and otherwise injure Michael Fullwood, and to continue to seize, confine, detain, and hold against his will Michael Fullwood.

**(Interstate Transmission of Extortionate Threats in violation of Title 18, United States Code, Sections 875(b) and 2.)**

A TRUE BILL:

Deputy FOREPERSON

Attorney for the United States in
and for the District of Columbia

**A080**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on October 15, 2018[1]

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **CRIMINAL NO.** |
| | : | |
| **JEFFREY RAPHIEL CLARK, JR.** | : | |
| | : | **VIOLATIONS:** |
| **Defendant.** | : | |
| | : | **18 U.S.C. § 922(g)(3)** |
| | : | **(Unlawful Possession of Firearms by** |
| | : | **Person Who is Unlawful User of** |
| | : | **any Controlled Substance)** |
| | : | |
| | : | **D.C. Code §7-2506.01** |
| | : | **(Possession of a Large Capacity** |
| | : | **Ammunition Feeding Device)** |
| | : | |

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE

Between on or about October 27, 2018, and on or about November 9, 2018, within the

District of Columbia, the defendant, **JEFFREY RAPHIEL CLARK, JR.**, then being an

unlawful user of a controlled substance as defined in Title 21, United States Code, Section 802,

did unlawfully and knowingly possess firearms in and effecting commerce and receive firearms

which had been shipped and transported in interstate and foreign commerce, to wit:

    (1)    a Remington Arms 1911 R1 handgun;

    (2)    a Mossberg Maverick 88 shotgun;

    (3)    a Ruger Mini 14 Ranch Rifle; and

---

[1] This grand jury was empaneled in the Superior Court of the District of Columbia and returned this indictment pursuant to its authority under D.C. Code § 11-1916(a).

**A081**

(4)     a Colt .38 Special handgun.

(**Unlawful Possession of a Firearm by a Person who is an Unlawful User of a Controlled Substance**, in violation of Title 18, United States Code, Section 922(g)(3))

## COUNT TWO

Between on or about October 27, 2018, and on or about November 9, 2018, within the District of Columbia, the defendant, **JEFFREY RAPHIEL CLARK, JR.**, did possess a large capacity ammunition feeding device.

(**Possession of a Large Capacity Ammunition Feeding Device**, in violation of 7 D.C. Code, Section 2506.01(b) (2001 ed.))

A TRUE BILL

FOREPERSON

*Jessie K. Liu /BM*

Attorney of the United States in
and for the District of Columbia

**A082**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on June 28, 2024[1]

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| v. | : | GRAND JURY ORIGINAL |
| | : | |
| CHARLES WESLEY MONROE, | : | VIOLATION: |
| | : | 18 U.S.C. § 922(g)(1) |
| Defendant. | : | (Unlawful Possession of a Firearm and |
| | : | Ammunition by a Person Convicted of a |
| | : | Crime Punishable by Imprisonment for a |
| | : | Term Exceeding One Year) |
| | : | |
| | : | FORFEITURE: |
| | : | 18 U.S.C. § 924(d); 21 U.S.C. § 853(p); |
| | : | and 28 U.S.C. § 2461(c) |

INDICTMENT

The Grand Jury charges that:

COUNT ONE

On or about April 29, 2024, within the District of Columbia, **CHARLES WESLEY MONROE**, knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in the Superior Court of the District of Columbia, criminal case number 2021 CF3 004141, did unlawfully and knowingly receive and possess a firearm, that is, a 9-millimeter Smith & Wesson SD9 2.0 semi-automatic pistol, and ammunition, that is, 9-millimeter ammunition, which had been possessed, shipped and transported in and affecting interstate and foreign commerce.

(**Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year**, in violation of Title 18, United States Code, Section 922(g)(1))

---

[1] This grand jury was empaneled by the Superior Court of the District of Columbia and returned this indictment pursuant to its authority under D.C. Code § 11-1916(a).

**A083**

## FORFEITURE ALLEGATION

1.      Upon conviction of the offense alleged in Count One of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), any firearms and ammunition involved in or used in the knowing commission of the offense, including but not limited to a 9-millimeter Smith & Wesson SD9 2.0 semi-automatic pistol and 9-millimeter ammunition.

2.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property that cannot be subdivided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Section 924(d); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c))

A TRUE BILL:

FOREPERSON.

*Jeanine M. Pirro (MP)*

Attorney of the United States in
and for the District of Columbia.

2

**A084**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**KEVONTE STEWART,**<br>**Defendant.** | **Case No. 1:25-MJ-225** |

**RESPONSE TO MAGISTRATE JUDGE FARUQUI'S**
**SEPTEMBER 29 ORDER REFUSING TO ACCEPT A**
**GRAND JURY RETURN (ECF 12)**

For the reasons set out in the Government's briefing in this matter, ECF 15, 16, the United States respectfully requests that this Court accept the indictment that the Superior Court grand jury voted to return and take appropriate curative action with respect to the Court's statements regarding the conduct of the U.S. Attorney's Office in presenting the matter to the Superior Court grand jury. The D.C. Circuit held in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), that pursuant to D.C. Code § 11-1916 a Superior Court grand jury is empowered to return an indictment to this Court. This Court must accept the returned indictment.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

 */s/Jonathan R. Hornok*
JONATHAN R. HORNOK
Assistant United States Attorney
Chief of the Criminal Division

Page 1 of 1
**A085**

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA )

      **v.** )      **No. 1:25-MJ-225 (ZMF)**

KEVONTAE STEWART )

_____ )

**RESPONSE TO ORDER OF THE COURT**

Kevontae[1] Stewart, through undersigned counsel, responds to the order of the Court

directing the parties to provide briefing as to whether this Court has jurisdiction to accept a federal

indictment on only a federal charge returned by a Superior Court grand jury. The government has

asserted that this Court must accept the indictment in this case because it is facially valid. That is

incorrect. The indictment returned in this case is facially invalid under the Federal Rules of

Criminal Procedure. This Court, therefore, cannot accept the indictment returned by the Superior

Court grand jury.

**Factual & Procedural Background**

On Friday, September 26, 2025, the United States Attorney's Office asked a grand jury of

this Court to return an indictment against Mr. Stewart, asserting that he had unlawfully possessed

a firearm in violation of 18 U.S.C. § 922(g)(1). This Court's grand jury declined. That day, the

foreperson of this Court's grand jury appeared before Magistrate Judge Sharbaugh in open court

to report that the grand jury had no billed Mr. Stewart's case. ECF No. 15 at 5. Judge Sharbaugh

convened an emergency status hearing to inform defense counsel that the government had failed

to obtain an indictment for Mr. Stewart. Upon defense counsel's request, Judge Sharbaugh

---

[1] The government misspells Mr. Stewart's first name in its emergency request. ECF No. 15. The correct spelling is Kevontae.

1

released Mr. Stewart and ordered the parties to reappear on Monday, September 29, 2025, at 12:30 PM to impose the conditions of Mr. Stewart's pretrial release.  Mr. Stewart appeared before Judge Sharbaugh on September 29 and was sworn to his conditions of release.  Under these conditions, Mr. Stewart must reside with his mother in North Carolina and is subject to a curfew from 10:00pm to 6:00am.  ECF No. 11.

That same day, the government presented its case against Mr. Stewart to a grand jury convened by the Superior Court of the District of Columbia.  ECF No. 15 at 5.  The Superior Court grand jury returned an indictment against Mr. Stewart charging him with a violation of 18 U.S.C. § 922(g)(1).  That afternoon—after Judge Sharbaugh had entered Mr. Stewart's conditions of pretrial release—the foreperson of the Superior Court grand jury appeared in this Court before Magistrate Judge Faruqui.  The foreperson of the Superior Court grand jury presented the indictment returned against Mr. Stewart to Judge Faruqui.  Judge Faruqui—confronted with the atypical situation of a Superior Court grand jury returning an indictment to him—was "concerned that it is unlawful" for him to accept an indictment from a Superior Court grand jury in federal court because "[n]o one has ever, after a no bill, gone to Superior Court and then brought a case here."  Tr. at 4, 8.  Judge Faruqui then set a briefing schedule on the issue ordering the government to file authority in support of its position by October 3, 2025.  In that same order, Judge Faruqui also appointed the Office of the Federal Public Defender as co-counsel for Mr. Stewart for the purpose of responding to the government's position on this issue.

Three days later, on October 2, 2025, the government filed an emergency motion with the Chief Judge of the District Court.  ECF No. 15.  In its emergency motion, the government asked Chief Judge Boasberg to vacate Judge Faruqui's briefing schedule, order Judge Faruqui to accept the indictment, and to enter specific language in its order which could be conveyed to the Superior

**A087**

Court grand jury. Chief Judge Boasberg convened a hearing on October 3, 2025, to address the government's emergency motion. Mr. Stewart's counsel from the Office of the Federal Public Defender was present for the hearing.

At the hearing, Chief Judge Boasberg heard argument from both the government and Mr. Stewart as to whether there was any emergency which would justify vacating Judge Faruqui's briefing schedule. After hearing from both parties, Chief Judge Boasberg concluded that there was no emergency justifying the government's request and denied the government's emergency motion without prejudice. Chief Judge Boasberg made plain that should either party disagree with Judge Faruqui's eventual ruling, that party could appeal Judge Faruqui's decision to him or the assigned district court judge—the typical course of conduct in this Court.

That evening, the government filed its response to Judge Faruqui's order calling for briefing on whether he is permitted to accept an indictment returned by a Superior Court grand jury. ECF No. 17. The government's response stated that this Court should accept the indictment "[f]or the reasons set out in the Government's" emergency motion. The response also stated that: "The D.C. Circuit held in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), that pursuant to D.C. Code § 11-1916 a Superior Court grand jury is empowered to return an indictment to this Court. This Court must accept the returned indictment." ECF No. 17.

**<u>Argument</u>**

The government argues that D.C. Code § 11-1916(a) requires the Court to accept the indictment returned against Mr. Stewart by the Superior Court grand jury. The government's argument, however, fails to consider the Federal Rules of Criminal Procedure which govern all federal criminal proceedings, including this one in this Court. The Federal Rules mandate that a criminal case may only be initiated by a grand jury convened by a federal judge returning an

3

**A088**

indictment against the criminal defendant. The Superior Court grand jury, however, was not convened by a federal judge and its indictment is, therefore, facially invalid.  The Court cannot accept this indictment.[2]

## I.  A Judge May Not Accept an Indictment that is Invalid on its Face.

Contrary to the government's assertion, neither a United States District Court Judge nor a United States Magistrate Judge may accept an indictment that is invalid on its face.

The government appears to claim that this Court has no authority to not accept an indictment.  Indeed, at the emergency hearing before Chief Judge Boasberg on October 3, 2025, the government asserted that even if an indictment was plainly facially invalid—such as if it was returned to a magistrate judge by a grand juror who was neither the foreperson nor the deputy foreperson in violation of Rule 6—the magistrate judge would have no authority to reject the indictment and must accept it regardless.  Under the government's reasoning, a United States Magistrate Judge is no more than a mailbox for indictments to be dropped by grand jurors.  This is not so.

A judge of this Court has no obligation to accept an indictment that is facially invalid.  The government's cited authority is not to the contrary.  *See* ECF No. 15 at 10 n.7.  The Supreme Court has said that "an indictment returned by a legally constituted nonbiased grand jury, like an information drawn by a prosecutor, *if valid on its face*, is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment." *Lawn v. United States,* 355 U.S. 339, 349 (1958) (emphasis added); *see also Costello v. United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a *legally constituted* and unbiased grand jury, like an

---

[2] Much of the government's emergency motion consisted of *ad hominem* attacks on this Court.  Chief Judge Boasberg expressed his disapproval of such attacks at the hearing before him, and, therefore, this response does not address them.

information drawn by the prosecutor, *if valid on its face*, is enough to call for trial of the charge on the merits.  The Fifth Amendment requires nothing more.") (emphasis added).  Both of these cases require that an indictment be valid on its face before a judge is required to accept it.  This implies an obligation on the part of the Court to ensure that an indictment is facially valid.  The logical corollary, then, is that where an indictment is not valid on its face, this Court cannot accept an indictment presented to it.

## II. The Indictment Returned Against Mr. Stewart is Facially Invalid and Must be Rejected.

## A. The Federal Rules of Criminal Procedure Require that an Indictment be Returned by a Federal Grand Jury

The Federal Rules of Criminal Procedure "govern the procedure in all criminal proceedings in the United States district courts, the United States courts of appeals, and the Supreme Court of the United States."  Fed. R. Crim. P. 1(a)(1).

Rule 6, in turn, governs the grand jury.  "When the public interest so requires, the court must order that one or more grand juries be summoned."  Fed. R. Crim. P. 6(a)(1).  "The court," then "will appoint one juror as the foreperson and another as the deputy foreperson."  *Id.* 6(c).  Proceedings before the grand jury are generally confidential, but "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter" for various reasons.  *Id.* 6(b)(2)(E).

"A grand jury may indict only if at least 12 jurors concur.  The grand jury—or its foreperson or deputy foreperson—must return the indictment to a magistrate judge in open court."  Fed. R. Crim. P. 6(f).  "If a complaint or information is pending against the defendant and 12 jurors do not concur in the indictment, the foreperson must properly and in writing report the lack of concurrence to the magistrate judge."  *Id.*

5

**A090**

"A grand jury must serve until the court discharges it, but it may serve more than 18 months only if the court, having determined that an extension is in the public interest, extends the grand jury's service." Fed. R. Crim. P. 6(g). "An extension may be granted for no more than 6 months, except as otherwise provided by statute." *Id.* Individual grand jurors may be excused by "the court" either temporarily or permanently. *Id.* 6(h). If a grand juror is excused permanently, "the court may impanel an alternate juror in place of the excused juror." *Id.*

**B. A Superior Court Judge May Not Summon a Grand Jury Which Can Return an Indictment to Initiate a Federal Criminal Case.**

Rule 6 makes clear, then, that "the court" is integral to the grand jury's functioning. "The court" summons the grand jury. "The court" appoints a foreperson and deputy foreperson. "The court" decides when to disclose grand jury matters to the public. "The court" may excuse grand jurors. And "the court" can replace excused grand jurors. The Federal Rules, however, define "the court" to exclude the local District of Columbia courts and their judges. A Superior Court grand jury, therefore, cannot return an indictment in compliance with Rule 6.

The Federal Rules' definition of "court" is plain. Rule 1 defines "court" as "a federal judge performing functions authorized by law." Fed. R. Crim. P. 1(b)(2). The Rules, in turn, define "federal judge," to mean "a justice or judge of the United States as these terms are defined 28 U.S.C. § 451"; "a magistrate judge"; and "a judge confirmed by the United States Senate and empowered by statute in any commonwealth, territory, or possession to perform a function to which a particular rule relates." Fed. R. Crim. P. 1(b)(3). The Rules then make it clear that the term "federal judge" "does not include local judges in the District of Columbia." Fed. R. Crim. P. 1 Advisory Committee Notes-2002 Amendment.

6

**A091**

The Court cannot accept the Superior Court indictment returned against Mr. Stewart because it is facially invalid.[3]  The face of the Indictment makes plain to this Court that it was returned by a Superior Court grand jury.  A Superior Court grand jury is not convened by "the court," *i.e.*, a "federal judge," as required by the Rules 1 and 6.  The indictment is, therefore, facially invalid.  The Court's analysis should end here.

Indeed, jurors in the Superior Court, both grand and petit jurors, are not summoned by a federal judge but instead are summoned according to the D.C. Code.  "At such times as are determined under the jury system plan, the Court shall summon or cause to be summoned from among qualified individuals under section 11-1906 sufficient prospective jurors to fulfill requirements for petit and grand jurors for the Court."  D.C. Code § 11-1907.  The definition of "the court" under the D.C. Code does not align with the definition of "the court" in the Federal Rules of Criminal Procedure.  Under the D.C. Code, "the court" refers to "the Superior Court of the District of Columbia and may include any judge of the Court acting in an official capacity."  D.C. Code § 11-1902(4).

The differences between this Court's juries and those of the Superior Court support Mr. Stewart's argument that he cannot be indicted on federal charges by a Superior Court grand jury.  The juries of this Court and the Superior Court are not identical or managed identically.  Congress created the Superior Court and the D.C. Court of Appeals in 1970 through the District of Columbia Court Reform and Criminal Procedure Act. Pub. L. No. 91-358, 84 Stat. 480 (July 29, 1970).  When the Superior Court was first created, the Superior Court juries were summoned by this Court.  132 Cong. Rec. S15070-01 (Oct. 3, 1986) ("Under current law, the Federal district court for the District of Columbia is charged with running a single jury selection system for both the local and

---

[3] The indictment returned by the Superior Court grand jury has not been placed on the docket, so defense counsel is not aware of the specific wording of the indictment in this case.

7

**A092**

Federal Courts."). Congress changed this in 1986 with the District of Columbia Judicial Efficiency and Improvement Act. "This bill … cut the ties that binds the local court to the Federal Court." *Id.* As enacted, a "jury system [was] hereby established for the Superior Court of the District of Columbia." D.C. Code § 11-1901.

And although this Court and the Superior Court both summon jurors from residents of the District of Columbia, they do not do so in the same way. *Compare* Jury Selection Plan for the Random Selection of Grand and Petit Jurors, United States District Court for the district of Columbia (As amended May 17, 2022), https://www.dcd.uscourts.gov/sites/dcd/files/D.D.C.JurySelectionPlan-20220517.pdf, *with* Jury Plan for the Superior Court of the District of Columbia (May 28, 2020), https://www.dccourts.gov/sites/default/files/Jury-Plan-2019-Effective-May-2020.pdf. This Court creates its master juror list by obtaining names of D.C. residents from the D.C. Board of Elections, the D.C. Department of Motor Vehicles, and the D.C. Department of Finance and Revenue. The Superior Court, on the other hand, creates its master list from those three sources *and* the list of individuals who have qualified to receive any type of public assistance benefits in the District of Columbia, the list of persons who have become naturalized citizens in the District of Columbia, and "such other source lists as may become available." Superior Court Jury Plan at 1-2. This Court then requires that all duplicates be excluded from the master list. D.D.C. Jury Plan at 2. The Superior Court jury plan does not include a requirement to exclude duplicates.

The Superior Court and this Court also exclude different classes of citizens from participating on juries. This Court excludes only 5 classes of citizens from participating on juries: non-citizens, those unable to read, write, and understand English, those unable to speak English, those incapable to render satisfactory service, and those charged or convicted of a felony who have

8

**A093**

not had their rights restored.  D.D.C. Jury Plan at 4.  The Superior Court, however, excludes those charged with misdemeanor offenses as well, and automatically requalifies those committed of felonies to serve on juries one year after completing their sentence.  Superior Court Jury Plan at 4.

The indictment returned against Mr. Stewart must be rejected because it is facially invalid under the Federal Rules of Criminal Procedure.

## II. The Government's Cited Authority is Not to the Contrary

The government relies on a D.C. Code provision and a 1997 case from the D.C. Circuit to support presenting a purely federal case to the Superior Court grand jury.  Neither can override the Congressionally enacted Federal Rules of Criminal Procedure.

The government first relies on D.C. Code § 11-1916(a) to justify its decision to take a federal case to the Superior Court grand jury.  Section 1916(a) of the D.C. Code[4] provides that a "grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts." The government interprets this provision as permitting the U.S. Attorney's Office to present federal charges to the Superior Court grand jury and return the indictment to a federal magistrate judge under any circumstances.  That is a stretch.

First, the term "take cognizance of all matters" is anything but clear.  Cognizance means "knowledge" or "comprehension by understanding."  *Cognizance*, Webster's Second New Int'l Dictionary 520 (2d ed. 1961).  Nothing about the term "cognizance" clearly delegates the authority to return an indictment to a different court than the one which summoned the grand jury.  If Congress had intended for this provision to mean that a Superior Court grand jury could return an indictment in federal court, it was certainly capable of saying so.  The government's interpretation

---

[4] The current version of this provision of the D.C. Code was enacted by Congress, not the D.C. Council, in the District of Columbia Judicial Efficiency and Improvement Act. Pub. L. No. 99-650, § 2, 100 Stat. 3635 (Nov. 14, 1986).

9

**A094**

begs the question why Congress would enact a bill creating two separate jury systems in the District of Columbia, but then permit the grand jury in one system to interfere with another. If anything, the ability of a Superior Court grand jury to "take cognizance" of a matter more naturally relates to a grand jury's investigatory function. By enacting § 11-1916(a), Congress was clarifying that a Superior Court grand jury may investigate all matters in the District, regardless of where any crime may eventually be charged.

Second, even if Congress was granting the authority to return an indictment to federal court to a Superior Court grand jury, that authority is still trumped by the Federal Rules of Criminal Procedure. Congress initially enacted this provision in 1970 when it first created the local District of Columbia Courts. Pub. L. No. 91-358, 84 Stat. 515 (July 29, 1970). In the system enacted in 1970, the juries of the federal courts and the Superior court were much more intertwined. At that time, "[j]urors serving within the District of Columbia [had] the same qualifications as provided for jurors in the Federal courts," and "[t]here [was] a single system in the District of Columbia for the selection of jurors for both Federal and District of Columbia courts." *Id.* That "selection system [was] prescribed by Federal law and executed in accordance therewith as provided by the United States District Court for the District of Columbia." *Id.*

In 1986, Congress elected to create two separate jury selection systems in the District of Columbia—one for federal court and one for the Superior Court. Pub. L. No. 99-650, 100 Stat. 3635 (Nov. 14, 1986); D.C. Code § 11-1901. Qualification for serving as a juror in Superior Court was no longer tied to eligibility to serve as a juror in federal court. D.C. Code. 11-1906. The 1986 Congressional amendments to the D.C. jury systems remain in effect today.

On the other hand, Congress has amended the Federal Rules of Criminal Procedure many times since 1986. Congress enacted the amendments to the Federal Rules of Criminal Procedure

10

**A095**

which defined "court" and "federal judge" in 2002. This later in time amendment (long after 1986) shows that even if § 11-1916 does authorize a Superior Court grand jury to present an indictment to a federal magistrate judge, Federal Rules of Criminal Procedure 6 and 1 now make such an indictment facially invalid.

Moreover, the D.C. Code speaks to how the juries of this Court and the Superior Court can interact. At D.C. Code § 11-1917, Congress laid out the "coordination and cooperation of the courts." This section provides that to "the extent feasible, the Superior Court and the United States District Court shall consider the respective needs of each court in the qualification, selection, and service of jurors. Nothing in this chapter shall be construed to prevent such courts from entering into any agreement for sharing resources and facilities (including automated data processing hardware and software, forms, postage, and other resources)." D.C. Code § 11-1917. Clearly Congress intended to limit the interactions between the two jury systems to sharing administrative systems if necessary. Had Congress intended for the two courts to coordinate by sharing a grand jury, it surely would have said so in this provision.

The government's reliance on the D.C. Circuit's opinion in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997) fares no better. In *Seals*, the court was presented with an indictment originally returned by a Superior Court grand jury, not after a federal grand jury refused to indict, as in Mr. Stewart's case. *Id.* at 453. Defendants were convicted after a jury trial of conspiracy, kidnapping and extortion. *Id.* On appeal, defendants argued that § 11-1916(a) "is unconstitutional because it vests the judicial power of the United States outside of Article III and it does so by improperly empowering the executive." *Id.* at 455-56. The court rejected these constitutional arguments. The *Seals* court, however, was never called to pass upon the question of whether the language of § 11-1916(a) authorized a Superior Court grand jury to return an indictment in federal court pursuant to

11

**A096**

Rule 6. This, therefore, remains an open question. And, like the provision itself, the decision in *Seals* was issued in 1997—5 years before the Supreme Court and Congress revised the Federal Rules of Criminal Procedure to exclude District of Columbia judges from summoning a grand jury which could return an indictment in federal court. *Seals*, therefore, does not control here.

Moreover, one of the primary rationales for the decision in *Seals* is no longer in effect. The court devoted much attention to the fact that grand juries in both courts were selected from identical pools and by "identical method[s]." *Id.* at 460. As discussed above, that is no longer true.

In addition, in what can only be characterized as a dramatic overstatement, the government claims that "the U.S. Attorney's Office has used Superior Court juries to return federal indictments for decades." ECF No. 15 at 1. For this proposition, the government cites three cases—*Seals* and two other cases—one from 2018 and one from 2024. ECF No. 15 at 8-9. In neither of the two cases was any objection apparently raised. The government's attempt to use a Superior Court grand jury to return this indictment after a properly constituted federal grand jury declined to do so was highly irregular and must be rejected. Indeed, the government did not dispute Judge Faruqui's statement that no one had ever gone to a Superior Court grand jury to obtain an indictment on a federal charge that a federal grand jury had declined.

12

**A097**

## <u>Conclusion</u>

The Federal Rules of Criminal Procedure do not permit a grand jury summoned by the Superior Court of the District of Columbia to return an indictment in federal court. This makes the indictment returned against Mr. Stewart facially invalid and the Court, therefore, has no authority to accept the indictment returned in this case.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
MICHELLE M. PETERSON
MATTHEW L. FARLEY
Assistant Federal Public Defenders
625 Indiana Ave., N.W.
Washington, D.C. 20004
(202) 208-7500

13

**A098**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**UNITED STATES OF AMERICA**

v.

**KEVONTE STEWART,
Defendant.**

</td><td>

**Case No. 1:25-MJ-225**

</td></tr>
</table>

## REPLY TO THE DEFENDANT'S RESPONSE TO ORDER OF THE COURT (ECF 21)

The defendant has asked this Court not to accept the indictment the Superior Court grand jury voted to return. ECF 21. For the reasons described below and in its previous briefing on this matter, the United States respectfully requests that this Court accept the indictment and that this Court take appropriate curative action regarding its statements disparaging the U.S. Attorney's Office's conduct in this case.

### I. ARGUMENT

*A. The Congress did not implicitly repeal D.C. Code § 11-1916.*

Defendant contends that this Court may not accept the indictment "because it is facially invalid under the Federal Rules of Criminal Procedure." ECF 21 at 9. The defendant focuses on the Advisory Committee Notes to the 2002 Amendment to rule 1, in which the Committee stated that the term "federal judge" does not include "local judges in the District of Columbia" ECF 21 at 6. From this premise, defendant asserts that an indictment returned by a Superior Court grand jury is invalid because that grand jury was "not convened" by a federal judge within the meaning of rules 1 and 6. This argument fails.

The Congress made clear in section 1916 that a Superior Court grand jury may "take *cognizance* of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts," D.C. Code § 11-1916 (emphasis added). The word *Cognizance* means "(1) The right and power to try and determine case; jurisdiction" *Cognizance*, BLACK'S LAW DICTIONARY (2nd Ed. 2001). The D.C. Circuit recognized the clarity of the Congress's intent in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), where the D.C. Circuit held that this statute means what is says: a Superior Court grand jury has the right and power to return an indictment to the District Court.[1]

The defendant essentially asks the Court to find that the Congress implicitly repealed D.C. Code § 11-1916, which the defendant acknowledges was enacted by the United States Congress, ECF 21 at 9 n.4, when it approved unrelated changes to the Federal Rules of Criminal Procedure.[2] That conclusion is disfavored by the Supreme Court. "[R]epeals by implications are not favored,' and are a 'rarity.' Presented with two statutes, the Court will 'regard each as effective'—unless Congress' intention to repeal is 'clear and manifest," or the two laws are 'irreconcilable.'" *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (internal citations omitted). A party seeking to suggest that two statutes cannot be harmonized, and

---

[1] Conversely, based on the plain statutory language in section 1916, the D.C. Court of Appeals rejected a challenge to an indictment rendered by a federal grand jury on D.C. Code murder charges that was returned in the Superior Court. *Hackney v. United States*, 389 A.2d 1336, 1338–39 (D.C. 1978).

[2] The Supreme Court proposes rule amendments, which go into effect if the Congress does not act. 28 U.S.C. § 2074.

that one displaces the other, bears the heavy burden of showing "a clearly expressed congressional intention" that such a result should follow. *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995). Courts indulge a "stron[g] presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quoting United *States v. Fausto*, 484 U.S. 439, 452, 453 (1988)).

The defendant's argument also upends well-established principles of statutory interpretation. The Supreme Court has instructed that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). "[W]hen Congress has focused on a particular subject, a court can reasonably rely on that expression of congressional intent, by contrast with a generally worded statute where it is unclear whether Congress focused on the particular matter at issue." *United States v. Stewart*, 104 F.3d 1377, 1387 (D.C. Cir. 1997) (citing *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). Here, by enacting section 1916, Congress made clear that a Superior Court grand jury could consider federal charges and authorize an indictment to be returned on those charges in federal district court. Nothing in the general amendments to the Federal Rules of Criminal Procedure suggest any desire to depart from the specific grand jury practice that Congress authorized for the District of Columbia.

Although the defendant makes hay out of a an Advisory Committee Note to the 2002 Amendment to rule 1(b)(3)(c) that clarifies that "local judges in the District of Columbia" are not included in the term "federal judge," Fed. R. Crim. P. 1, Advisory Committee Notes, the argument completely fails to grapple with *Seals*. In *Seals*, the D.C. Circuit held that the Article III power of federal judges has little bearing on a Superior Court grand jury's power to sit and make decisions. *Seals*, 130 F.3d at 457. Indeed, the D.C. Circuit held that "the grand jury must 'remain free to pursue its investigations unhindered by external influence *or supervision* so long as it does not trench upon the legitimate rights of any witness called before it." *Id.* (quoting *United States v. Williams*, 504 U.S. 36, 48–49 (1992)). Thus, it certainly cannot be said that an Advisory Committee Note to a minor change to rule 1 would override the power of Superior Court grand juries, the *Seals* holding, or the Congress's authority to make law specific to the unique enclave that is the District of Columbia.[3] *Seals*, 130 F.3d at 457.

Finally, with respect to the defendant's suggestion that District of Columbia Judicial Efficiency and Improvement Act "cut the ties that binds the local court to the Federal Court" in a way that invalidates section 1916, the defendant misses that *the*

---

[3] It is also worth considering the authority that allows the creation of the Federal Rules of Criminal Procedure. 28 U.S.C. § 2072(a) states, "The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrate judges thereof) and courts of appeals." It further states that the rules "shall not abridge, enlarge or modify any substantive right." *Id*. at § 2072(b). It therefore would make no sense that the Federal Rules of Criminal Procedure could limit the substantive powers of the grand jury.

*same act he points to is the act that created section 1916. See* Pub. L. No. 99-650, §

1916, 100 Stat. 3635 (1986).[4]

### B. Seals *is binding law.*

Despite the defendant's attempt to suggest that *Seals*'s rationale is no longer

persuasive, the case remains binding precedent. This Court, "like panels of [the D.C.

Circuit], are obligated to follow controlling circuit precedent until either [the Circuit],

sitting en banc, or the Supreme Court, overrule[s] it." *Brookens v. Acosta*, 297 F. Supp.

3d 40, 47 (D.D.C. 2018), *aff'd sub nom. Brookens v. Dep't of Lab.*, No. 18-5129, 2018

WL 5118489 (D.C. Cir. Sept. 19, 2018); *see also Harris v. Bessent*, No. 25-5037, 2025

WL 1021435, at *1 (D.C. Cir. Apr. 7, 2025). This Court is duty bound to follow the

holding in *Seals* unless and until the Circuit reverses course.

Additionally, more recent caselaw has suggested that the 2002 amendment to

rule 1 of the Federal Rules of Criminal Procedure has not abrogated section 1916 or

*Seals*. In 2007, this Court addressed *Seals* when determining whether a Superior

Court grand jury was a "Federal grand jury" under 18 U.S.C. § 1515(a)(1) when the

grand jury was investigating only a potential D.C. Code violation. *United States v.*

*Brown*, No. 07-cr-75 CKK, 2007 WL 2007513, at *4 (D.D.C. July 9, 2007). District

Judge Kollar-Kotelly cited *Seals* as settled law, noting that the D.C. Circuit had

referred to a "Superior Court grand jury as a '*federally competent* grand jury,' . . . in

a case in which a D.C. Superior Court grand jury returned an indictment in the

---

[4] Indeed, the Superior Court's Criminal Rules largely follow the Federal Rules.
See D.C. Code § 11-946.

United States District Court for the District of Columbia on federal charges." *Id.* (citing *Seals*, 130 F.3d at 457). Ultimately, the Court concluded—"based on the facts in this case"—that because "the D.C. Superior Court grand jury charged with investigating the murder . . . served only in a local capacity in its investigation of a locally-defined crime, . . . Defendants did not allegedly obstruct a 'Federal grand jury'" in violation of 18 U.S.C. § 1512(c)(2). *Brown*, 2007 WL 2007513, at *5.

If Judge Kollar-Kotelly had concluded that *Seals* was no longer good law or that D.C. Code § 11-1916 had been repealed by the Advisory Committee Notes to the 2002 amendments to the Federal Rules of Criminal Procedure, the analysis would not have turned on "the facts in [that] case." Instead, Judge Kollar-Kotelly would have simply reasoned that a grand jury proceedings in Superior Court never could be considered "official proceedings" under federal law. The court did not do that.

Finally, contrary to defendant's claims, ECF 21 at 11, the fact that the initial grand jury to consider these charges returned a no-bill does not undermine the plain language of section 1916 and the D.C. Circuit's interpretation of that provision in *Seals*. The no-bill does not prevent the United States from presenting the charges to a second grand jury, *United States v. Thompson*, 251 U.S. 407, 414–15 (1920), without regard to whether that second grand jury resides in the District Court or in the Superior Court.

> *C. A magistrate judge is not empowered to determine the legal*
> *validity of the indictment during the grand jury return hearing.*

The defendant's arguments also misunderstand the purpose of returning an indictment in open court under rule 6(f). Rule 6(f) enshrines the centuries old

requirement that grand jurors publicly present the indictment because that "is the evidence required by law to prove that it is sanctioned by the accusing body." *Renigar v. United States*, 172 F. 646, 649 (4th Cir. 1909) (quoting *Simmons v. Commonwealth*, 89 Va. 156, 158 (1892) (quoting *Com. v. Cawood*, 4 Va. 527, 541 (Va. Gen. Ct. 1826))). In other words, the open-court requirement is about making a public record of the grand jury's concurrence with the indictment. *Cf.* Fed. R. Crim. P. 6 Advisory Committee Notes to 1966 Amendments (highlighting that "some official record should be made of the grand jury action").

The defendant's proposed role for the magistrate judge in determining the legal validity of the indictment is inconsistent with the limited role created by the Congress and recognized by the Supreme Court. "Congress made clear . . . that the magistrate acts subsidiary to and only in aid of the district court. Thereafter, the entire process takes place under the district court's total control and jurisdiction." *United States v. Raddatz*, 447 U.S. 667, 681 (1980); *see also Gonzalez v. United States*, 553 U.S. 242, 245 (2008). Put another way, the power of the magistrate judge is limited. *United States v. Garcia*, 936 F.3d 1128, 1136 (10th Cir. 2019). Dispositive matters, such as the decision whether to dismiss an indictment, are within the purview of the Article III judge. *See Raddatz*, 447 U.S. at 676. A magistrate judge does not have the power to "dismiss or quash an indictment." 28 U.S.C. § 636(b)(1)(A). Allowing a magistrate judge to wade into statutory construction arguments—as the defendant has urged here—go beyond the record-making purpose of the grand jury return hearing and into

matters left to the Article III judge by rule 12 of the Federal Rules of Criminal Procedure.

Moreover, a magistrate judge does not have the authority to refuse to accept an indictment because of a prior no bill. The Supreme Court has held that a U.S. Attorney is empowered to "present[] to one grand jury charges which a previous grand jury has ignored." *See United States v. Thompson*, 251 U.S. 407, 414–15 (1920). Moreover, "[t]he Double Jeopardy Clause of the Fifth Amendment does not bar a grand jury from returning an indictment when a prior grand jury has refused to do so." *United States v. Williams*, 504 U.S. 36, 49 (1992). In addition, "[i]t is well settled that more than one grand jury may investigate the same matter." *In re Grand Jury Proceeding*, 971 F.3d 40, 49 (2d Cir. 2020).

Simply put, there is no authority permitting a magistrate judge to decline to accept the indictment the Superior Court voted to return, particularly at this early stage in proceedings. To do so would mean ignoring binding circuit precedent, which has been settled for 30 years. And as set forth in the examples cited below, Superior Court grand juries have exercised their right and power to return federal indictments in years since the D.C. Circuit settled the matter in *Seals*.

| Case Name | Case Number | Date | Lead Charge | District Judge |
|---|---|---|---|---|
| *United States v. Seals* | 95-cr-284 | Oct. 31, 1995 | 18 U.S.C. § 371 | Lamberth |
| *United States v. Doostdar* | 18-cr-255 | Aug. 20, 2018 | 18 U.S.C. § 371 | Friedman |
| *United States v. Clark* | 18-cr-338 | Nov. 15, 2018 | 18 U.S.C. § 922(g)(3) | Kelly |
| *United States v. Wallace* | 19-cr-151 | May 6, 2019 | 18 U.S.C. § 844(i) | Hogan |

| Case Name | Case Number | Date | Lead Charge | District Judge |
|---|---|---|---|---|
| *United States v. Carter* | 20-cr-5 | Jan. 6, 2020 | 18 U.S.C. § 922(g)(1) | Bates |
| *United States v. Monroe* | 24-cr-321 | July 15, 2024 | 18 U.S.C. § 922(g)(1) | Cobb |

## II. CONCLUSION

For all the foregoing reasons, and any additional points and authorities which may be cited by the government at a hearing on this motion, this Court should accept the indictment the Superior Court grand jury voted to return and it should take appropriate curative action regarding its public statements disparaging the U.S. Attorney's Office's actions in this case.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

 */s/Jonathan R. Hornok*
JONATHAN R. HORNOK
Assistant United States Attorney
Chief of the Criminal Division

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES,

Plaintiff,

v.                                                          No. 25-mj-0225

KEVONTAE STEWART,

Defendant.

**<u>ORDER</u>**

Between the year 2005[1] and today, over 5,000 indictments were returned in the United States District Court for the District of Columbia. Last week, the government attempted—for the first time ever—to return an indictment from a D.C. Superior Court grand jury after a federal grand jury previously refused to indict. This unprecedented workaround to the normal federal grand jury process immediately raised serious questions about the legality of the government's conduct. Nevertheless, the government demanded that this Court accept its extraordinarily unusual indictment without any further scrutiny, insisting not only that the indictment was lawful but that this Court lacked the power to even consider its legality. But this Court is bound to apply the Federal Rules of Criminal Procedure, and the Rules do not permit this Court—much less require it—to approve of the facially invalid grand jury indictment that the government has proffered.

---

[1] In 2005, the clerk's office began keeping files electronically, making that an easy point of reference for data collection.

**A108**

## I.      BACKGROUND

On September 18, 2025, the government filed a criminal complaint against Mr. Kevontae Stewart alleging that he had unlawfully possessed a firearm in violation of 18 U.S.C. § 922(g)(1). *See* Complaint, ECF No. 1. On Friday, September 26, 2025, this Court's grand jury declined to return an indictment against Mr. Stewart. *See* Report of Grand Jury, ECF No. 9. That afternoon, the Court held an emergency hearing to address Mr. Stewart's continued detention given the grand jury no-bill. *See* Docket, September 26, 2025, hearing before Judge Sharbaugh.

At the emergency hearing, Mr. Stewart moved to dismiss the case against him and again asserted his right to a preliminary hearing.[2] *Id.* The Court declined to dismiss the case at that juncture but noted that the preliminary hearing scheduled for September 30, 2025 would proceed given the grand jury's refusal to vote in favor of indicting the case. *Id*.

On September 29, 2025, the government attempted to return an indictment charging Mr. Stewart with a single federal count violation based on a D.C. Superior Court grand jury's vote to return an indictment. The undersigned, doubting that it would be lawful to accept an indictment from a D.C. Superior Court grand jury, ordered briefing on the matter from the government and appointed the Office of the Federal Public Defender as co-counsel for Mr. Stewart.

---

[2] Separately, this Court recognizes that there is an alternative basis under which this indictment could be invalidated. While prosecutors enjoy broad discretion in charging decisions, "the doctrine [of prosecutorial vindictiveness] precludes action by a prosecutor that is designed to penalize a defendant for invoking any legally protected right available to [him] during a criminal prosecution." *United States v. Meadows*, 867 F.3d 1305, 1311 (D.C. Cir. 2017). "[E]vidence sufficient to establish a realistic likelihood of vindictiveness" raises a presumption that the government must rebut. *Meadows¸* 867 F.3d at 1311.

The government's insistence on securing an indictment by any means necessary in response to Mr. Stewart exercising his right to a preliminary hearing and moving to dismiss his case following the grand jury no-bill is arguably enough to raise such a presumption. *See, e.g.*, *United States v. Terrell*, 220 F. Supp. 3d 952, 946 (N.D. Iowa 2016) (finding vindictive prosecution where the government refused to give the defendant "an opportunity to continue cooperating" because he "insisted on going forward with [his] preliminary and detention hearing").

## II.    DISCUSSION

### A.    The Court's Power

An indictment that is substantively deficient is "a legal nullity." *See, e.g., United States v. Alcorta*, 145 F. Supp. 3d 357, 362 (M.D. Pa. 2015) (holding that an indictment form that used a different name than the person the government accused was a substantive error that rendered the indictment "a legal nullity"); *United States v. Daniels,* 973 F.2d 272, 274 (4th Cir. 1992) (finding that an indictment that fails to "include every essential element of the charged offense" is "fatally defective"). The Supreme Court has held time and again that an indictment must be "valid on its face" and "returned by a legally constituted nonbiased grand jury" for the case to proceed. *Costello v. United States*, 350 U.S. 359, 363 (1956); *see also Lawn v. United States*, 355 U.S. 339, 349 (1958).

It is well within a magistrate judge's discretion to refuse a facially invalid indictment. "[T]he responsibility for issuing subpoenas and for accepting returned indictments is vested in United States magistrate judges." *United States v. Seals*, 130 F.3d 451, 457 (D.C. Cir. 1997) (citing Fed. R. Crim. P. 6(e)(4) & 6(f)). Indeed, "supervisory responsibilities [over a grand jury] are often discharged by a magistrate judge[, not a district judge]." *Id.* at 459. Such supervisory responsibility is limited to "curb[ing] federal prosecutorial abuses," *id.* at 458, and ensuring that facially invalid indictments are not returned, *see Lawn*, 355 U.S. at 349.

The government insists that this Court has no power to refuse even a facially invalid indictment. *See* October 3, 2025, Emergency Hearing Tr. at 5:5–12 (Q: Are you saying [the magistrate judge] would have to accept that indictment even if it were flawed or even if it were improperly presented? A: I believe so, your honor). The government is wrong. First, it cites no authority for this proposition. Second, this proposition contravenes both the well-established procedures surrounding grand jury indictments and common sense. The government's position

3

**A110**

would obligate this Court to accept any and all indictment documents the government thrusts before it, including: an indictment returned by a state-court grand jury from Maryland; an indictment that omits the name of the defendant or the charges against them; an indictment charging offenses that the government did not present to a grand jury; an indictment charging statutory violations no longer in effect; an indictment where there was not a quorum of grand jurors; etc. This Court's statutorily created responsibility supervising the grand jury process and the orderly administration of justice forbids that outlandish result.

It should come as no surprise to the government that this Court serves as more than a mere rubber stamp on grand jury returns. Indeed, just last week, the undersigned refused a facially invalid indictment because the government failed to present a charge to the grand jury, as reflected in the poll sheet, that was in its indictment. The government acknowledged the error and informed the undersigned that they would resubmit their indictment at a later date.

The government's view begs the question of why Congress involved magistrate judges in the grand jury return process at all. Congress could have made returns automatic upon a vote by the grand jury. The grand jury would then give the indictment to the Clerk's office to be docketed. In this world, the only check against invalid indictments being returned would be upon a motion from the defendant to dismiss the indictment. The presiding district judge would then dismiss the indictment. Beyond not being what Congress intended, "this is an astonishingly callous argument which ignores the obvious. For a wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted. The stigma cannot be easily erased." *In re Fried*, 161 F.2d 453, 458 (2d Cir. 1947); *see also United States v. Search of L. Off., Residence, & Storage Unit Alan Brown*, 341 F.3d 404, 415 (5th Cir. 2003) (quoting *In re Fried)*.

The government's insistence that no mechanism prevents the acceptance of an invalid indictment also ignores the harm all defendants face from being booked and processed upon the return of an indictment. Not to mention, that law enforcement arrests many defendants upon the return of an indictment. "Arrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *United States v. Marion*, 404 U.S. 307, 320 (1971). The "time spent in jail awaiting trial has a detrimental impact on the individual" and "[i]mposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who" were wrongly charged to begin with. *Barker v. Wingo*, 407 U.S. 514, 532. This harm also extends to defendants already detained on other charges: "while it might be argued that a person already in prison would be less likely than others to be affected by 'anxiety and concern accompanying public accusation,' there is reason to believe that an outstanding untried charge (of which even a convict may, of course, be innocent) can have fully as depressive an effect upon a prisoner as upon a person who is at large." *United States v. Brown*, 520 F.2d 1106, 1112 (D.C. Cir. 1975). And even defendants already on pre-trial release are at risk from indictment returns. A returned indictment presents a renewed opportunity to detain such defendants, just as the government could do here to Mr. Stewart.

### B.    The Requirement of a Federal Grand Jury

The Federal Rules of Criminal Procedure have "the force of law," *United States v. Robertson*, 55 F.R.D. 13, 14 (D.D.C. 1972), and "govern the procedure in all criminal proceedings in the United States district courts." Fed. R. Crim. P. 1(a)(1). A United States magistrate judge is bound by the "powers and duties conferred or imposed" by these Rules. 28 U.S.C. Code § 636

("Each United States magistrate judge serving under this chapter shall have . . . all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure for the United States District Courts.").

The Rules limit the Court's power to accept indictments. Rule 6 governs the grand jury. It provides that "the court" must order the grand jury to be summoned, appoint the foreperson and deputy foreperson, and perform other tasks related to the continued operation of the grand jury. *See* Fed. R. Crim. P. 6(a), 6(c), 6(g), 6(h). The Rules define "court" as "a federal judge." Fed. R. Crim. P. 1(2). The Rules, in turn, define "federal judge" to mean (A) "a justice or judge of the United States as these terms are defined 28 U.S.C. § 451"; (B) "a magistrate judge"; or (C) "a judge confirmed by the United States Senate and empowered by statute in any commonwealth, territory, or possession to perform a function to which a particular rule relates." Fed. R. Crim. P. 1(b)(3)(A)–(C). Judges from D.C. Superior Court do not satisfy any of these three definitions.

First, let's address Rule 1(b)(3)(A): under 28 U.S.C. § 451, "judge" includes "judges of the courts of appeals, district courts, Court of International Trade and any court created by Act of Congress, the judges of which are entitled to hold office during good behavior." 28 U.S.C. § 451. "Justice" is defined as "the Chief Justice of the United States and the associate justices of the Supreme Court." *Id.* While an act of Congress created the D.C. Superior Court, its judges are not entitled to hold office with life tenure (i.e., "good behavior"). *See* D.C. Code § 1–204.31(c) (Superior Court Associate Judges are appointed for a term of fifteen years). Thus, D.C. Superior Court Associate judges are not "judges" within the meaning of Rule 1(b)(3)(A).

Next up, Fed. R. Crim. P. 1(b)(3)(B): Rule 1 defines "magistrate judge" as a "United States Magistrate Judge as defined in 28 U.S.C. §§ 631–639." Fed. R. Crim. P. 1(b)(5). Section 631 provides that a "United States magistrate judge" is one that is appointed by "the judges of each

United States district." *Id*. Unlike United States magistrate judges, D.C. Superior Court magistrate judges are appointed by the chief judge of D.C. Superior Court. *See* D.C. Code § 11–1732(a). Thus, D.C. Superior Court magistrate judges are not "judges" within the meaning of Rule 1(b)(3)(B).

Finally, Fed. R. Crim. P. 1(b)(3)(C): Although D.C. Superior Court judges are confirmed by the United States Senate, the District of Columbia is a federal district and not a commonwealth, territory, or possession as the Rule requires. "Currently, two United States insular areas are commonwealths, the Northern Mariana Islands and Puerto Rico" and "only one [territory] exists currently, Palmyra Atoll." U.S. Dep't of the Interior, Definitions of Insular Area Political Organizations, https://perma.cc/62YD-32FR (last visited Oct. 8, 2025). "Possession" refers to the same land areas encompassed by the phrase "territory" *See id.* (explaining that while "it still appears in Federal statutes and regulations, possession is no longer current colloquial usage.").

Further, within the same section of definitions in Rule 1, "State" is defined as: "the District of Columbia, and any commonwealth, territory, or possession of the United States."[3] Fed. R. Crim. P. 1(b)(9). By excluding the District of Columbia in Rule 1(b)(3)(C), but including it in Rule 1(b)(9), we can safely conclude that the District of Columbia is not a "commonwealth, territory, or possession." Otherwise, Congress would not have set it apart from the other three terms in Rule 1(b)(9). To find otherwise would imply that Congress's words are not carefully chosen to make meaningful distinctions. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a

---

[3] The fact that this inclusion and exclusion is within the same statute demonstrates that Congress necessarily considered this distinction. *See Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) (quoting *Kurinsky v. United States*, 33 F.3d 594, 597 (6th Cir.1994) ("The doctrine of noscitur a sociis instructs that 'a . . . term is interpreted within the context of the accompanying words 'to avoid the giving of unintended breadth to the Acts of Congress.'")).

temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health.") (internal quotations and citations omitted). Further substantiating this reading, Rule 1(10)(B) defines a "State or local judicial officer" as "a judicial officer empowered by statute in the District of Columbia or in any commonwealth, territory, or possession to perform a function to which a particular rule relates." Congress yet again set the District of Columbia apart from "any commonwealth, territory, or possession." Moreover, Rule 1(10)(B) necessarily excludes D.C. Superior Court judges from the definition of a "federal judge" by instead categorizing them as a "State or local judicial officer." Thus, D.C. Superior Court judges are not federal judges within the meaning of Rule 1(b)(3)(C).

The final nail in the coffin is the advisory committee notes to Rule 1. The notes expressly clarify that the term "federal judge" "does not include local judges in the District of Columbia." Fed. R. Crim. P. 1 Advisory Committee Notes-2002 Amendment. Because Rule 6 is explicit that a grand jury must be summoned by a federal judge, as that term is defined in Rule 1, there is no plausible reading of the Rules that would allow for a grand jury summoned by a D.C. Superior Court judge to return federal charges in federal court.

### C.      The Federal Rules Supersede the D.C. Code

The government argues that D.C. Code § 11-1916 empowers a D.C. Superior Court grand jury to return federal indictments in federal court. But this provision of the D.C. Code cannot modify federal court procedural rules, nor can it expand the powers conferred upon federal magistrate judges or override the grand jury procedures expressly set forth in the Federal Rules that require indictments to be issued by a grand jury summoned by the federal court.

"[T]he D.C. Circuit has repeatedly held that a single set of procedural rules—the rules that govern federal courts—apply with respect to the federal court's adjudication of alleged criminal

violations[.]" *United States v. Greene*, 516 F. Supp. 3d 1, 15 (D.D.C. 2021). In *Greene*, the court considered what procedural rules apply when a defendant is accused of D.C. Code violations in federal court. Specifically, what happened when the relevant D.C. Code provision and federal statute imposed differing obligations. Despite the existence of both provisions, the Court applied the federal statute. *See id.* Thus, Rule 6 governs federal court grand jury procedure, not the arguably conflicting provisions of D.C. Code § 11-1916.

Courts in this District and the D.C. Circuit have consistently reaffirmed this principle. *See, e.g.*, *United States v. Hammond*, No. 02-cr-294, 2020 WL 1891980, at *7 (D.D.C. Apr. 16, 2020) (holding that federal court must apply federal sentencing code rather than D.C. sentencing code when defendant was charged with D.C. Code violations in federal court); *see also United States v. Brown*, 483 F.2d 1314, 1318 (D.C. Cir. 1973) (holding that federal court must apply federal bail provision rather than D.C. Code bail provision because defendant was prosecuted in federal court despite only being convicted of D.C. Code violations); *United States v. Belt*, 514 F.2d 837, 843 (D.C. Cir. 1975) (holding that, where a defendant is tried for local and federal offenses in district court, "the federal forum's evidentiary law" governs because it "is patently not feasible for the [court] to try [such] a defendant" under two sets of evidentiary rules).

Further, if this Court were to "accept the government's contention that the local provision[] do[es] apply" then "defendants in the federal courts of this jurisdiction would be treated more harshly than defendant's in any other federal court[.]"*Brown*, 483 F.2d at 1318. The D.C. Circuit has made clear that such disparate treatment of D.C. defendants within the federal judicial system cannot be tolerated. *Id.* Specifically, subjecting federal defendants in Washington, D.C., to both federal grand jury proceedings and (at the government's whim) to Superior Court grand jury proceedings would unfairly place them in greater legal jeopardy. There are substantive differences

between the two grand jury systems. One example is the different selection criteria for potential jurors. *See* Def. Resp., ECF No. 21 at 7–9. Another difference is the term and substance of what D.C. Superior Court grand juries see. D.C. Superior Court grand juries sit for 25 days and generally see a huge volume of arrest-generated cases. These cases often involve a single witness testifying before the grand jury. In contrast, the federal grand jury sits for a year, yet hears far fewer cases. And these cases allege violations of generally more complex federal crimes that are often the subject of lengthy investigations for which multiple witnesses would testify. Arguably, the lower volume of cases gives the federal grand jurors additional time to pressure test the government's case. The unprecedented number of recent federal grand jury rejections—a trend that appears to be spreading as most recently seen in Chicago—reflects that federal grand juries want more than the government is offering. So, there may be a nominal risk that a D.C. Superior Court grand jury is a more receptive audience for charging federal offenses than a federal grand jury. Indeed, a federal grand jury said no here, and then a Superior Court grand jury said yes. *Brown* necessitates a reading of the rules that forecloses any chance that this harsher standard would apply to a federal D.C. defendant. 483 F.2d at 1318.

The government argues that this interpretation of the Federal Rules renders D.C. Code § 11–1916 out of existence. Not so. It is permissible under both the Federal Rules and D.C. Code § 11–1916 for a *federal* grand jury to return an indictment being prosecuted in *D.C. Superior Court*. The D.C. Circuit has held this much to be true. *See Hackney v. United States*, 389 A.2d 1336, 1339 (D.C. 1978) (holding that D.C. Code § 11–1916 permits the United States District Court grand jury to return an indictment in D.C. Superior Court).

But speaking of reading out of existence: the government's take on D.C. Code § 11–1916 allows for entirely eliminating the federal grand jury process for Washington, D.C. Under their

10

**A117**

view, the government could take all federal indictments to D.C. Superior Court without any limitations. That outcome is something to be especially vigilant against given the recent struggles of the government to bend federal grand juries to the government's will. *See, e.g.*, *United States v. Beidleman*, No. 25-cr-270, 2025 WL 2803850, at *1 (D.D.C. Oct. 1, 2025) (collecting many of the cases where there have been no true bills).

### D.    The Government's Reliance on *Seals* is Misplaced

No case has considered the question of whether the Federal Rules authorize a federal magistrate judge to accept an indictment from a D.C. Superior Court. Not *Seals*, nor the other five cases the government cites in its reply. The only question presented in *Seals* was whether such a procedure would be *constitutionally* permitted under separation-of-powers principles and the Fifth Amendment. *Seals* is silent on whether the D.C. Code provision the government relies upon can effectively rewrite the grand jury procedures that are set forth in the Federal Rules.

Importantly, the 2002 amendment to the Rule 1—which expressly excludes D.C. Superior Court judges in the Advisory Committee Notes—came *years after* both the enactment of D.C. Code § 11-1916 and the decision in *Seals*. *See* supra at II(B). Thus, Rules 1 and 6 dictate the outcome here.

## III.   CONCLUSION

This litigation and the delay caused by it could have been avoided if the government had simply gone to one of the other federal grand juries. That escape hatch remains open today. At any time, the government can short circuit this dispute by taking their federal charge before a federal grand jury. The question then is why are they *now* afraid to do so?

Date: October 9, 2025

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

12

**A119**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **UNITED STATES OF AMERICA** |
| **v.** |
| **KEVONTE STEWART,**<br>**Defendant.** |

**Case No. 1:25-MJ-225**

## REQUEST FOR REVIEW OF JUDGE FARUQUI'S ORDER REFUSING TO ACCEPT A GRAND JURY RETURN

The United States of America respectfully requests that the Chief Judge, for the reasons described below and in its other briefing in this case, ECF 15, 16, 17, 23, vacate Magistrate Judge Zia M. Faruqui's order, ECF 24, in which he refused to accept the indictment a Superior Court grand jury voted to return in this case. This Court should also, on or before October 21, 2025, issue an order directing Judge Faruqui to accept the indictment at a hearing on October 22, 2025, which is the last day on which the Superior Court grand jury is in session.

As set forth below, the Congress, in D.C. Code § 11-1916, gave the Superior Court grand jury jurisdiction to return the indictment. The D.C. Circuit recognized this jurisdiction in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), which remains binding precedent for this Court.

### I. BACKGROUND

*A. Judge Faruqui found probable cause for the federal charge,
but a District Court grand jury did not concur in the indictment.*

On September 18, 2025, Judge Faruqui issued the criminal complaint in this case, finding that there was probable cause to believe that the defendant unlawfully

possessed a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). ECF 1. The same day, the defendant appeared before Judge Faruqui for his initial appearance. The next day, September 19, 2025, Magistrate Judge Matthew J. Sharbaugh ordered the defendant detained, finding him to be a danger to the community, and set a preliminary hearing in this matter for Tuesday, September 30, 2025, at 9:30 AM.

On Friday, September 26, 2025, Grand Jury 25-3 in the United States District Court declined to return an indictment charging the defendant with the violation of 18 U.S.C. § 922(g)(1). ECF 9. The same day, the foreperson appeared in court before Judge Sharbaugh to report the lack of concurrence pursuant to rule 6(f) of the Federal Rules of Criminal Procedure. And then Judge Sharbaugh held an emergency status hearing and released the defendant at defense counsel's request. In light of the defendant's release, the government requested that the preliminary hearing be moved from September 30, 2025, at 9:30 AM, to October 8 or 9, 2025. *See* Fed. R. Crim. P. 5.1(c). The Court declined to do so at that time, but set a hearing on Monday, September 29, 2025, at 12:30 PM, to swear the defendant into release conditions and consider the government's request to continue the preliminary hearing.

*B. A Superior Court grand jury voted to return an indictment.*

Because no grand jury was sitting in the federal courthouse on September 29, 2025—the only intervening court day before the scheduled preliminary hearing—the government determined to seek an indictment from the Superior Court grand jury pursuant to D.C. Code § 11-1916, which was available at approximately 1:15 PM on Monday, September 29. Thus, on Friday, September 26, the government contacted the clerk's office and Judge Faruqui's chambers, advising that it expected to present

the case to a grand jury empaneled in the Superior Court for the District of Columbia and requested that the court prepare to receive an indictment if one were returned. The government cited D.C. Code § 11-1916 as the basis for its request.

Given the conflicting timing on Monday, one AUSA appeared at the 12:30 PM hearing in the federal courthouse and another appeared in the Superior Court grand jury, located at 601 D Street NW, at 1:15 PM. By 2:00 PM, the Superior Court grand jury, which had been empaneled on September 4, voted to return the indictment. After the Superior Court grand jury voted to return the indictment, the AUSA who appeared in the Superior Court grand jury learned that the preliminary hearing— which had been scheduled for the next morning—was continued.

*C. Judge Faruqui refused to accept the indictment the Superior Court grand jury voted to return.*

That same afternoon, the government appeared before Judge Faruqui with the foreperson to return the indictment. During the hearing, the AUSA presented the legal authority for the Superior Court grand jury to return the indictment, including D.C. Code § 11-1916, *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), *United States v. Brown*, No. 07-75, 2007 WL 2007513 (D.D.C. July 9, 2007), *United States v. Allen*, 729 F. Supp. 120 (D.D.C. 1989), and the federal indictment returned to this Court by a Superior Court grand jury in *United States v. Clark*, 18-cr-338 (D.D.C. Nov. 15, 2018). Transcript, *United States v. Stewart*, 25-mj-225 (D.D.C. Sept. 29, 2025), at 2–4. After taking a recess to consider the legal authorities presented by the United States, Judge Faruqui resumed the bench and declined to accept the return.

He then appointed the Federal Public Defender's Office as "co-counsel in this matter" and ordered adversarial briefing on the matter. ECF 12.

Thereafter, the United States filed an emergency request for review before the Chief Judge. ECF 15. The Chief Judge held a hearing on October 3, 2025, at which time he ruled that the motion for review was premature. The government again presented its arguments to the magistrate judge, ECF 17, and the defendant filed a response on October 7, 2025, ECF 21. The government filed a reply brief on October 8, 2025. ECF 23.

During the hearing on October 9, 2025, Judge Faruqui declined to hear argument and then announced that he would not accept the indictment for reasons he would state is a written opinion. Later that day, Judge Faruqui issued a written opinion with two principal holdings: (1) that a magistrate judge has the authority to determine whether the indictment was valid,[1] and (2) that this Court is duty bound to ignore D.C. Code § 11-1916 because of the 2002 amendment to rule 1 of the Federal Rules of Criminal Procedure. ECF 24.

In his written order, Judge Faruqui reasons that D.C. Code § 11-1916 has been superseded by the Federal Rules of Criminal Procedure, ECF 24 at 8–11, because

---

[1] As set forth in prior briefing, ECF 15, 17, 23, which is incorporated herein, Judge Faruqui effectively dismissed the instant indictment before it was even filed, acting beyond his authority as a magistrate judge and usurping the power to "dismiss or quash an indictment" and make other dispositive rulings that is reserved to District Judges by Article III of the U.S. Constitution, 28 U.S.C. § 636, and rule 12 of the Federal Rules of Criminal Procedure. *See also United States v. Raddatz*, 447 U.S. 667, 681 (1980); *Gonzalez v. United States*, 553 U.S. 242, 245 (2008). But assuming *arguendo* that a magistrate judge does have such power, Judge Faruqui's reasoning on the merits is erroneous and must be overturned.

section 1916 is a matter of local procedure—akin to sentencing or bail procedures—that federal courts must ignore. *Id.* at 8–9 (citing *United States v. Greene*, 516 F. Supp. 3d 1, 15 (D.D.C. 2021)). Judge Faruqui reasons further that allowing a Superior Court grand jury to return an indictment on federal charges would unfairly prejudice defendants given the "nominal risk that a D.C. Superior Court grand jury is a more receptive audience for charging federal offenses" because Superior Court grand jurors do not have as much time to "pressure test the government's case." *Id.* at 10. Thus, Judge Faruqui found it necessary to adopt "a reading of the rules that forecloses any chance" of this risk for federal defendants. *Id.*

Under Judge Faruqui's reading of the Federal Rules of Criminal Procedure, the rules "limit the Court's power to accept indictments." *Id.* at 6. Judge Faruqui's reasoning proceeds as follows: Rule 6(a)(1) requires that "[w]hen the public interest so requires, the *court* must order that one or more grand juries be summoned." Fed. R. Crim. P. 6(a)(1) (emphasis added). Rule 6(c) provides that "[t]he *court* will appoint one juror as the foreperson and another as the deputy foreperson." Fed. R. Crim. P. 6(c) (emphasis added). And the word *court* in the Federal Rules of Criminal Procedure includes the U.S. District Court for the District of Columbia but not the Superior Court for the District of Columbia. *Id.* 6–8. Thus, Judge Faruqui concludes, this Court must refuse to accept an indictment from a Superior Court grand jury that has "take[n] cognizance of [a] matter[] brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts" pursuant to D.C. Code § 11-1916.

## II. ARGUMENT

*A. This Court has authority to review Judge Faruqui's order.*

The Rules of the United States District Court for the District of Columbia delineate the role of the Chief Judge in reviewing decisions of the magistrate judges and handling matters related to the grand jury. Local rule 57.14(b) states that "one of the duties of the Chief Judge is to empanel the grand jury and hear and determine all matters relating to proceedings before the grand jury." D.D.C. Ct. R. 57.14(b). It also assigns to the Chief Judge the duty to "hear and determine requests for review of rulings by magistrate judges in criminal matters not already assigned to a district judge." *Id.* at 57.14(e). Here, because the magistrate judge has issued an order and the underlying matter is not already assigned to a district judge, the Chief Judge should review it. Moreover, since the order directly implicates the grand jury's functioning, the Chief Judge is within his authority to "determine all matters relating to proceedings before the grand jury." *Id.* at 57.14(b).

*B. This Court must give full effect to D.C. Code § 11-1916, harmonizing it with the Federal Rules of Criminal Procedure.*

The Supreme Court has instructed that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). "[W]hen Congress has focused on a particular subject, a court can reasonably rely on that expression of congressional intent, by contrast with a generally worded statute where it is unclear whether Congress focused on the particular matter at issue." *United States v. Stewart*, 104

F.3d 1377, 1387 (D.C. Cir. 1997) (citing *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).

Moreover, "repeals by implications are not favored,' and are a 'rarity.' Presented with two statutes, the Court will 'regard each as effective'—unless Congress' intention to repeal is 'clear and manifest," or the two laws are 'irreconcilable.'" *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (internal citations omitted). A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing "a clearly expressed congressional intention" that such a result should follow. *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995). Courts indulge a "stron[g] presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quoting *United States v. Fausto*, 484 U.S. 439, 452, 453 (1988)).

Here, D.C. Code § 11-1916 is a specific statute enacted by Congress that is part of a comprehensive act to "constitute [a] Tribunal[] inferior to the supreme Court" within in the District of Columbia—a place over which the Congress has unique power to "exercise exclusive Legislation in all Cases whatsoever." U.S. Const. Art. I § 8. Under D.C. Code § 11-1916, a Superior Court grand jury—like a District Court grand jury—may "take *cognizance* of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts," D.C. Code § 11-1916 (emphasis added). The word *cognizance* means "(1) The right and

power to try and determine cases; jurisdiction." *Cognizance*, BLACK'S LAW DICTIONARY (2nd Ed. 2001). Additionally, in the next section, the Congress mandated the following: "To the extent feasible, the Superior Court and the United States District Court shall consider the respective needs of each court in the qualification, selection, and service of jurors." D.C. Code § 11-1917. Thus, the Congress specifically directed the Superior Court to consider the needs of the District Court when supervising the operation of Superior Court grand juries.

In *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), the D.C. Circuit held that D.C. Code § 11-1916 means what it says: a Superior Court grand jury has the jurisdiction to return an indictment to the District Court. Likewise, based on the plain language of section 11-1916, the D.C. Court of Appeals held that a District Court grand jury had jurisdiction to return an indictment to the Superior Court. *Hackney v. United States*, 389 A.2d 1336, 1338–39 (D.C. 1978). In other words, the appellate courts to consider this statute have both concluded that the Congress gave all grand juries in the District of Columbia uniquely broad jurisdiction over both federal and local matters. Courts "normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Ryan v. Gonzales*, 568 U.S. 57, 66 (2013) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 646-47 (2010)). Thus, at the time of the 2002 amendments to the Federal Rules, Congress was aware of the binding precedent that clearly authorized the coextensive jurisdiction of District Court and Superior Court grand juries in the District of Columbia.

In contrast, the Federal Rules of Criminal Procedure have general application to all federal courts throughout the republic and do not reveal a Congressional intent to supersede or repeal D.C. Code § 11-1916. To begin, there is nothing in the 2002 amendments to the rules that demonstrate that the Congress was "focused on the particular matter at issue" here: whether Superior Court grand juries were empowered to return federal indictments. Indeed, the Advisory Committee Notes for the 2002 amendments provide the following: "The language of Rule 6 has been amended as part of the general restyling of the Criminal Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic, except as noted below." The notes that follow do not mention anything about the provisions in subsection (a) and (f), which deal with the convening of grand juries and the return of indictments by grand juries. Indeed, none of the provisions or advisory notes of rule 6 make any mention of the District of Columbia or the Superior Court. And there is no definition in rule 1 for the term grand jury that by its terms excludes Superior Court grand juries. Bottom line: there is nothing to suggest the 2002 amendments to the Federal Rules of Criminal Procedure were intended to address the unique role that grand juries in the District of Columbia have to consider federal and local criminal charges.

Next, the text of rule 6 is not restrictive. Put another way, the rule states what this Court must do, not what the Superior Court cannot do. Rule 6(a) provides that "the court must order that one or more grand juries be summoned." But by requiring this Court to summon a grand jury, the rule by its own language does not exclude the

Superior Court from doing the same. Likewise, rule 6(f) provides the following: "A grand jury may indict only if at least 12 jurors concur. The grand jury—or its foreperson or deputy foreperson—must return the indictment to a magistrate judge in open court." But there is nothing in the text of that provision, or the definitions in rule 1, that requires the grand jury in question to have been summoned by this Court pursuant to rule 6(a). Simply put, there is nothing in the text of rule 6 that is necessarily irreconcilable with Superior Court grand juries exercising the coextensive jurisdiction granted by D.C. Code § 11-1916.

In the context of appropriations, the D.C. Circuit has held "it seems barely necessary to repeat the frequently stated and eminently sound maxim that the policy against repeals by implication is of particular force when the purported repealer takes the form of an appropriations enactment." *Demby v. Schweiker*, 671 F.2d 507, 512 (D.C. Cir. 1981). Much like an appropriations enactment, a stylistic change to the Federal Rules of Criminal Procedure should not be considered a conscious repeal of D.C. Code § 11-1916. As stated in *Demby*, "It is difficult to imagine that any member of Congress . . . would consider that he was voting for the repeal" of section 11-1916 by not objecting to the proposed rule changes in 2002. *Id*. Indeed, "[t]he conventional way to signal that one statutory provision is intended to override conflicting provisions is the construction, "Notwithstanding any other provision of law." *P.J.E.S. by & through Escobar Francisco*, 502 F. Supp. at 541 (D.D.C. 2020) (citing *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993)).

In the absence of any explicit reference to D.C. Code § 11-1916, this Court is bound to apply the Supreme Court's strong presumption against repeal by implication and read the Federal Rules of Criminal Procedure in a way that harmonizes them with D.C. Code § 11-1916. A harmonious reading is readily available: Under rule 6(a), "[w]hen the public interest so requires, [this] court must order that one or more grand juries be summoned." Likewise, under D.C. Code § 11-1907 the Superior Court shall summon grand juries. And pursuant to D.C. Code § 11-1916 and rule 6(f), "[a] grand jury," whether summoned by this court or the Superior Court, "may indict only if at least 12 jurors concur." If any grand jury in the District of Columbia votes to return an indictment to this Court pursuant to D.C. Code § 11-1916, then the "grand jury—or its foreperson or deputy foreperson—must return the indictment to a magistrate judge in open court" pursuant to rule 6(f). Under this harmonious reading of the rules and the D.C. Code, this Court should accept the indictment the Superior Court grand jury voted to return.

*C. This Court is bound by the D.C. Circuit's opinion in* Seals.

Next, Magistrate and District Courts, "like panels of [the D.C. Circuit], are obligated to follow controlling circuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule[s] it." *Brookens v. Acosta*, 297 F. Supp. 3d 40, 47 (D.D.C. 2018), *aff'd sub nom. Brookens v. Dep't of Lab.*, No. 18-5129, 2018 WL 5118489 (D.C. Cir. Sept. 19, 2018); *see also Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *1 (D.C. Cir. Apr. 7, 2025). This Court is duty bound to follow the holding in *Seals* unless and until the Circuit reverses course.

In *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), the D.C. Circuit held that section 11-1916 permitted a Superior Court grand jury to return an indictment to this Court. In that case, the United States secured an indictment alleging violations of federal law before a grand jury empaneled in the Superior Court. *See* Indictment, *United States v. Seals*, No. 95-cr-284 (D.D.C. Oct. 31, 1995), ECF 1. The defendant moved to dismiss the indictment on the basis that section 11-1916 was unconstitutional and that it "deprive[d] them of the constitutional safeguards associated with Article III supervision of federally-indicting grand juries." *Seals*, 130 F.3d at 456 n.3. The D.C. Circuit rejected this argument. The court acknowledged that "section 1916(a) is applicable only to the unique federal enclave." *Id.* at 457 (internal quotation marks omitted). But the court reasoned that "the power to supervise a federally-competent grand jury cannot fairly be described as an essential attribute of the judicial power of the United States." *Id.* at 459 (internal quotation marks omitted). The court concluded, "While the grand jury arrangement in the District of Columbia may be unique, 'our constitutional principles of separated powers are not violated . . . by mere anomaly or innovation.'" *Id.* at 460 (quoting *Mistretta v. United States*, 488 U.S. 361, 385 (1989)).

Additionally, more recent caselaw has suggested that the 2002 amendment to rule 1 of the Federal Rules of Criminal Procedure has not abrogated section 11-1916 or *Seals*. In 2007, this Court addressed *Seals* when determining whether a Superior Court grand jury was a "Federal grand jury" as that term is used in 18 U.S.C. § 1515(a)(1) when the grand jury was investigating only a potential D.C. Code violation.

*United States v. Brown*, No. 07-cr-75 CKK, 2007 WL 2007513, at \*4 (D.D.C. July 9, 2007). District Judge Kollar-Kotelly cited *Seals* as settled law, noting that the D.C. Circuit had referred to a "Superior Court grand jury as a '*federally competent* grand jury,' . . . in a case in which a D.C. Superior Court grand jury returned an indictment in the United States District Court for the District of Columbia on federal charges." *Id.* (citing *Seals*, 130 F.3d at 457). Ultimately, however, Judge Kollar-Kotelly concluded—"based on the facts in this case"—that because "the D.C. Superior Court grand jury charged with investigating the murder . . . served only in a local capacity in its investigation of a locally-defined crime, . . . Defendants did not allegedly obstruct a 'Federal grand jury'" in violation of 18 U.S.C. § 1512(c)(2). *Brown*, 2007 WL 2007513, at \*5.

If Judge Kollar-Kotelly had concluded that *Seals* was no longer good law or that D.C. Code § 11-1916 had been repealed by the 2002 amendments to the Federal Rules of Criminal Procedure, the analysis would not have turned on "the facts in [that] case." Instead, Judge Kollar-Kotelly would have simply reasoned that grand jury proceedings in Superior Court never could be considered "official proceedings" under federal law. The court did not do that.[2]

---

[2] Judge Faruqui reasons that defendants in the District of Columbia face greater jeopardy because District Court or Superior Court grand juries may return a federal indictment. ECF 24 at 9. This is incorrect. Defendants in other federal districts face the prospect of state and federal indictments without the same double jeopardy protections that D.C. defendants enjoy. *United States v. Mills*, 964 F.2d 1186, 1193 (D.C. Cir. 1992); *Robertson,* 810 F.2d at 257; *United States v. Alston,* 609 F.2d 531, 537 n. 31 (D.C.Cir.1979) (dicta); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *Bartkus v. Illinois,* 359 U.S. 121, 132–33, 79 S.Ct. 676, 682–83, 3 L.Ed.2d 684 (1959)).

Finally, if the 2002 amendment to the Federal Rules of Criminal Procedure abrogated *Seals*, this issue would have been discovered and litigated at some point during the nearly twenty-three years between the 2002 amendments and this case. As set forth in the examples cited below, multiple judges of this Court have presided over cases based on indictments returned by Superior Court grand juries:

| Case Name | Case Number | Date | Lead Charge | District Judge |
|---|---|---|---|---|
| *United States v. Seals* | 95-cr-284 | Oct. 31, 1995 | 18 U.S.C. § 371 | Lamberth |
| *United States v. Doostdar* | 18-cr-255 | Aug. 20, 2018 | 18 U.S.C. § 371 | Friedman |
| *United States v. Clark* | 18-cr-338 | Nov. 15, 2018 | 18 U.S.C. § 922(g)(3) | Kelly |
| *United States v. Wallace* | 19-cr-151 | May 6, 2019 | 18 U.S.C. § 844(i) | Hogan |
| *United States v. Carter* | 20-cr-5 | Jan. 6, 2020 | 18 U.S.C. § 922(g)(1) | Bates |
| *United States v. Monroe* | 24-cr-321 | July 15, 2024 | 18 U.S.C. § 922(g)(1) | Cobb |

### *D. The U.S. Attorney had prosecutorial discretion to present this matter to a Superior Court grand jury.*

The Executive branch enjoys the authority to submit charges to a new grand jury after another grand jury has refused to approve an indictment. *United States v. Williams*, 504 U.S. 36, 49 (1992) (citing *Ex parte United States*, 287 U.S. 241, 250–251 (1932)); *In re U.S.,* 441 F.3d 44, 63 (1st Cir. 2006) ("As one commentator has noted, '[t]he longstanding federal rule is that resubmissions [of an indictment after one grand jury refuses to indict] are permissible, without court approval, even when the prosecutor presents no additional evidence to the second grand jury.' 4 LaFave et al., *Criminal Procedure* § 15.2(h), at 284–85 (2d ed. 1999).") "Incidental to the

functions confided in Article II is 'the power to perform them, without obstruction or impediment.'" *Trump v. Vance*, 591 U.S. 786, 810 (2020) (citation and quotation omitted).

The Supreme Court has held that a U.S. Attorney is empowered to "present[] to one grand jury charges which a previous grand jury has ignored." *See United States v. Thompson*, 251 U.S. 407, 414–15 (1920).[3] In considering whether a court could require judicial approval before a U.S. Attorney presented charges to a second grand jury, the Supreme Court held that such action "is so incompatible with the general principles governing the subject as to cause it to be, in substance, . . . a mere disregard or repudiation of the principles themselves." *Id.* at 414. In reaching this conclusion, the Supreme Court noted that the improper "exercise of judicial discretion" in controlling grand jury presentations would "destroy[]" the "right of the grand jury to consider" cases and U.S. Attorney's "coterminous" authority to present them. *Id.* at 415.[4]

---

[3] The Supreme Court in *Thompson* also found fault with a lower court's dismissal of an indictment because "comprehensively considering the subject, the assertion of the judicial discretion which was the basis of the judgment below is incompatible with the spirit and purpose underlying the admitted principles as to the power of grand juries, and the right of the government to initiate prosecutions for crime, since in the case stated such powers are controlled, not by a rule of law, but depend upon a mere exercise of judicial discretion." *Id.*

[4] *See also United States v. Pabian*, 704 F.2d 1533, 1537 (11th Cir. 1983) ("The decision to resubmit is a matter of prosecutorial discretion not generally subject to judicial scrutiny.") (citing, inter alia, *United States v. Batchelder*, 442 U.S. 114, 124 (1979)).

To the extent that Judge Faruqui suggests that the indictment could be rejected for prosecutorial vindictiveness, this serious allegation is not founded in law. Judge Faruqui cites *United States v. Meadows* as a basis that such conduct was at play in this case. ECF 24 at 2. But "[a]s an initial matter, the Supreme Court has expressed doubt that in the run-of-the-mill pretrial situation, the prosecutor would have any reason to engage in vindictive behavior; the Court noted that defendants routinely assert procedural rights prior to trial and that prosecutors are unlikely to respond vindictively to this everyday practice." *United States v. Meadows*, 867 F.3d 1305, 1312 (D.C. Cir. 2017). In this very young case, nothing has been asserted other than procedural rights. It is also worth noting that the government only sought indictment on the charge already listed in the complaint—the same charge for which Judge Faruqui found probable cause. And the government sought to return the indictment from the Superior Court grand jury because that was the only grand jury available before the preliminary hearing. Thus, to the extent that any conceivable "presumption" of vindictiveness might exist, the record here absolutely rebuts it.

## III. CONCLUSION

Accordingly, this Court should vacate Judge Faruqui's order and, on or before October 21, 2025, issue an order directing Judge Faruqui to accept the indictment at a hearing on October 22, 2025.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

/s/ Jonathan R. Hornok
JONATHAN R. HORNOK
Assistant United States Attorney
Chief of the Criminal Division

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**            )

         **v.**                           )            **No. 1:25-MJ-225 (ZMF)**

**KEVONTAE STEWART**                    )

_____)

### <u>RESPONSE TO GOVERNMENT'S REQUEST FOR REVIEW</u>

Kevontae[1] Stewart, through undersigned counsel, responds to the government's request for review of Judge Faruqui's order declining to accept a grand jury return. ECF No. 25. On October 9, 2025, Judge Faruqui concluded that the indictment in this case returned to him by a grand jury of the D.C. Superior Court was facially invalid and refused to accept it. He issued a written order to that effect the same day. ECF No. 24. Judge Faruqui's decision was correct. This Court, therefore, should also refuse to accept the indictment returned by a Superior Court grand jury.

---

[1] The government has now misspelled Mr. Stewart's first name three times in its case captions. Two of these misspellings were apparently intentional, as they occurred after Mr. Stewart informed government counsel of the proper spelling of Mr. Stewart's name. The correct spelling of Mr. Stewart's first name is "Kevontae."

**Factual and Procedural Background**

On Friday, September 26, 2025, the United States Attorney's Office asked a grand jury of this Court to return an indictment against Mr. Stewart, alleging that he had unlawfully possessed a firearm in violation of 18 U.S.C. § 922(g)(1).  This Court's grand jury declined to do so.  That day, the foreperson of this Court's grand jury appeared in open court before Magistrate Judge Sharbaugh to report that the grand jury had no-billed Mr. Stewart's case.  ECF No. 15 at 5.  Judge Sharbaugh convened an emergency status hearing to inform defense counsel that the government had failed to obtain an indictment for Mr. Stewart.  Upon defense counsel's request, Judge Sharbaugh released Mr. Stewart and ordered the parties to reappear on Monday, September 29, 2025, at 12:30 p.m. to impose the conditions of Mr. Stewart's pretrial release.  Mr. Stewart appeared before Judge Sharbaugh on September 29 and was sworn to his conditions of release.  At that time, Mr. Stewart's preliminary hearing was scheduled for the next day, September 30, 2025.

That same day, the government presented its case against Mr. Stewart to a grand jury convened by the Superior Court of the District of Columbia.  ECF No. 15 at 5.  Only now does the government provide an explanation for *why* it chose to present Mr. Stewart's case to a Superior Court grand jury.  The government now asserts that it presented Mr. Stewart's case to the Superior Court grand jury because

2

**A138**

"no grand jury was sitting in the federal courthouse on September 29, 2025—the only intervening court day before the scheduled preliminary hearing."  ECF No. 25 at 2.  That Superior Court grand jury returned an indictment against Mr. Stewart charging him with a violation of 18 U.S.C. § 922(g)(1).

That afternoon—after Judge Sharbaugh had entered Mr. Stewart's conditions of pretrial release—the foreperson of the Superior Court grand jury appeared before Magistrate Judge Faruqui.  The foreperson of the Superior Court grand jury presented the indictment returned against Mr. Stewart to Judge Faruqui.  Judge Faruqui—confronted with the atypical situation of a Superior Court grand jury returning an indictment to him—was "concerned that it is unlawful" for him to accept an indictment from a Superior Court grand jury in federal court because "[n]o one has ever, after a no bill, gone to Superior Court and then brought a case here." ECF No. 16-1 at 4, 8.

Judge Faruqui then set a briefing schedule on the issue ordering the government to file authority in support of its position by October 3, 2025.  In that same order, Judge Faruqui also appointed the Office of the Federal Public Defender as co-counsel for Mr. Stewart for the purpose of responding to the government's position on this issue.  Three days later, on October 2, 2025, the government filed an emergency motion asking this Court to vacate Judge Faruqui's briefing schedule.

**A139**

ECF No. 15.  This Court convened a hearing on Friday October 3, 2025, and concluded that emergency action was unwarranted and instructed the parties to proceed by complying with Judge Faruqui's briefing schedule.

That evening, the government filed its response to Judge Faruqui's order calling for briefing on whether he is permitted to accept an indictment returned by a Superior Court grand jury.  ECF No. 17.  The government's response stated that this Court should accept the indictment "[f]or the reasons set out in the Government's" emergency motion."  The response also stated that:  "The D.C. Circuit held in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), that pursuant to D.C. Code § 11-1916 a Superior Court grand jury is empowered to return an indictment to this Court.  This Court must accept the returned indictment."  ECF No. 17.

Mr. Stewart responded, as ordered, on October 7, 2025.  ECF No. 21.  Mr. Stewart argued that the Federal Rules of Criminal Procedure precluded Judge Faruqui from accepting the indictment and that the D.C. Circuit's decision in *Seals* was not controlling in this situation.  The government then filed an unsolicited reply to Mr. Stewart's opposition on October 8, 2025.  ECF No. 23.

Judge Faruqui convened a hearing on October 9, 2025, where he informed the parties that he had determined that he did have the authority to review the validity of an indictment and that he would not be accepting the indictment in this case as it

4

**A140**

was facially invalid.  Judge Faruqui entered a minute order to this effect indicating that a written opinion would follow.  Judge Faruqui issued his opinion later that evening.  ECF No. 24.

Judge Faruqui concluded that it was "well within a magistrate judge's discretion to refuse a facially invalid indictment," because "the government's position would obligate [a magistrate judge] to accept any and all indictment documents the government thrusts before it," ECF No. 24 at 3-4, regardless of any number of glaring discrepancies which may appear on the face of an indictment. Judge Faruqui held that "[i]t should come as no surprise to the government that [magistrate judges] serve as more than a mere rubber stamp on grand jury returns." ECF No. 24 at 4.

On the merits, Judge Faruqui concluded that the Federal Rules of Criminal Procedure rendered the indictment in this case facially invalid.  Judge Faruqui held that Rules 1 and 6 require that an indictment be returned by a grand jury summoned by "the court" and that under the Rules, the Superior Court does not satisfy the definition of "court" in Rule 1.  Judge Faruqui then concluded that the D.C. Code and the Circuit Court's opinion in *Seals* did not require him to reach the opposite conclusion.  ECF No. 24 at 8-11.

Five days later, on October 14, 2025, the government petitioned this Court to

5

**A141**

review Judge Faruqui's decision to reject the indictment for the same reasons it previously presented to Judge Faruqui.

## Argument

The Federal Rules of Criminal Procedure are clear. Federal judges are required to review the face of an indictment before accepting it from a grand jury to ensure that it is facially valid. This cursory examination includes confirming that a federal felony is originating from an indictment returned by a *federal* grand jury summoned by a *federal* judge. The Rules have even specifically excluded the judges of the District of Columbia from the list of those empowered to summon a grand jury which can return a federal indictment. Neither the D.C. Code nor the Circuit Court's opinion in *Seals* require otherwise. The indictment in this case, therefore, must be rejected.

## I. THE FEDERAL RULES FORBID ACCEPTING A SUPERIOR COURT GRAND JURY RETURN

The Federal Rules of Criminal Procedure require that an indictment returned to initiate a federal felony case originate from a grand jury convened in a federal court. An indictment originating from any other court is, therefore, facially invalid, and must be rejected.

**A142**

## A.    The Court must reject a facially invalid indictment.

Judges are not "a mere rubber stamp on grand jury returns."  ECF No. 24 at 4.  Rather, judges receiving an indictment—whether a magistrate judge or a district judge—have an obligation to review the indictment on its face before accepting it. A facially invalid indictment must be rejected to not unlawfully initiate a criminal case against a defendant.

The Supreme Court has made clear that a defendant may challenge an indictment before it is returned, questioning whether it was returned by a "legally constituted and unbiased grand jury" and whether the indictment is "valid on its face."  *Lawn v. United States*, 355 U.S. 339, 349-50 (1958); *see also Costello v. United States*, 350 U.S. 359, 363 (1956) ("An indictment returned by a *legally constituted* and unbiased grand jury, like an information drawn by the prosecutor, *if valid on its face*, is enough to call for trial of the charge on the merits.  The Fifth Amendment requires nothing more." (emphasis added)).  Unlike a challenge to the evidence presented to the grand jury, this sort of challenge does not result in "a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury."  *Lawn*, 355 U.S. at 349.  Instead, this sort of challenge calls on the judge reviewing the indictment to confirm only that nothing is amiss on the

7

**A143**

indictment's face.  This limited inquiry is not only permitted, but required, to ensure that indictments are not wrongfully returned.

To argue otherwise would be "an astonishingly callous argument which ignores the obvious.  For a wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted.  The stigma cannot be easily erased." *In re Fried*, 161 F.2d 453, 458 (2d Cir. 1947).  Especially "in our society [where] liberty is the norm," *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)), courts must take care not to accept invalid indictments.  Accepting an indictment often results in arrest and pretrial detention and "[i]mposing those consequences on anyone who has not yet been convicted is serious." *Barker v. Wingo*, 407 U.S. 514, 532 (1972).  "'It is especially unfortunate to impose them on those persons who were wrongly charged to begin with.'"  ECF No. 24 (quoting *Barker*, 407 U.S. at 532).

Indeed, indictments have serious consequences on the lives of a criminal defendant.  An indictment "may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and friends." *United States v. Marion*, 404 U.S. 307, 320 (1971).

When a grand jury foreperson seeks to return an indictment in open court, the judge receiving that indictment has an obligation to review the indictment to ensure

**A144**

that it is facially valid. This obligation is not onerous. The reviewing judge must ensure that the indictment names the defendant and lists the charges against him. The reviewing judge should ensure that the charges brought against the defendant are based on criminal laws still in effect. The reviewing judge should also confirm that the requisite number of grand jurors voted in favor of the indictment and that the person returning the indictment is the grand jury foreperson or deputy foreperson. And no less important, the reviewing judge should check that the grand jury returning the indictment was constituted by the correct court. A judge in the federal District Court for the Eastern District of Virginia, for example, could not accept an indictment returned by the Arlington County Circuit Court grand jury.

A judge should accept an indictment only when the judge is satisfied that the indictment is valid on its face. Typically, confirming that an indictment is facially valid should require nothing more than a glance at the indictment itself. But if the indictment fails to satisfy these most basic requirements, the judge has an obligation to reject it. *See* ECF No. 24 at 4 (magistrate court rejected an indictment where the indictment showed that the government had failed to present a charge to the grand jury).

The government no longer contests that courts have an obligation to review indictments before accepting them in this Court. Before Judge Faruqui, the

9

**A145**

government argued that magistrate judges have no authority to review an indictment. ECF No. 15 at 10, ECF No. 23 at 6. Indeed, when this Court convened an emergency hearing, the government maintained that a judge must accept even a facially invalid indictment. October 3, 2025, Emergency Hearing Tr. at 5:5-12 (Q: Are you saying [the magistrate judge] would have to accept that indictment even if it were flawed or even if it were improperly presented? A: I believe so, your honor.). But the government has abandoned this position. In its filing seeking review of Judge Faruqui's decision to reject the indictment, the government never once asserts that he did not have the authority to do so. The government, therefore, has waived this argument before this Court. *Petit v. U.S. Dep't of Educ.,* 675 F.3d 769, 779 (D.C. Cir. 2012).

**B.     The Federal Rules require that an indictment be returned by a grand jury of the *federal* court.**

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury." U.S. Const. amend V. The Supreme Court has held that this provision of the Fifth Amendment requires that all felony charges must proceed through an indictment returned by a grand jury. *Ex parte Wilson*, 114 U.S. 417, 427 (1885); *United States v. Moreland*, 258 U.S. 433, 441 (1922). Congress codified this requirement in the Federal Rules of Criminal Procedure.

10

**A146**

The Federal Rules of Criminal Procedure "govern the procedure in *all criminal proceedings in the United States district courts*, the United States courts of appeals, and the Supreme Court of the United States." Fed. R. Crim. P. 1(a)(1) (emphasis added). Rule 7, which provides that all felony convictions proceed by indictment, is a direct codification of the Fifth Amendment. Fed. R. Crim. P. 7(a)(1) ("An offense (other than criminal contempt must be prosecuted by an indictment if it is punishable: (A) by death; or (B) by imprisonment for more than one year."). Under the Rules, an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by the government." Fed. R. Crim. P. 7(c)(1). "For each count, the indictment … must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." *Id.*

Rule 6, in turn, governs the grand jury which must return an indictment. "When the public interest so requires, the court must order that one or more grand juries be summoned." Fed. R. Crim. P. 6(a)(1). "The court," then "will appoint one juror as the foreperson and another as the deputy foreperson." *Id.* 6(c). Proceedings before the grand jury are generally confidential, but "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter" for various reasons. *Id.* 6(b)(2)(E).

11

**A147**

"A grand jury may indict only if at least 12 jurors concur. The grand jury—or its foreperson or deputy foreperson—must return the indictment to a magistrate judge in open court." Fed. R. Crim. P. 6(f). "If a complaint or information is pending against the defendant and 12 jurors do not concur in the indictment, the foreperson must properly and in writing report the lack of concurrence to the magistrate judge." *Id.*

"A grand jury must serve until the court discharges it, but it may serve more than 18 months only if the court, having determined that an extension is in the public interest, extends the grand jury's service." Fed. R. Crim. P. 6(g). "An extension may be granted for no more than 6 months, except as otherwise provided by statute." *Id.* Individual grand jurors may be excused by "the court" either temporarily or permanently. *Id.* 6(h). If a grand juror is excused permanently, "the court may impanel an alternate juror in place of the excused juror." *Id.*

Rule 6 makes clear, then, that "the court" is integral to the grand jury's functioning. "The court" summons the grand jury. "The court" appoints a foreperson and deputy foreperson. "The court" decides when to disclose grand jury matters to the public. "The court" may excuse grand jurors. And "the court" can replace excused grand jurors. The Federal Rules, however, define "the court" to exclude the

12

**A148**

local District of Columbia courts and their judges. A Superior Court grand jury, therefore, cannot return an indictment in compliance with Rule 6.

The Federal Rules' definition of "court" is plain. Rule 1 defines "court" as "a federal judge performing functions authorized by law." Fed. R. Crim. P. 1(b)(2). The Rules, in turn, define "federal judge," to mean "a justice or judge of the United States as these terms are defined 28 U.S.C. § 451"; "a magistrate judge"; and "a judge confirmed by the United States Senate and empowered by statute in any commonwealth, territory, or possession to perform a function to which a particular rule relates." Fed. R. Crim. P. 1(b)(3). Judges of the Superior Court are not included within this definition of "federal judge."

Judges of the D.C. Superior Court are not covered by 28 U.S.C. § 451. A "judge or justice" referred to in 28 U.S.C. § 451 includes the Chief Justice or an Associate Justice of the Supreme Court and any judge of a court created by an act of Congress which is "entitled to hold office during good behavior." 28 U.S.C. § 451. Judges of the Superior Court, however, are not entitled to hold office during good behavior. Rather, they are appointed for fifteen-year terms. D.C. Code 1-204.31(c).

Judges of the Superior Court—even magistrate judges of the Superior Court— are not "magistrate judges" under the Rules. Rule 1 defines a "magistrate judge" to be "a United States magistrate judge as defined in 28 U.S.C. §§ 631-39." And these

13

**A149**

provisions of the U.S. Code define a magistrate judge as one appointed by "the judges of each United States district." 28 U.S.C. § 631. D.C. Superior Court judges are not appointed by U.S. District Court judges, but rather by the President. And Superior Court magistrate judges are appointed by the Chief Judge of the Superior Court. D.C. Code § 11-1732(a).

Finally, judges of the Superior Court are not judges of a United States commonwealth, territory, or possession because the District of Columbia is neither a commonwealth, a territory, nor a possession. The Rules of Criminal Procedure do not define these terms, but the U.S. Department of the Interior provides necessary context. A "commonwealth" is an "organized United States insular area, which has established with the Federal Government, a more highly developed relationship, usually embodied in a written mutual agreement." U.S. Dep't of the Interior, Definitions of Insular Area Political Organizations, https://www.doi.gov/oia/islands/politicatypes. According to Interior, there are currently two commonwealths in the jurisdiction of the United States: The Northern Mariana Islands and Puerto Rico. *Id.* The Department has defined "territory" and "possession" identically as an "incorporated United States insular area, of which only one exists currently, Palmyra Atoll." *Id.* The term "possession" "still appears in Federal statutes and regulations" but "is no longer current colloquial usage." *Id.*

14

**A150**

Neither the terms "commonwealth," "territory," nor "possession" encompass the District of Columbia. Indeed, the Rules discuss the District of Columbia as being distinct from commonwealths, territories, and possessions. In the definition of "state," Rule 1 notes that "'State' includes the District of Columbia, *and* any commonwealth, territory, or possession of the United States." If the District of Columbia were considered a commonwealth, territory, or possession, there would be no need to list it separately in the definition of "state."

The judges of the Superior Court, therefore, do not fall under any of the definitions of "federal judge" in Rule 1. Indeed, if there were any lingering doubt that Superior Court judges are not "federal judges" under the Rules, that doubt is eliminated by the committee notes to Rule 1. There, the drafters of the 2002 Amendment to Rule 1 specifically state that the "term [federal judge] does not include local judges in the District of Columbia." Fed. R. Crim. P. 1 Advisory Committee Notes-2002 Amendment.

The Court cannot accept the Superior Court indictment returned against Mr. Stewart because it is facially invalid.[2] It is undisputed that the face of the Indictment makes plain to this Court that it was returned by a Superior Court grand jury. A

---

[2] The indictment returned by the Superior Court grand jury has not been placed on the docket, so defense counsel is not aware of the specific wording of the indictment in this case.

15

**A151**

Superior Court grand jury is not convened by "the court," *i.e.*, a "federal judge," as required by the Rules 1 and 6. The indictment is, therefore, facially invalid. The Court's analysis should end here.

The nature of the Superior Court grand jury confirms that it is not qualified to return a federal indictment. Jurors in the Superior Court, both grand and petit jurors, are not summoned by a federal judge but instead are summoned according to the D.C. Code. "At such times as are determined under the jury system plan, the Court shall summon or cause to be summoned from among qualified individuals under section 11-1906 sufficient prospective jurors to fulfill requirements for petit and grand jurors for the Court." D.C. Code § 11-1907. The definition of "the court" under the D.C. Code does not align with the definition of "the court" in the Federal Rules of Criminal Procedure. Under the D.C. Code, "the court" refers to "the Superior Court of the District of Columbia and may include any judge of the Court acting in an official capacity." D.C. Code § 11-1902(4).

The differences between this Court's juries and those of the Superior Court support Mr. Stewart's argument that he cannot be indicted on federal charges by a Superior Court grand jury. The juries of this Court and the Superior Court are not identical or managed identically. Congress created the Superior Court and the D.C. Court of Appeals in 1970 through the District of Columbia Court Reform and

16

**A152**

Criminal Procedure Act. Pub. L. No. 91-358, 84 Stat. 480 (July 29, 1970). When the Superior Court was first created, the Superior Court juries were summoned by this Court. 132 Cong. Rec. S15070-01 (Oct. 3, 1986) ("Under current law, the Federal district court for the District of Columbia is charged with running a single jury selection system for both the local and Federal Courts."). Congress changed this in 1986 with the District of Columbia Judicial Efficiency and Improvement Act. "This bill … cut the ties that binds the local court to the Federal Court." *Id.* As enacted, a "jury system [was] hereby established for the Superior Court of the District of Columbia." D.C. Code § 11-1901.

And although this Court and the Superior Court both summon jurors from residents of the District of Columbia, they do not do so in the same way. *Compare* Jury Selection Plan for the Random Selection of Grand and Petit Jurors, United States District Court for the district of Columbia (As amended May 17, 2022), https://www.dcd.uscourts.gov/sites/dcd/files/D.D.C.JurySelectionPlan-20220517.pdf, *with* Jury Plan for the Superior Court of the District of Columbia (May 28, 2020), https://www.dccourts.gov/sites/default/files/Jury-Plan-2019-Effective-May-2020.pdf. This Court creates its master juror list by obtaining names of D.C. residents from the D.C. Board of Elections, the D.C. Department of Motor Vehicles, and the D.C. Department of Finance and Revenue. The Superior Court, on

17

**A153**

the other hand, creates its master list from those three sources *and* the list of individuals who have qualified to receive any type of public assistance benefits in the District of Columbia, the list of persons who have become naturalized citizens in the District of Columbia, and "such other source lists as may become available." Superior Court Jury Plan at 1-2. This Court then requires that all duplicates be excluded from the master list. D.D.C. Jury Plan at 2. The Superior Court jury plan does not include a requirement to exclude duplicates.

The Superior Court and this Court also exclude different classes of citizens from participating on juries. This Court excludes only five classes of citizens from participating on juries: non-citizens, those unable to read, write, and understand English, those unable to speak English, those incapable to render satisfactory service, and those charged or convicted of a felony who have not had their rights restored. D.D.C. Jury Plan at 4. The Superior Court, however, excludes those charged with misdemeanor offenses as well, and automatically requalifies those committed of felonies to serve on juries one year after completing their sentence. Superior Court Jury Plan at 4.

Moreover, the grand juries of the two courts function differently. "D.C. Superior Court grand juries sit for 25 days and generally see a huge volume of arrest-generated cases. These cases often involve a single witness testifying before the

18

**A154**

grand jury. In contrast, the federal grand jury sits for a year, yet hears far fewer cases. And these cases allege violations of generally more complex federal crimes that are often the subject of lengthy investigations for which multiple witnesses would testify. Arguably, the lower volume of cases gives the federal grand jurors additional time to pressure test the government's case." ECF No. 24 at 10.

These differences confirm the impropriety of seeking a federal indictment from a local grand jury. The citizens, residents, and visitors of D.C. deserve better.

## II. THE D.C. CODE DOES NOT REQUIRE THIS COURT TO ACCEPT AN INDICTMENT FROM A SUPERIOR COURT GRAND JURY

The government argues that Judge Faruqui was required by the D.C. Code to accept an indictment returned by a Superior Court grand jury. Specifically, the government points to D.C. Code § 11-1916(a), which provides that "[a] grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable." According to the government, this statute grants the U.S. Attorney's Office *carte blanche* to seek indictments on federal charges from a Superior Court grand jury and *vice versa*. That is a stretch. The language of § 11-1916(a) is anything but clear and the timing of the amendments to the Federal Rules of Criminal Procedure belie this argument.[3]

---

[3] In the alternative, the Federal Rules trump the D.C. Code in this instance because the provisions in question are procedural in nature. In this Court, which at times

19

**A155**

## A.   The statutory language rebuts the government's argument.

The government would have the Court believe that the meaning of § 11-1916(a) is plain and that through this provision, Congress has explicitly granted the U.S. Attorney's Office authority to seek indictments on federal charges from a local grand jury because a local grand jury is empowered to "take cognizance of all matters before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts." § 11-1916(a).  But this is far from clear.

First, the term "take cognizance of" is ambiguous at best.  The government has asserted—twice now—that "cognizance" "means '(1) the right and power to try and determine case; jurisdiction,' *Cognizance*, Black's Law Dictionary (2d Ed. 2001)."  ECF No. 23 at 2; ECF No. 25 at 7-8.  There are a few issues with this definition, not the least of which is that the second edition of Black's Law Dictionary was not published in 2001, but in 1910, and its definition of "cognizance" is quite expansive, providing five different subcategories of the definition. *Cognizance*, Black's Law Dictionary 213 (2d ed. 1910).

---

deals with both federal and D.C. Code criminal offenses, defendants are protected by federal procedural rules, including the Federal Rules of Criminal Procedure and the Federal Rules of Evidence.  ECF No. 24 at 8-9. This Court, meanwhile, applies D.C. substantive law, such as elements of an offense and the rules of sentencing to D.C. Code offenses. *Id.*  Because the rules governing the grand jury are procedural, the Federal Rules control.

**A156**

The government appears to be citing from the seventh edition of Black's Law Dictionary, published in 1999. The seventh edition defines cognizance as "The right and power to try and determine cases; JURISDICTION"; "The taking of judicial or authoritative notice"; "Acknowledgment or admission of an alleged fact; esp. (*hist.*), acknowledgment of a fine. *See* FINE (1); FINE SUR COGNIZANCE DE DROIT."; and "*Common-law pleading*. In a replevin action, a plea by the defendant that the goods are held in bailment for another. *Cf.* AVOWRY."  *Cognizance*, Black's Law Dictionary 253 (7th ed. 1999).

Even under this seventh edition definition, the language of § 11-1619 is unclear.  The fact that "cognizance" can speak to jurisdiction, authority, acknowledgment, and taking notice of muddies the waters.  Perhaps, as the government argues, the language was intended to mean that any grand jury operating in the District could return an indictment to either court.  But just as likely, this definition speaks to a grand jury's investigative function, clarifying that the grand jury's power to investigate is not limited by where the object of the investigation may ultimately be indicted.

**B.    The history of § 11-1916(a) undercuts the government's argument.**

The legislative history of § 11-1916 shows that its meaning is less clear than the government proffers.  This provision of the D.C. Code was originally enacted by

21

**A157**

Congress as D.C. Code § 11-1903 when it created the Superior Court in 1970. Pub. L. No. 91-358, 84 Stat. 515 (July 29, 1970). In the system established in 1970, the juries of the federal courts and the Superior Court were much more intertwined. At that time, "[j]urors serving within the District of Columbia [had] the same qualifications as provided for jurors in the Federal courts," and "[t]here [was] a single system in the District of Columbia for the selection of jurors for both Federal and District of Columbia courts." *Id.* That "selection system [was] prescribed by Federal law and executed in accordance therewith as provided by the United States District Court for the District of Columbia." *Id.*

In 1986, Congress elected to create two separate jury selection systems in the District of Columbia—one for federal court and one for the Superior Court. Pub. L. No. 99-650, 100 Stat. 3635 (Nov. 14, 1986); D.C. Code § 11-1901. Qualification for serving as a juror in Superior Court was no longer tied to eligibility to serve as a juror in federal court. D.C. Code § 11-1906. The 1986 congressional amendments to the D.C. Code moved § 11-1903 to its current location at § 11-1916. The 1986 Congressional amendments to the D.C. jury systems remain in effect today.

The 1986 legislation also spoke to how the juries of this Court and the Superior Court interact. In D.C. Code § 11-1917, Congress laid out the "coordination and cooperation of the courts." This section provides that to "the

22

**A158**

extent feasible, the Superior Court and the United States District Court shall consider the respective needs of each court in the qualification, selection, and service of jurors.   Nothing in this chapter shall be construed to prevent such courts from entering into any agreement for sharing resources and facilities (including automated data processing hardware and software, forms, postage, and other resources)." D.C. Code § 11-1917.   Clearly, Congress intended to limit the interactions between the two jury systems to the sharing of administrative systems if necessary.   Had Congress intended for the two courts to coordinate by sharing a grand jury, it surely would have said so in this provision.

Moreover, the language of § 11-1916(a) has likely *never* meant what the government argues.   When Congress created the D.C. Superior Court in 1970 and enacted § 11-1903, there was only one jury system in the District.   There would have been no need to confirm that a grand jury could return an indictment to either court— this was obvious under that original system.   And when Congress excised the D.C. Superior Court from the federal court jury system in 1986—and moved the "take cognizance" language to § 11-1916(a)—it would have made no sense to grant the Superior Court grand jury authority in federal court.   The entire point of the 1986 legislation was to separate the jury systems, not shackle them together.

23

**A159**

Regardless of what Congress intended in 1970 when it originally enacted § 11-1903 or in 1986 when it moved it to § 11-1916, the Federal Rules of Criminal Procedure were amended to explicitly exclude the District of Columbia in 2002. And this later-in-time amendment controls. "[W]here there is a conflict between an earlier statute and a subsequent enactment, the subsequent enactment governs." *Busbee v. Smuith*, 549 F. Supp. 494, 523 (D.D.C. 1982) (quoting *Interstate Commerce Comm'n v. Southern Railway*, 543 F.2d 534, 439 (5th Cir. 1976)).

The government asserts that following the requirements of Rules 1 and 6 violates two canons of statutory construction. First, the government asserts that holding that Rule 1 and 6 limit the reach of § 11-1916(a) would improperly permit a general statute to modify a more specific statute. Second, the government asserts that reaching the same conclusion would be improperly finding that Congress had repealed § 11-1916(a) by implication when it enacted the 2002 amendments to the Federal Rules of Criminal Procedure. Neither argument is persuasive.

The government asserts that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one," ECF No. 25 at 6 (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)). Applying this, the government asserts that § 11-1916 is "specific" and cannot be controlled by the "general" Rules 1 and 6. How so?

24

**A160**

Here, there is clear intention that Congress, through the 2002 Amendment, meant to exclude the District of Columbia courts and judges from its definition of "court" and "federal judge". The committee notes explicitly state that judges of the District of Columbia local courts are not considered federal judges who are required to summon a grand jury. Rarely is Congress's intention so clear.

Next, the government argues that Judge Faruqui's reading of Rules 1 and 6 would require finding that Congress had repealed § 11-1916(a) by implication. Not so. First, as discussed above, it is not clear that § 11-1916(a) ever had the meaning the government assigns. But putting that aside, even if when it was originally enacted as § 11-1903 in 1970 it did empower a single grand jury to return indictments in either court, that likely changed when Congress created two separate jury systems in the District of Columbia in 1986. By the time Congress amended the Criminal Rules in 2002, § 11-1916 likely had not empowered a Superior Court grand jury to return a federal indictment for 16 years.

Second, even if § 11-1916 does mean exactly what the government says, repeals by implication do occur when two statutes irreconcilably conflict with each other. *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). And here, the two provisions would explicitly conflict if the Court adopts the government's reading of § 11-1916(a). Federal Rules 1 and 6 would limit the ability to return a federal

25

**A161**

indictment to a federal grand jury, but § 11-1916(a) would permit a Superior Court grand jury to ignore this rule. Because those provisions directly contradict, the later-in-time provision, *i.e.*, the 2002 amendment to Rules 1 and 6 must control.

### C.    A harmonious reading of the Rules and § 11-1916(a) does exist.

"[C]ourts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton*, 417 U.S. at 551. This axiom is no less true here and all parties agree that § 11-1916 and the Rules can be read harmoniously, but the parties disagree on what this reading is.[4]

The government offers that Rules 6 and 1 are not restrictive and therefore speak only to how a federal grand jury must conduct itself, but do not limit the ability of a Superior Court grand jury to return a federal indictment. ECF No. 25 at 9-11. Under the government's reading, Rule 6(a) requires a federal judge to summon a grand jury and Rule 6(f) discusses the grand jury voting to indict and returning the indictment, but nothing requires that the grand jury in 6(f) be the same grand jury

---

[4] The government's argument that a harmonious reading does exist is effectively a concession that no repeal by implication has occurred here.

summoned in 6(a).  ECF No. 25 at 10.  This reading stretches the statute to the point of absurdity and flies in the face of the canons of statutory interpretation.

Under the canon of consistent usage, "[i]n a given statute, the same term usually has the same meaning and different terms usually have different meanings." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (citing A. Scalia & B. Garner, Reading Law 170-171 (2012)).  The government is asserting, however, that the term "grand jury" means different things not just throughout the Federal Rules but within Rule 6 itself, which governs the grand jury.  This makes no sense.  Why would the grand jury in 6(f) be any different than the grand jury in 6(a), 6(b), 6(c), 6(d), 6(e), 6(g), or 6(h)?  There is no indication in Rule 6 or anywhere else in the Rules that the grand jury returning an indictment in 6(f) is not the same grand jury governed by the rest of Rule 6.

The government asserts that "there is nothing in the text of Rule 6 that is necessarily irreconcilable with Superior Court grand juries exercising the coextensive jurisdiction granted by D.C. Code § 11-1916," ECF No. 25 at 10, but stating this emphatically does not make it true.  If Superior Court grand juries are permitted to exercise "coextensive jurisdiction" with federal grand juries, then Rules 1 and 6 are rendered meaningless.  The Federal Rules of Criminal Procedure were put in place to "provide for the just determination of every criminal proceeding, to

27

**A163**

secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay." Fed. R. Crim. P. 2. Permitting the U.S. Attorney's Office to go across the street to get an indictment after failing to get one in this courthouse is hardly just or fair to the people of D.C.

As Judge Faruqui noted, giving the U.S. Attorney's Office two bites at the apple of securing a federal indictment would amount to "disparate treatment of D.C. defendants within the federal judicial system" which "cannot be tolerated." ECF No. 24 at 9. The government responds that Judge Faruqui is "incorrect" because "[d]efendants in other federal districts face the prospect of state and federal indictments without the same double jeopardy protections that D.C. defendants enjoy." ECF No. 25 at 13 n.2. The government, again, misses the mark. Judge Faruqui has correctly noted that should the government prevail here, D.C. defendants will be the only defendants in the country where the United States government will be able to take advantage of two different court systems to secure an indictment for federal charges. This is the sort of unfairness the Federal Rules were designed to prevent.

Judge Faruqui has offered a reasonable reading of D.C. Code § 11-1916(a): "It is permissible under both the Federal Rules and D.C. Code § 11-1916 for a *federal* grand jury to return an indictment being prosecuted in *D.C. Superior Court*." ECF

28

**A164**

No. 24 at 10 (emphasis in original).  Should this Court find it necessary to assign a meaning to D.C. Code § 11-1916(a), it should adopt Judge Faruqui's interpretation. But it is not necessary for the Court to interpret § 11-1916(a).  Rather, a plain reading of the Rules makes clear that what the government has done here is impermissible and the indictment cannot be accepted by any federal judge.

## III.   THE D.C. CIRCUIT'S OPINION IN *SEALS* DOES NOT CONTROL

The government's reliance on the D.C. Circuit's opinion in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997) fares no better.  When a prior case does not include a ruling on a particular issue, the case "cannot be considered binding precedent on that issue."  *Common Cause v. FEC*, 108 F.3d 413, 416 (D.C. Cir. 1997).  And "[j]udicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed."  *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissenting).

*Seals* is not controlling because the *Seals* court never addressed the questions raised in this case.  In *Seals*, the court was presented with an indictment originally returned by a Superior Court grand jury, not after a federal grand jury refused to indict, as in Mr. Stewart's case.  *Id.* at 453.  The defendants were convicted after a jury trial of conspiracy, kidnapping, and extortion.  *Id.*  On appeal, the defendants argued that § 11-1916(a) "is unconstitutional because it vests the judicial power of

29

**A165**

the United States outside of Article III and it does so by improperly empowering the executive." *Id.* at 455-56. The court rejected these constitutional arguments. The *Seals* court, however, was never called to pass upon the question of whether the language of § 11-1916(a) authorized a Superior Court grand jury to return an indictment in federal court pursuant to Rule 6. This, therefore, remains an open question. And, similar to the provision itself, the decision in *Seals* was issued in 1997—five years before the Supreme Court and Congress revised the Federal Rules of Criminal Procedure to exclude District of Columbia judges from summoning a grand jury that could return an indictment in federal court. *Seals*, therefore, does not control here.

Moreover, one of the primary rationales for the decision in *Seals* is no longer in effect. The court devoted much attention to the fact that grand juries in both courts were selected from identical pools and by "identical method[s]." *Id.* at 460. As discussed above, that is no longer true.

The government makes a last-ditch argument, saying that "if the 2002 amendment to the Federal Rules of Criminal Procedure abrogated *Seals*, the issue would have been discovered and litigated at some point during the nearly twenty-three years between the 2002 amendments and this case." ECF No. 25 at 14. In support, the government cites to six cases where this has happened in the 55 years

30

**A166**

since the Superior Court was created in 1970, the 39 years since the jury systems of

the two D.C. courts were separated, and the 23 years since the 2002 amendment to

the Federal Rules.  This is far from persuasive.  That this issue has not yet been

litigated does not affect the validity of Mr. Stewart's argument or the plain language

of Rules 1 and 6.

## IV.   PROSECUTORIAL DISCRETION IS NOT UNLIMITED

The government asserts that its decision to seek an indictment in Superior

Court is an element of its broad prosecutorial discretion and, therefore, cannot be

challenged.  ECF No. 25 at 14.  And the government is correct that there is precedent

supporting the government "presenting to one grand jury charges which a previous

grand jury has ignored." *United States v. Thompson*, 251 U.S. 407, 414-15 (1920).

But prosecutorial discretion is not the issue in Mr. Stewart's case.  The issue is

whether the indictment returned by a Superior Court grand jury is invalid on its face.

31

**A167**

## **Conclusion**

The Federal Rules of Criminal Procedure do not permit a grand jury summoned by the Superior Court of the District of Columbia to return an indictment in federal court. This makes the indictment returned against Mr. Stewart facially invalid and the Court, therefore, has no authority to accept the indictment returned in this case.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
MICHELLE M. PETERSON
MATTHEW L. FARLEY
Assistant Federal Public Defenders
625 Indiana Ave., N.W.
Washington, D.C.  20004
(202) 208-7500

32

**A168**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**KEVONTAE STEWART,**<br>**Defendant.** | **Case No. 1:25-MJ-225** |

**REPLY IN FURTHER SUPPORT OF REQUEST FOR REVIEW OF**
**THE MAGISTRATE JUDGE'S ORDER REFUSING TO ACCEPT**
**A GRAND JURY RETURN**

The United States of America respectfully requests that the Chief Judge vacate the

Magistrate Judge's order, ECF 24, and direct that the indictment be accepted. The defendant's

arguments to the contrary are without merit.

I. ARGUMENT

*A. The Magistrate Judge and the defendant concede that the government*
*has the authority to represent a case after a no bill.*

The defendant[1] concedes that "there is precedent supporting the government 'presenting to

one grand jury charges which a previous grand jury has ignored.'" ECF 28 at 31 (quoting *United*

*States v. Thompson*, 251 U.S. 407, 414–15 (1920)). The Magistrate Judge did not address

*Thompson* in his order and has likewise provided no legal basis for a contrary conclusion. *See*

*generally* ECF 24. Indeed, the Magistrate Judge acknowledges that the government has the right

---

[1] The government objects to adversarial briefing on the acceptance of a grand jury return. The indictment return is part of the grand jury process. "Courts have rejected attempts to enjoin federal criminal prosecutions on grounds that criminal defendants have an adequate remedy in the form of a motion to dismiss any indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure." *See Peters v. United States*, No. 23-CV-03014, 2024 WL 2274079, at *7 (D. Colo. May 20, 2024) (citing *United States v. Stone*, 394 F. Supp. 3d 1, 14 (D.D.C. 2019) ("[T]he proper avenue for defendant to mount a legal challenge to the prosecution is through a motion to dismiss under Federal Rule of Criminal Procedure 12.")).

to represent this matter to another federal grand jury. *Id.* at 12. Bottom line, there is no dispute that it is legal and proper for the government to present this matter to another competent grand jury after the first grand jury failed to concur with the indictment.

The defendant attempts to distinguish *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), because that case involved "an indictment originally returned by a Superior Court grand jury, not after a federal grand jury refused to indict, as in Mr. Stewart's case." ECF 28 at 29. But this is distinction without legal significance. The defendant concedes that the government has the discretion to present a matter to a second grand jury after the first grand jury fails to concur with the indictment. ECF 28 at 31. Thus, this Court cannot ignore the D.C. Circuit's opinion in *Seals* simply because the grand jury in this case voted to return an indictment after another grand jury failed to do so.

### B. Superior Court grand juries may return indictments in federal court.

The question, then, is simply whether Superior Court grand juries are empowered to return indictments in federal court. The answer is yes. The defendant—and the Magistrate Judge—struggle against the plain language of D.C. Code § 11-1916(a), which provides the following: "A grand jury serving in the District of Columbia may take *cognizance* of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts," D.C. Code § 11-1916 (emphasis added). The word *cognizance* means "(1) The right and power to try and determine cases; jurisdiction." *Cognizance*, BLACK'S LAW DICTIONARY (2nd Pocket Ed. 2001).[2] The defendant points out that "cognizance" can "speak to jurisdiction, authority, acknowledgment, and taking notice." ECF 28 at 21. And importantly, the defendant concedes that

---

[2] To clarify, the government's cite is to Black's Law Dictionary Second Pocket Edition, which is based on the Seventh Edition of Black's Law Dictionary.

"[p]erhaps, as the government argues, the language was intended to mean that any grand jury operating in the District could return an indictment to either court." *Id*. In fact, the Magistrate Judge and the defendant even agree that section 11-1916 empowers federal grand juries to return indictments in Superior Court. ECF 24 at 10 (citing *Hackney v. United States*, 389 A.2d 1336, 1339 (D.C. 1978)); ECF 28 at 28–29.

But then the Magistrate Judge and the defendant argue that the same language of section 11-1916 means something different for a Superior Court grand jury that votes to return an indictment to District Court. The plain language of section 11-1916 refutes such contortion. The text of the statute has one group: "A grand jury serving in the District of Columbia."[3] It contains one grant of authority: "may take cognizance of all matters brought before it." And it includes one amplification: "regardless of whether an indictment is returnable in the Federal or District of Columbia courts." D.C. Code § 11-1916(a). In other words, there is only one set of words applicable to both District Court and Superior Court grand juries. And there is nothing in the text from which this Court could conclude that the Congress intended to distinguish a "[Superior Court] grand jury serving in the District of Columbia" from a "[District Court] grand jury serving in the District of Columbia." The reading urged by the Magistrate Judge and the defendant is only possible by adding words to the text of D.C. Code § 11-1916.

As the defendant acknowledges, "'[i]n a given statute, the same term usually has the same meaning and different terms usually have different meanings.'" ECF 28 at 27 (quoting *Pulsifer v. United States*, 601 U.S. 124, 149 (2024)). Thus, because the Magistrate Judge and the defendant

---

[3] The defense's worry about a local grand jury in Arlington, Virginia, seeking to return an indictment to the District Court for the Eastern District of Virginia is unpersuasive. ECF 28 at 9. Section 11-1916 only applies to the District of Columbia, which is a unique federal enclave over which the Congress has complete authority.

have conceded that the words of section 11-1916 mean that District Court grand juries are empowered to return indictments to Superior Court, this Court should adopt the same meaning for Superior Court grand juries that vote to return indictments to District Court.[4] Indeed, the Magistrate Judge and the defendant have not identified a single court that has read section 11-1916 differently.

Nevertheless, the Magistrate Judge and the defendant argue that the 2002 amendments to the Federal Rules of Criminal Procedure implicitly repealed section 11-1916. That argument fails. As explained in the government's briefing in this case, when "presented with two statutes, the Court will 'regard each as effective'—unless Congress' intention to repeal is 'clear and manifest,' or the two laws are 'irreconcilable.'" *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (internal citations omitted). Neither the Magistrate Judge nor the defendant have been able to direct this Court to "a clearly expressed congressional intention" that the 2002 amendments to Rule 1 regarding the definition of the word *Court* were intended to curtail the jurisdiction the Congress granted to "[a] grand jury serving in the District of Columbia" in section 11-1916. *See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

*C. The Chief Judge of this Court, through the Magistrate Judge's chambers, raised this issue in 2020, and then the Court accepted the indictment from the Superior Court grand jury.*

In *Seals*, the D.C. Circuit concluded that "[w]hile the grand jury arrangement in the District of Columbia may be unique, 'our constitutional principles of separated powers are not violated . . .

---

[4] To the extent that the defendant argues that District of Columbia Judicial Efficiency and Improvement Act "cut the ties that binds the local court to the Federal Court" in a way that invalidates section 11-1916, the defendant misses that *the same act he points to is the act that created section 11-1916*. *See* Pub. L. No. 99-650, § 1916, 100 Stat. 3635 (1986).

by mere anomaly or innovation.'" *Seals*, 130 F.3d at 460 (quoting *Mistretta v. United States*, 488 U.S. 361, 385 (1989)). In the decades since *Seals*, the judges in this Court that have considered indictments returned by Superior Court grand juries under D.C. Code § 11-1916 have likewise found no legal impediment to the unique grand jury arrangement in this district. In addition to the cases identified in the government's other briefing, the following cases also involved indictments returned by Superior Court grand juries:

| Case Name | Case Number | Date | Lead Charge | District Judge |
|---|---|---|---|---|
| *United States v. Parker* | 19-cr-127 | April 12, 2019 | 18 U.S.C. § 922(g)(1) | McFadden |
| *United States v. Kelly* | 20-cr-2 | Jan. 2, 2020 | 18 U.S.C. § 922(g)(1) | McFadden |
| *United States v. Henderson* | 20-cr-3 | Jan. 3, 2020 | 18 U.S.C. § 922(g)(1) | Cooper |
| *United States v. Scott* | 20-cr-275 | Dec. 8, 2020 | 21 U.S.C. § 846 | Boasberg |

Of particular note, Judge Faruqui was the assigned Magistrate Judge in *United States v. Scott*, No. 20-cr-275—a case assigned to this Court. On December 8, 2020, at 1:26 PM, the U.S. Attorney's Office received an email from Judge Faruqui's chambers with the following request: "Chief Judge Howell would like additional information on the authority for this Court to accept an indictment from Superior Court." At 2:37 PM that afternoon, an AUSA responded to Judge Faruqui's chambers via email, citing D.C. Code § 11-1916(a); *United States v. Seals*, 130 F.3d 451, 456 (D.C. Cir. 1997); and *United States v. Allen*, 729 F.Supp. 120, 122 (D.D.C. 1989); *United States v. Christian*, 394 A.2d 1, 42–43 (D.C. 1978).[5] The court then accepted the indictment returned by the Superior Court grand jury.

---

[5] The referenced email is attached as Exhibit 1.

II. CONCLUSION[6]

Accordingly, this Court should vacate the Magistrate Judge's order and issue an order directing the Magistrate Judge to accept the indictment.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

/s/Jonathan R. Hornok
JONATHAN R. HORNOK
Assistant United States Attorney
Chief of the Criminal Division

---

[6] The defendant also contends that the government has waived its argument that a magistrate judge does not have the authority to order adversarial briefing on the acceptance of an indictment and that the Magistrate Judge's inquiry goes beyond facial validity. ECF 28 at 9. Not so. The government's opening brief reasserted those arguments. ECF 25 at 4 n.1. Additionally, the cases cited by the defense regarding facial invalidity all deal with unrelated challenges after an indictment was docketed: *In re Fried*, 161 F.2d 453, 458 (2d Cir. 1947), dealt with the suppression of evidence. And *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021), dealt with pretrial detention under the Bail Reform Act.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CASE NO:  25-mj-225 |
| | : | |
| KEVONTAE STEWART, | : | |
| | : | |
| Defendant. | : | |

**NOTICE OF EXHIBIT**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby informs the Court and defense that the attached exhibit is being provided in connection with ECF 29.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

 */s/Jonathan R. Hornok*
JONATHAN R. HORNOK
Assistant United States Attorney
Chief of the Criminal Division

1

**A175**

# Exhibit 1



**From:** ▮▮▮▮▮▮▮▮
**Sent:** Tuesday, December 8, 2020 2:37 PM
**To:** Faruqui_▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮
**Subject:** RE: Grand Jury Return

Good afternoon ▮▮▮▮▮▮ ,

Please advise us if this information is sufficient.

The relevant statute is D.C. Code § 11-1916(a):

(a) A grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts.

See also, *United States v. Seals and Brooks*, 130 F. 3d 451, 456 (D.C. Cir. 1999) (District of Columbia grand jury's authority to return indictment in federal court was not unconstitutional); *United States v. Allen*, 729 F.Supp 120, 122 (D.C.D 1989) (District of Columbia Superior Court grand jury is authorized by Congress to return a federal indictment); and *United States v. Christian*, 394 A.2d 1, 42-43 (D.C. 1978) (Superior Court grand juries were intended to have powers comparable to federal grand juries).

On January 3, 2020, we presented *United States v. Henderson*, 20-cr-3 (CRC), to a Superior Court grand jury which returned an indictment in federal court.

We only use D.C. Code § 11-1916(a), when we cannot present a matter to a federal grand jury.

Thank you.

**From:** Faruqui Criminal ▮▮▮▮▮▮▮▮
**Date:** December 8, 2020 at 1:26:36 PM EST
**To:** ▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮
**Subject:** RE: Grand Jury Return

Good Afternoon,

Once the documents are updated please send them to the clerk's office (and cc this email please). Also, Chief Judge Howell would like additional information on the authority for this Court to accept an indictment from Superior Court. I will be looking into this, but can you please do so as well? Do you know when this was last done?

Thank you,

███████

███████████

Criminal Law Clerk to the Honorable Magistrate Judges
United States District Court for the District of Columbia

███████████

---

**From:** ███████████████████████
**Sent:** Tuesday, December 8, 2020 12:01 PM
**To:** Faruqui Criminal ████████████████
**Cc:** ████████████████████████████████

**Subject:** Re: Grand Jury Return

<mark>CAUTION - EXTERNAL:</mark>

Thank you.

> On Dec 8, 2020, at 11:28 AM, Faruqui Criminal ████████████████ wrote:
>
> Good Morning,
>
> I spoke with the Clerk's Office and they agree that the dates should be changed where they indicate that the indictment was returned on December 7. I will leave it up to you to decide if anything needs to be changed to indicate that the vote took place yesterday.
>
> Thank you,
>
> ███████

2

**A178**

████████████

**Criminal Law Clerk to the Honorable Magistrate Judges**
**United States District Court for the District of Columbia**

████████████

---

**From:** Faruqui Criminal
**Sent:** Tuesday, December 8, 2020 10:10 AM
**To:** ████████████████████████████████████████
████████████
**Cc:** ████████████████████████████████████████
████████████████████
**Subject:** Grand Jury Return

Good Morning Counsel,

I was reviewing the GJ return for ES and noticed that the date of return is incorrect (the documents say Dec 7 rather than Dec 8). Can you correct the documents? For documents that the foreperson signed the foreperson can just cross out the incorrect information and add his/her initials. The indictment list can just be re-submitted. Thank you!

Thank you,

████████████

████████████

**Criminal Law Clerk to the Honorable Magistrate Judges**
**United States District Court for the District of Columbia**

████████████

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA,**

**v.**

**KEVONTAE STEWART,**

    **Defendant.**

**Magistrate Judge No. 25-225**

---

## ORDER

As set forth in the accompanying Memorandum Opinion, the Court ORDERS that:

1.   The Government's [25] Motion to Review the Order Refusing to Accept a Grand Jury Return is GRANTED; and

2.   The Magistrate Judge on criminal duty shall accept the indictment in this matter.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: November 20, 2025

1

**A180**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**v.**<br><br>**KEVONTAE STEWART,**<br><br>**Defendant.** | **Magistrate Judge No. 25-225** |

## <u>MEMORANDUM OPINION</u>

After failing to secure an indictment from a federal grand jury sitting in this district, the Government turned to a D.C. Superior Court grand jury, asking for an indictment for the same violation of federal criminal law.  That local grand jury returned a true bill, which the Government delivered to one of our federal magistrate judges.  Understandably surprised by this unorthodox approach, he initially refused to accept the return and asked for briefing on whether this course was legally permissible.  After such briefing, he wrote a thoughtful opinion concluding that he had no power to accept the indictment.  The Government appealed to this Court.

This issue is challenging, as dueling statutory sources provide contradictory answers.  A provision of the D.C. Code ostensibly permits local grand juries to return indictments in federal court, while the Federal Rules of Criminal Procedure arguably say the opposite.  The Court ultimately holds that the D.C. Code prevails, and it thus orders the criminal-duty magistrate judge to accept the indictment.

1

**A181**

## I.    Procedural History

On September 18, 2025, Kevontae Stewart was arrested.  See ECF No. 3 (Arrest Warrant).  The Government filed a Complaint alleging that he had possessed a firearm after previously being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).  See ECF No. 1 (Crim. Compl.).  The Government sought an indictment from a federal grand jury, but that grand jury returned a no bill on September 26.  See ECF No. 9 (No Bill).  Rather than try its luck with a different federal grand jury, the Government presented its case to a Superior Court grand jury, which voted to return the indictment on the same federal charge.  See ECF No. 14 (MJ Tr.) at 2:12–17.  The Government then returned to federal court and presented the local indictment to Magistrate Judge Zia Faruqui on September 29.  Id. at 2:2–17.

At a hearing that day, Magistrate Judge Faruqui declined to accept the indictment return. Id. at 4:17–19.  Noting that it was exceedingly unusual for the Government to seek an indictment for federal crimes from a local grand jury — and perhaps unprecedented to do so after a federal no bill — Magistrate Judge Faruqui ordered briefing on whether the law permitted such a maneuver.  Id. at 4:17–6:13.

Instead of engaging in such briefing, the Government filed an emergency request asking this Court to vacate Magistrate Judge Faruqui's order.  See ECF No. 15 (Emer. Req. Vacate).  It contended that he lacked the authority to refuse to receive the indictment because magistrate judges do not have the power to "dismiss or quash an indictment."  Id. at 10 (quoting 28 U.S.C. § 636(b)(1)(A)).  It further argued that briefing was unnecessary because the D.C. Code clearly permits a Superior Court grand jury to return an indictment in federal district court.  Id. at 8. This Court held a hearing on October 3 and denied the Government's request for emergency relief, allowing the expedited briefing to go forward.  See Minute Entry of Oct. 3, 2025.

After briefing was complete, Magistrate Judge Faruqui penned an opinion, refusing to accept the local indictment of Stewart. See ECF No. 24 (Order) at 1. He held that the indictment was "facially invalid" because the Federal Rules of Criminal Procedure, as amended in 2002, require that a valid indictment be returned by a grand jury empaneled by a "court," id. at 5–6, which unequivocally excludes grand juries convened in D.C. Superior Court. See Rule 1(b). Magistrate Judge Faruqui further held that the relevant D.C. Code provision "cannot modify federal court procedural rules, nor can it . . . override the grand jury procedures expressly set forth in the Federal Rules that require indictments to be issued by a grand jury summoned by the federal court." Id. at 8.

The Government then appealed the Order to this Court. See ECF No. 25 (Mot. Rev.); see also LCrR 59.3(a) ("Requests for review of an order by a magistrate judge in a criminal matter not assigned to a district judge . . . are to be made to the Chief Judge . . . ."). It now renews its argument that the D.C. Code permits a local grand jury to return an indictment in federal court — and vice versa — and contends that the Federal Rules do not abrogate that authorization. See generally Mot. Rev. at 6–10. To hold otherwise, the Government argues, would constitute a "repeal by implication" of a D.C. Code provision by a seemingly unrelated amendment to the Federal Rules. Id. at 11. Defendant naturally takes the opposite view and urges affirmance of Magistrate Judge Faruqui's order. See generally ECF No. 28 (Resp.).

## II.     Analysis

The Court initially examines whether a magistrate judge has authority to reject an indictment in the first place. Finding that he does, the Court proceeds to discuss the propriety of the return in this case.

**A183**

A.    Magistrate Judge Authority

Although it did not press this argument in its Motion for Review, the Government contended before Magistrate Judge Faruqui and this Court during the emergency hearing that magistrate judges have no power to reject a facially invalid indictment. See Emergency Req. Vacate at 10. As it also seeks to "preserve that argument" for appeal, see ECF No. 32 (Tr.) at 3:14–15, the Court first addresses this question.

Magistrate judges' power comes from statutory, rather than constitutional, sources, and it is thus subject to "the district court's total control and jurisdiction." Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665, 677 (2015) (quotation marks omitted). They cannot resolve certain dispositive motions — say, a motion to "dismiss or quash an indictment." 28 U.S.C. § 636(b)(1)(A). But accepting indictments, and ensuring that those indictments facially conform to the Federal Rules of Criminal Procedure, falls within the heartland of a magistrate judge's authority. See Rule 6(f) (requiring grand jury to "return the indictment to a magistrate judge in open court") (emphasis added).

Confirming that an indictment is returned by a grand jury authorized to return it is akin to verifying that the document satisfies other features described in the Federal Rules of Criminal Procedure. Those features include that the indictment: 1) identifies one or more defendants; 2) actually charges a crime, see Rule 7(c)(1); 3) is "signed by an attorney for the government," id.; and 4) was returned by a particular grand jury. See Rule 6(a); U.S. Const. amend. V. An indictment's compliance with those requirements is apparent from the face of the document, and a magistrate judge can require the Government to fix errors before accepting the indictment. See Order at 4 (noting Magistrate Judge Faruqui rejected "facially invalid indictment" where Government "failed to present a charge to the grand jury . . . that was in its indictment"). Such

**A184**

challenges are thus unlike ones that are appropriately brought via motions to dismiss — *e.g.*, "a defect in instituting the prosecution," like improper venue or error during the grand-jury proceeding, <u>see</u> Rule 12(b)(3)(A), or substantive challenges to the sufficiency of an indictment. <u>See</u> Rule 12(b)(3)(B).

Even if Congress wrested the indictment-return process from magistrate judges and directed clerks of court to file indictments upon receipt from the Government attorney, those clerks would still ministerially confirm that the filed document was in fact an indictment. <u>Cf.</u>, *e.g.*, <u>Villasenor v. Fairfield Police Dep't</u>, 2011 WL 1599152, at *5–6 (E.D. Cal. Apr. 27, 2011) (clerk "returned as un-filed" document "written entirely in Spanish," which was appropriate since documents in language other than English did not "t[ake] the form of actual filings"); <u>Sermeno v. Tang</u>, 2025 WL 2722659, at *5 (N.D. Cal. Sep. 5, 2025) (permissible for state court clerk to reject filings for failure to "comply with technical formatting requirements"), <u>adopted</u>, 2025 WL 2721682.  It follows that magistrate judges, vested with statutory power to supervise indictment proceedings, can both verify that a document is actually an indictment and order briefing to resolve a discrete legal question regarding indictment requirements.  <u>Cf.</u> <u>United States v. Seals</u>, 130 F.3d 451, 457 (D.C. Cir. 1997) ("[T]he responsibility for issuing subpoenas and for accepting returned indictments is vested in United States magistrate judges.").

The Government's argument — that a magistrate judge cannot reject the return of a document that on its face is not a proper indictment — presents untenable implications.  Under its theory, a magistrate judge would be obligated to accept patently insufficient indictments, including those written in a foreign language or those returned by a grand jury in an entirely different jurisdiction.  <u>See</u> ECF No. 21 (Def. Emer. Resp.) at 4 (noting Government implied as much during hearing on emergency request to vacate briefing).  That would undermine

5

**A185**

magistrate judges' administrative and supervisory authority over the grand jury and indictment process.

In this case, Magistrate Judge Faruqui received an indictment from a non-federal grand jury, which, absent a distinct provision of the D.C. Code, would undisputedly have been an invalid indictment in federal district court. See Tr. at 4:7–14 (government agreeing that authority of local grand jury to return indictment in federal court is "wholly reliant" on Section 11-1916(a)).  If Magistrate Judge Faruqui were right on the merits, it would be as if the Government had presented him with an indictment returned from a court in Sweden.  Both his decision to seek briefing on whether a local grand jury is authorized to return an indictment in federal court and his conclusion that magistrate judges can reject indictments returned by an unauthorized grand jury strike an appropriate balance between magistrate judges' circumscribed power and the need to verify that defendants are subject only to procedurally valid indictments.  Cf. Costello v. United States, 350 U.S. 359, 363 (1956) (Fifth Amendment requires "[a]n indictment returned by a legally constituted . . . grand jury").

Nor is the ability of an indicted defendant to subsequently move for the dismissal of a patently invalid indictment a sufficient check.  "[A] wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted."  In re Fried, 161 F.2d 453, 458 (2d Cir. 1947).  What is more, a defendant would be subject to unnecessary court appearances, the risk of pretrial detention, and collateral consequences like employment loss or family upheaval between when the indictment is returned and its inevitable dismissal.  See also Klopfer v. North Carolina, 386 U.S. 213, 222 (1967) (noting "pendency of the indictment" subjects defendant to "public scorn," risks employment, and chills speech — all amounting to

6

**A186**

"oppression"). When an indictment can be deemed plainly deficient as an administrative matter, there is no need to trigger those consequences.

The Court is thus convinced that a magistrate judge may reject an indictment that is facially invalid. It now turns to whether one returned by a local grand jury falls into that category.

### B.    Power of Local Grand Jury

The merits present a much closer question. As the Court observed during argument on the Motion for Review, "[W]here [the analysis] begins is where it ultimately ends." Tr. at 13:20–21. Put another way, to answer which statutory authority governs is to resolve the case. The Court looks first at the Government's reliance on a D.C. Code provision and then examines the defense's counter with the Federal Rules of Criminal Procedure.

#### 1.    *D.C. Code Section 11-1916(a)*

The Government starts with D.C. Code Section 11-1916(a). Originally enacted by Congress in 1970 and codified as Section 11-1903(a), that section provides: "A grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts." See Pub. L. No. 91-358, 84 Stat. 515 (July 29, 1970). The text grants expansive authority: it covers any grand jury "serving in the District of Columbia," which would apply to grand juries convened by either District or Superior Court. It authorizes those grand juries to consider "all" matters before them, without restriction, and, for good measure, it clarifies that matters may be brought before either grand jury "regardless" of where a resulting indictment is returnable. Had Congress wanted to limit cross-jurisdictional power to certain issues, specific grand juries, or particular phases of the investigation and indictment process, it could easily have drafted a much

7

**A187**

different statute with those limitations.  Cf. Consumer Fed. of Am. v. United States Dep't of Health & Human Servs., 83 F.3d 1497, 1503 n.6 (D.C. Cir. 1996) (statutory reading unlikely when Congress "presumably would have drafted the statute differently" to achieve obvious alternative outcome).  By its plain terms, Section 11-1916(a) appears to permit the Government to do what it did here: seek an indictment from a local grand jury, returnable in District Court. To be clear, it also allows the reverse: a federal grand jury returning an indictment in Superior Court.

Our Circuit has concluded, albeit in *dicta*, that Section 11-1916(a) does indeed authorize a local grand jury to return a federal indictment.  In Seals, where a Superior Court grand jury indicted two defendants on the federal charges of conspiracy, kidnapping, and extortion and returned the indictment in federal court, our Court of Appeals rejected a constitutional challenge to Section 11-1916(a).  See 130 F.3d at 452.  The Circuit concluded that it did not encroach upon a defendant's right to be indicted by a grand jury simply because an Article I judge (*i.e.*, a D.C. Superior Court judge) supervised the grand-jury proceedings.  Id. at 458–60.  In so doing, it described Section 11-1916(a) as authorizing "a limited sharing of the supervisory power" with D.C. Superior Court judges, who could oversee local grand juries that returned indictments to District Court.  Id. at 459.  While Seals discussed the statutory meaning of Section 11-1916(a) only in *dicta*, it presumably would not have upheld the local grand jury's indictment as constitutional if it had thought that such a grand jury lacked the ability to indict a defendant in federal court at all.  See also id. at 453 (describing, without questioning, District Court's holding that Congress "validly authorized the D.C. Superior Court . . . to supervise a grand jury that can indict for both D.C. and federal offenses").

8

**A188**

Two other courts in this district have assumed that Section 11-1916(a) authorizes precisely the type of indictment the local grand jury returned in this case. See, e.g., United States v. Allen, 729 F. Supp. 120, 122 (D.D.C. 1989); United States v. Brown, 2007 WL 2007513, at *4 (D.D.C. July 9, 2007). While none has squarely addressed the question before this Court — what Section 11-1916(a) means as a matter of statutory interpretation — the unanimity across courts indicates that other jurists took for granted that Section 11-1916(a) permits local and federal grand juries in D.C. to return indictments in either court. That bolsters this Court's conclusion that Section 11-1916(a) authorizes such coextensive jurisdiction.

The defense points out that "take cognizance" does not self-evidently include the power to vote to return an indictment. See Resp. at 20. Stewart contends that the term instead only "speaks to a grand jury's investigative function." Id. at 21 (emphasis added). Under his reading, any grand jury sitting in a D.C. court (local or federal) would have the "power to investigate," no matter "where the object of the investigation may ultimately be indicted" — but could return an indictment only in the court that convened it. Id.

While that reading is creative, the D.C. Court of Appeals has found that such an interpretation is "overly literal." Hackney v. United States, 389 A.2d 1336, 1339 (D.C. 1978). In Hackney, it rejected the argument that this code provision "permits a grand jury only to 'take cognizance' of a matter ultimately proper before another court, but not to return an indictment with respect to such matters." Id. Grand juries engage in two central activities: investigating potential crimes and voting on whether to return indictments in those matters. United States v. Doe Corp., 59 F.4th 301, 304 (7th Cir. 2023) ("[T]he grand jury has broad authority to investigate potential wrongdoing and, if wrongdoing is discovered, to decide whether to return a criminal indictment."). The breadth of the D.C. Code provision's terms — which permit grand

9

**A189**

juries to "take cognizance" of "all matters" — is consistent with a jurisdictional grant covering all grand-jury functions, not one in particular.  See D.C. Code § 11-1916(a).  And because grand juries primarily investigate and indict, a statutory interpretation that hives off one of those two functions is unlikely absent specific words authorizing the grand jury only to investigate, probe, inquire, or take some similar action.  This Court agrees with the D.C. Court of Appeals that the best interpretation of Section 11-1916(a) allows D.C. grand juries to vote to return indictments in matters before it if those indictments are "returnable in Federal or District of Columbia courts."

The defense puts forth another argument: that Congress changed the terms of D.C. grand juries' authority when it passed the District of Columbia Jury System Act.  See Resp. at 22; Pub. L. No. 99-650, 100 Stat. 3635 (Nov. 14, 1986).  The Act split the previously unified jury-selection systems for District Court and Superior Court.  It also recodified then-Section 11-1903 as Section 11-1916, without any changes to the provision's language.  Compare Pub. L. No. 99-650, 100 Stat. 3635 (Nov. 14, 1986), with Pub. L. No. 91-358, 84 Stat. 515 (July 29, 1970) (identical language in original Section 11-1903).  The defense contends that the recodification, standing alone, altered the provision's meaning because the "context completely changed in 1986."  Tr. at 17:17.  But a "change of arrangement" in a statute "cannot be regarded as altering the scope and purpose of the enactment" absent Congress's "clearly expressed" intent to "change the[] effect" of the preexisting law.  Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 227 (1957).  No evidence of congressional intent to alter D.C. grand juries' mutual indictment power exists in either the 1986 Act or its legislative history, and this Court will not "lightly assume that Congress silently attache[d] different meanings" to identical provisions.  Azar v. Allina Health Servs., 587 U.S. 566, 574 (2019).

10

**A190**

This Court is convinced that in 1970, Congress authorized local grand juries sitting in the District to return indictments in District Court, and vice versa. Absent any intervening statutory change, that authority remains today.

### 2.    *Federal Rules of Criminal Procedure*

Stewart hangs his hat, conversely, on a separate statutory scheme: the current Federal Rules of Criminal Procedure, as amended in 2002. That year — after the D.C. Court of Appeals' decision in Hackney, Section 11-1916(a)'s recodification in 1986, and the D.C. Circuit's opinion in Seals — Congress adopted the Federal Rules Committee's proposed amendments. See 28 U.S.C. §§ 2072, 2074 (permitting Supreme Court to promulgate rules of procedure, requiring submission to Congress for consideration before effective date); Fed. R. Crim. P. 1 Notes (amended Apr. 29, 2002). Relevant here, those amendments modified Rule 6(a)(1) to read (as it does today): "When the public interest so requires, the court must order that one or more grand juries be summoned." (emphasis added). The amendments also defined "court" for the first time in Rule 1(b)(2) as "a federal judge performing functions authorized by law." And all parties agree that the term "court" does not include D.C. Superior Court. See Tr. at 4:20–22 (Government agreeing that "plain text" of Rules "exclude[s] D.C. local courts from the definition of court"). The defense thus contends that a D.C. Superior Court grand jury was not convened by a "court" in accordance with the Federal Rules, and any indictment returned by such a grand jury is invalid under those Rules. See generally Resp. at 10–16.

At first blush, this position makes sense. The text of the Federal Rules of Criminal Procedure offers a single path to formally charge a defendant with a felony in federal court: via indictment returned by a grand jury, which in turn is convened by a federal (not D.C. Superior) "court." The Federal Rules, furthermore, "govern the procedure in all criminal proceedings in

11

**A191**

the United States district courts." Rule 1(a)(1). Indeed, "one of the central purposes of the Rules was to make uniform the practices of all the district courts." United States v. Wallace & Tiernan, Inc., 349 F.2d 222, 226 (D.C. Cir. 1965). It follows that an indictment obtained through a different path — namely, by a non-federal grand jury — does not comply with the Rules' strictures, and is thus invalid. Accord Resp. at 10 ("The Federal Rules require that an indictment be returned by a grand jury of the federal court.") (formatting altered). Magistrate Judge Faruqui adopted this interpretation. See Order at 5–8.

The problem with such an approach is that the Advisory Committee Note to the 2002 Amendment characterizes most of the changes to Rule 6 as "stylistic," intended to make the Rules "more easily understood and to make style and terminology consistent throughout the rules." While not dispositive, "Advisory Committee Notes provide a reliable source of insight into the meaning of a rule, especially when, as here, the rule was enacted precisely as the Advisory Committee proposed." United States v. Vonn, 535 U.S. 55, 64 n.6 (2002). Here, the notes emphasize several times over that the 2002 amendments were a "general restyling" without changes in "substance" or "practice" except "as noted" specifically. See Rule 6, Committee Notes on Rules — 2002 Amendment. The note accompanying the newly added definition of "court" describes the term as "almost always synonymous with the term 'district judge,'" but clarified to include "magistrate judges" and "circuit judges who may be authorized to hold a district court." Rule 1, Committee Notes on Rules — 2002 Amendment.

Read together, the 2002 Amendment and its Advisory Committee Notes do not alter preexisting jurisdictional arrangements. For example, while "court" was not defined in the pre-2002 Rules, see Rule 54 (2001) (transferred 2002), circuit judges authorized to sit as a district court certainly fell within the pre-2002 definition of "court," despite subverting the pre-2002

12

**A192**

"traditional view that 'court' means district judge."  Rule 1, Committee Notes on Rules — 2002 Amendment; see also United States v. Cabrera-Sarmiento, 533 F. Supp. 799 (S.D. Fla. 1982) (circuit judge sitting by designation ruling on motion to dismiss indictment).  The 2002 Amendments are best read as adding clarity without disturbing the status quo.  As previously discussed, that existing status quo included an exception to the Federal Rules of Criminal Procedure for D.C.'s unique grand-jury system.  See supra Section II.B.1; cf. also Cook Cnty. v. United States ex rel. Chandler, 538 U.S. 119, 130 (2003) (when Congress changes statutory context surrounding term, here increasing punitive damages available against a "person," it "does not follow" that the change "has the force to show congressional intent to repeal implicitly the existing definition" of that statutory term).

Accepting the defense's reading also requires a more difficult corollary: that non-substantive, seemingly unrelated amendments to the Federal Rules rendered Section 11-1916(a) meaningless.  The defense originally proposed a statutory interpretation that would harmonize Section 11-1916(a) and the Federal Rules by permitting federal grand juries to return indictments to Superior Court but not the converse.  See Resp. at 28; see also Order at 10 (acknowledging same potential interpretation).  During the hearing before this Court, however, it acknowledged that changes to the D.C. Superior Court Rules of Criminal Procedure — which reflected their federal counterparts and included a complementary definition of "court" that excludes federal judges, see D.C. Sup. Ct. R. Crim. P. 1(d)(3), (5) — would also prohibit a federal grand jury from returning a local indictment.  See generally Tr. at 14:7–15:20.  Such an interpretation of the 2002 Amendment, and its local counterpart, would nullify Section 11-1916(a).

As discussed above, grand juries investigate, indict, and do little else.  To conclude that Congress intended to gut Section 11-1916(a)'s application to one of those two functions

13

**A193**

(indictment), this Court would require evidence of a "clear and manifest" legislative intention to do so. Nat'l Ass'n of Home Builders v. Def. of Wildlife, 551 U.S. 644, 663 (2007) (quoting Posadas v. Nat'l City Bank, 296 U.S. 497, 503 (1936)). Because none exists, this Court will not infer such a repeal. See also id. (absent "irreconcilable conflict" or clear substitute, "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum") (internal quotation marks and citations omitted); see also Epic Sys. Corp. v. Lewis, 584 U.S. 497, 510 (2018) (recognizing "strong presumption that repeals by implication are disfavored") (alterations and quotation marks removed).

A final wrinkle concerns the removal of a comment to D.C. Superior Court Rule of Criminal Procedure 6. Until 2015, the Rule "recognize[d] that a grand jury summoned by the Superior Court may return indictments in either the Superior Court or the United States District Court." D.C. Sup. Ct. R. Crim. P. 6 comment (2015) (removed 2016). The Superior Court Rules Committee removed that comment in its 2016 Amendment. See D.C. Sup. Ct. R. Crim. P. 6 comment (2016). The defense contends that this change indicates that the Rules Committee understood its own amendment (which mirrored the 2002 Amendment to the Federal Rules) to reflect the post-2002 nullification of Section 11-1916(a). See Tr. at 14:7–15:20. Maybe so. But the Rules Committee did not edit the comment or explain whether it had removed it for purely stylistic reasons or to reflect its altered understanding of the local grand jury's authority. Even if there were no doubt as to what the Committee understood itself to be doing, that conclusion is not binding on this Court, nor can a change to the comments of D.C. Superior Court Rules overcome a federal statutory provision.

The defense also sounds the alarm about the practical consequences of the Government's position. As interpreted by this Court, the D.C. Code provision would permit the Government to

14

**A194**

bring <u>any</u> criminal matter before a local grand jury for indictment, including "a capital case, treason, RICO, sedition," and other crimes thought to be reserved for the federal courts.  <u>See</u> Tr. 7:19–8:18 (Government agreeing "no limit" on "kinds of federal crimes" brought to local grand jury).  What is more, the Government could choose to circumvent the federal grand jury altogether and decide it "will never take a case to a federal grand jury."  <u>Id.</u> at 8:10.  Both of these scenarios are indeed troubling — even if neither has occurred yet — but the remedy would lie with Congress, not this Court, to correct such systematic (if hypothetical) avoidance of the federal grand jury.

## III.    Conclusion

For the reasons discussed above, the Court will order the criminal-duty magistrate judge to accept the indictment in this case.  A separate Order so stating will issue this day.

<div style="text-align: right">

/s/ <i>James E. Boasberg</i>
JAMES E. BOASBERG
Chief Judge

</div>

Date:  <u>November 20, 2025</u>

<div style="text-align: center">

15

**A195**

</div>

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA           )

   v.          )   **No. 1:25-MJ-225 (ZMF)**

KEVONTAE STEWART     )

_____)

**MOTION FOR STAY OF ORDER**

Kevontae Stewart, through undersigned counsel, asks this Court to stay its recent order, ECF Nos. 37 & 38, for a brief five-business-day administrative stay permitting co-counsel to consult with each other and with Mr. Stewart himself regarding next steps in these proceedings.

On September 26, 2025, the government presented its case against Mr. Stewart to a grand jury convened by this Court. That grand jury declined to return an indictment against Mr. Stewart. The government, rather than exercising its right to present its case against Mr. Stewart to a subsequent federal grand jury, chose to present its case to a grand jury convened by the District of Columbia Superior Court. The Superior Court grand jury voted to indict, and the government sought to return that indictment in this Court. Magistrate Judge Faruqui, after calling for briefing from both parties, declined to accept the indictment, holding that the Federal Rules of Criminal Procedure precluded him from accepting the Superior Court indictment. The government sought review from this Court.

Yesterday, on November 20, 2025, this Court issued its opinion on whether the government's actions were proper and ultimately ordered that magistrate court to accept the indictment returned by the Superior Court. In its order, this Court described the question of whether the government can lawfully bring an indictment from the Superior Court to this Court as

<div align="center">1</div>

<div align="center">**A196**</div>

a "close[] question." ECF No. 38 at 7, and the issue as "challenging," ECF No. 38 at 1.  In light of

this Court's Memorandum Opinion and Order, Mr. Stewart asks this Court to stay its orders, ECF

Nos. 37 & 38, for five business days permitting Mr. Stewart's counsel to consult amongst

themselves and to consult with Mr. Stewert about how to proceed.

The factors to weigh when deciding whether to issue a stay pending appeal are well settled.

The Supreme Court explained in *Nken v. Holder*, that "those legal principles have been distilled

into consideration of four factors: '(1) whether the stay applicant has made a strong showing that

he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a

stay; (3) whether issuance of the stay will substantially injure the other parties interested in the

proceeding; and (4) where the public interest lies.'"  556 U.S. 418, 434 (2009) (quoting *Hilton v.

Braunskill*, 481 U.S. 770, 776 (1987)).

These factors overwhelmingly favor granting a brief administrative stay in this case.  Mr.

Stewart has made a strong showing that he will prevail if chooses to appeal this Court's decision.

Indeed, this Court described the issue as "challenging" and a "close[] call."  ECF No. 38 at 1, 7.

As Mr. Stewart described in his briefing to the magistrate court and this Court, the proper reading

of the Federal Rules of Criminal Procedure and the D.C. Code is that the government's actions

were unlawful and he cannot be hailed into court by an indictment returned by a Superior Court

grand jury.  And Mr. Stewart will certainly be irreparably injured if the government is permitted

to present the Superior Court indictment to a federal magistrate court.  As this Court acknowledged

in its memorandum opinion:

> "[A] wrongful indictment is no laughing matter; often it works a
> grievous, irreparable injury to the person indicted." *In re Fried*, 161
> F.2d 453, 458 (2d Cir. 1947). What is more, a defendant would be
> subject to unnecessary court appearances, the risk of pretrial
> detention, and collateral consequences like employment loss or

2

**A197**

family upheaval between when the indictment is returned and its inevitable dismissal. See also *Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967) (noting "pendency of the indictment" subjects defendant to "public scorn," risks employment, and chills speech — all amounting to "oppression"). When an indictment can be deemed plainly deficient as an administrative matter, there is no need to trigger those consequences.

ECF No. 38 at 6-7.  And the other parties in this proceeding, *i.e.*, the government, will suffer no prejudice from a five-business-day administrative stay.  If, after the five business days, Mr. Stewart elects not to appeal this Court's order, the government will be able to proceed as normal presenting the indictment to the magistrate court as ordered in ECF No. 37.  No prejudice to the government will result from waiting five business days.  And finally, the public interest overwhelmingly weighs in favor of granting Mr. Stewart's request for a brief administrative stay.  The public has a vital interest in the government being held to proper procedures in indicting the residents of the District of Columbia.  The public has an interest in the government proceeding methodically, if slowly, to ensure that it complies fully with the law, rather than the government proceeding by improperly indicting someone and hauling them into Court for lengthy, drawn-out proceedings.

In light of Mr. Stewart's need to consult with his various counsel and the *Nken* factors, this Court should grant a five-business-day administrative stay of its order documented at ECF Nos. 37 & 38.

<div style="margin-left:50%">

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
MICHELLE M. PETERSON
MATTHEW L. FARLEY
Assistant Federal Public Defenders
625 Indiana Ave., N.W.
Washington, D.C.  20004
(202) 208-7500

</div>

3

**A198**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 25-MJ-225 (ZMF) |
| | : | |
| KEVONTAE STEWART, | : | |
| | : | |
| Defendant | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR STAY OF ORDER AND GOVERNMENT'S MOTION FOR A HEARING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this opposition to the Defendant's Motion for a Stay. (ECF 39). In addition, the government moves for this Court to set a hearing to accept the return in this matter.  The factors enumerated under *Nken v. Holder*, 556 U.S. 418 (2009), do not militate in favor of a stay in this case. Therefore, the Court should deny the defendant's Motion for a Stay and schedule a hearing to accept the return.

## ARGUMENT

Under *Nken*, a court should consider four factors in considering whether to grant a stay including: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).  None of the factors warrant a stay in the instant case.

First, the defendant has not shown a likelihood of success on the merits.  To begin, the Chief Judge's order is not a final order from which the defendant can appeal at this time.  Under 28 U.S.C. § 1291 the court of appeals has jurisdiction over appeals from final orders. A final order

1

**A199**

is one which disposes of all issues in dispute as to all parties. It "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). Additionally, "interlocutory appeals are generally disfavored as 'disruptive, time-consuming, and expensive' for both the parties and the courts[.]" *See In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 105 (D.C. Cir. 2002). Thus, "criminal defendants cannot [even] appeal constitutional violations on an interlocutory basis, but must wait until after they are convicted[.]" *In re Larson*, 466 B.R. 147, 150 (B.A.P. 10th Cir. 2012).

Next, the Chief Judge's opinion engages with each of the defendant's arguments, weighs them, and comes to a reasoned conclusion. (ECF 38). The fact that there is a possibility that an appellant may succeed on appeal does not justify a stay in and of itself. "[I]f any showing of likelihood of success would tip the scales on the other factors in favor of granting the stay, then courts would always stay their judgments pending appeal. There is, after all, always some possibility of a successful appeal." *Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt*, 704 F. Supp. 2d 50, 53 (D.D.C. 2010). Here, the Chief Judge has issued a thoughtful decision that is not a final order from which the defendant could appeal. Thus, the defendant cannot satisfy the first prong under *Nken*.

Second, the defendant will not be irreparably harmed if he is not granted the stay. The defendant has already been charged and is under the Court's supervision. And it has already been widely publicized that the defendant was charged with a federal crime and that a Superior Court grand jury voted to indictment him. In other words, the defendant cannot show any additional irreparable harm that would occur by allowing the criminal proceeding to continue.

Conversely, as to the third factor, the Superior Court grand jury is harmed because a delay further foils its Congressionally granted right to return indictments to the U.S. District Court. *See*

2
**A200**

D.C. Code § 11-1916.  Further, additional delay raises the risk, even if slight, that the necessary grand jurors become unavailable to return the indictment.

The fourth factor, the interest of the public, also weighs against granting the stay.  The public has an interest in this case proceeding because, as this court found at the initial detention hearing in this matter, the defendant presents a danger to the community.  Further delaying the resolution of this case extends that risk to the residents of this community.  Finally, the defendant's proffered public interest in "ensur[ing] that [the government] complies fully with the law," (ECF 39 at 3), has been vindicated by the thoughtful review and order of the Chief Judge.

<div align="center">**CONCLUSION**</div>

Accordingly, this Court should deny the defendant's Motion for Stay (ECF 39), and set a hearing—pursuant to the order of the Chief Judge—to accept the grand jury return as soon as possible.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By:    /s/ Caelainn Carney
       CAELAINN CARNEY
       NY Bar No. 5751672
       Special Assistant United States Attorney
       601 D Street, N.W.
       Washington, D.C. 20530
       202-714-6433
       Caelainn.carney@usdoj.gov

<div align="center">3
**A201**</div>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| **Plaintiff,** | : | |
| **vs.** | : | **Case No.: 25-mj-225** |
| **KEVONTAE STEWART** | : | |
| **Defendant.** | : | |

## NOTICE OF APPEAL

**Name and address of appellant:**          Kevontae Stewart

**Name and address of appellant's attorney:**          Matthew L. Farley
Assistant Federal Public Defender
Office of the Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, DC 20004

**Concise statement of judgment or order, giving date, and any sentence:**  District Court's order directing the magistrate court to accept an indictment returned by a grand jury established by the District of Columbia Superior Court.  The Order (ECF No. 37) and Memorandum Opinion (ECF No. 38) were issued on November 20, 2025.

**Name and institution where now confined, if not on bail:** N/A

**I, the above-named appellant, hereby appeal to the United States Court of Appeals for the District of Columbia from the above-stated judgment.**

Nov. 26, 2025
DATE

CJA, NO FEE _____FPD_____
PAID USDC FEE ___NO_____
PAID USCA FEE ___NO_____

KEVONTAE STEWART_____
APPELLANT

A. J. Kramer_____
FEDERAL PUBLIC DEFENDER
ATTORNEY FOR APPELLANT

Does counsel wish to appear on appeal? Yes

Has counsel ordered transcripts? No

Is this appeal pursuant to the 1984 Sentencing Reform Act? No

**A202**

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **v.** | ) | **No. 1:25-MJ-225 (ZMF)** |
| **KEVONTAE STEWART** | ) | |
| | ) | |

## MOTION FOR STAY PENDING APPEAL

On November 26, 2025, the defendant, Kevontae Stewart, filed a Notice of Appeal from this Court's order directing the Magistrate Court to accept an indictment returned by a grand jury convened by the Superior Court of the District of Columbia, *see* ECF No. 41. Mr. Stewart now moves this court to stay its order, ECF Nos. 37 & 38, directing the Magistrate Court to accept the indictment returned by the Superior Court grand jury pending appeal. In the alternative, if the Court does not stay the effect of its order pending appeal, Mr. Stewart asks the Court to stay further criminal proceedings pending issuance of the mandate by the Court of Appeals.

On September 26, 2025, the government presented its case against Mr. Stewart to a grand jury convened by this Court. That grand jury declined to return an indictment against Mr. Stewart. The government, rather than exercising its right to present its case against Mr. Stewart to a subsequent federal grand jury, chose to present its case to a grand jury convened by the District of Columbia Superior Court. The Superior Court grand jury voted to indict, and the government sought to return that indictment in this Court. Magistrate Judge Faruqui, after requesting briefing from both parties, declined to accept the indictment, holding that the Federal Rules of Criminal Procedure precluded him from accepting the Superior Court indictment. The government sought review from this Court.

1

**A203**

On November 20, 2025, this Court issued its opinion on whether the government's actions were proper, and ultimately ordered the Magistrate Judge to accept the indictment returned by the Superior Court grand jury.  In its order, this Court described the question of whether the government can lawfully bring an indictment from the Superior Court to this Court as a "close[] question." ECF No. 38 at 7, and the issue as "challenging," ECF No. 38 at 1.  The next day, Mr. Stewart moved this Court for a brief administrative stay of its order to permit Mr. Stewart to consult with counsel and make a decision regarding whether to appeal this Court's order.  The government opposed the motion.  This Court granted Mr. Stewart's motion for a brief stay on November 24, 2025, staying its order directing the Magistrate Court to accept the indictment until December 1, 2025, because the Court "agree[d] with Defendant that the factors articulated in *Nken v. Holder*, 556 U.S. 418, 434 (2009), militate in favor of a brief stay."  Minute Order, Nov. 24, 2025.  Now that Mr. Stewart has appealed, he asks the Court to extend the stay pending the outcome of the appeal.

The factors to weigh when deciding whether to issue a stay pending appeal are well settled.  The Supreme Court explained in *Nken v. Holder*, that "those legal principles have been distilled into consideration of four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"  556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Like the decision to grant a brief administrative stay, these factors overwhelmingly favor granting a stay pending appeal in Mr. Stewart's case.  First, Mr. Stewart has made a strong showing that he is likely to succeed on the merits.  To be clear, it is not necessary that Mr. Stewart show

2

**A204**

that he has an "an absolute certainty of success." *Population Inst. v. McPherson,* 797 F.2d 1062, 1078 (D.C. Cir. 1986). "Rather, '[i]t will ordinarily be enough that the [movant] has raised serious legal questions going to the merits, so serious, substantial, [and] difficult as to make them a fair ground of litigation.'" *Pan Am Flight 73 Liaison Grp. v. Dave*, 711 F. Supp. 2d 13, 37 (D.D.C. 2010) (Bates, J.) (quoting *Population Inst.*, 797 F.2d at 1078). And where a court is the first court to pass on a legal question, that issue is—by definition—a "fair ground for litigation." *See id.* ("Here, because this Court appears to be the first court to interpret and Libyan Claims Resolution Act … the proper interpretation of these documents are a 'fair ground for litigation.'").

Mr. Stewart's case is the first to directly pose the question of whether a federal criminal case can be initiated with a charging document obtained from the grand jury established by the Superior Court of the District of Columbia. The only cases to even touch upon this issue all assumed that the U.S Attorney's Office could initiate federal cases via a Superior Court grand jury. *See United States v. Seals*, 130 F.3d 451, 457 (D.C. Cir. 1997); *United States v. Allen*, 729 F. Supp. 120, 122 (D.D.C. 1989); *United States v. Brown*, 2007 WL 2007513, at *4 (D.D.C. July 9, 2007). Indeed, this Courted noted in its memorandum opinion that no court has "squarely addressed the question before this Court." ECF No. 38 at 9.

That this question is a "fair ground for litigation" is supported by the fact that the two decisions addressing this question in this case reached different outcomes. Magistrate Judge Faruqui wrote a "thoughtful opinion," ECF No. 38 at 1, concluding that the Federal Rules of Criminal Procedure required that an indictment be returned by a grand jury established by a federal court, regardless of an earlier-in-time D.C. Code provision which may have authorized the process in years past. This Court, of course, reached the opposite conclusion. ECF No. 38. But this

**A205**

disagreement amongst the judges of this Court alone indicates that this issue is a fair ground for litigation justifying granting a stay of the Court's order pending appeal.

In further support of Mr. Stewart's arguments on the merits, Mr. Stewart incorporates by reference his arguments on the merits made in earlier briefing on this issue.  ECF Nos. 21 & 28. In addition, this Court noted that the issue here is "challenging," ECF No. 38 at 1, and a "close[]" question."  ECF No. 38 at 7.  And in criminal cases, close questions of law should be interpreted in favor of the defendant.  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 27 (D.C. Cir. 2019) ("Under the rule of lenity, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." (quotation marks omitted)).

Second, Mr. Stewart will be irreparably injured absent a stay.  As this Court acknowledged in its memorandum opinion:

> "[A] wrongful indictment is no laughing matter; often it works a grievous, irreparable injury to the person indicted." *In re Fried*, 161 F.2d 453, 458 (2d Cir. 1947). What is more, a defendant would be subject to unnecessary court appearances, the risk of pretrial detention, and collateral consequences like employment loss or family upheaval between when the indictment is returned and its inevitable dismissal. See also *Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967) (noting "pendency of the indictment" subjects defendant to "public scorn," risks employment, and chills speech — all amounting to "oppression"). When an indictment can be deemed plainly deficient as an administrative matter, there is no need to trigger those consequences.

ECF No. 38 at 6-7.

To argue otherwise "is an astonishingly callous argument which ignores the obvious." *Fried*, 161 F.2d at 458.  Mr. Stewart's liberty has already been seriously infringed.  An "[a]rrest is a public act that may seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations,

4

**A206**

subject him to public obloquy, and create anxiety in him, his family and his friends." *United States v. Marion*, 404 U.S. 307, 320 (1971). And Mr. Stewart did spend time in pre-trial detention, which is known to have a "detrimental impact on the individual." *Barker v. Wingo*, 407 U.S. 514, 532.

The government argues that Mr. Stewart will suffer no harm because he has already been charged and is under the Court's supervision, and it has already been "widely publicized" that Mr. Stewart has been charged with a federal crime. ECF No. 40 at 3. There is some truth to this—Mr. Stewart has already been harmed by the government's actions and his liberty is already being deprived through pretrial supervision. So, yes, Mr. Stewart is already experiencing harms. But he will certainly experience more harm if the government is permitted to hail Mr. Stewart into repeated court appearances for continued criminal proceedings that he should not be subject to in the first place.

Subjecting Mr. Stewart to further criminal proceedings, therefore, would be subjecting Mr. Stewart to the very harm that the grand jury requirement is meant to protect against. "The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes." *Costello v. United States*, 350 U.S. 359, 362, (1956). The grand jury "serves the 'dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions.'" *United States v. Sells Eng'g*, 463 U.S. 418 (1983) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 686-687 (1972)). "[T]he grand jury shields the accused from unjust prosecution." *United States v. Coachman*, 752 F.2d 685, 690 (D.C. Cir. 1985). "If this were not its transcendent mission, the grand jury as we know it would be unnecessary." *Id.* And "[t]he grand jury provides an additional check on felony prosecutions, acting as a 'buffer or referee between the Government

5

**A207**

and the people,' to ensure that the charges are well-founded." *Trump v. United States*, 603 U.S. 593 (2024) (quoting *United States v. Williams*, 504 U.S. 36, 47 (1992)).

Third, the government will not be harmed if this Court grants a stay pending appeal. In the context of the brief stay, the government did not assert that it would suffer any harm if the brief stay was granted. This was a concession that it would suffer no harm in the context of a stay. Instead, the government argued that "the Superior Court grand jury" would be harmed. This begs the question of whether the Superior Court grand jury is even an interested party in these proceedings. The parties to this case are the government and Mr. Stewart. These are the only two parties that the Court should consider in deciding whether to grant a stay. And the United States will not suffer any sort of harm by first permitting the Court of Appeals to speak on the legality of the indictment. Indeed, if the government wanted its prosecution (and future such prosecutions) to proceed on firm footing, it would join Mr. Stewart in asking the Court of Appeals to settle this question of first impression.

And fourth, the public interest weighs heavily toward assuring that the government be held to the strict structures of the law in initiating criminal prosecutions. Ensuring that the government acts lawfully with regard to Mr. Stewart gives the public confidence that the government will act lawfully if its prosecution power is turned on them.

The government asserts that the public has an interest in proceeding with prosecution because Mr. Stewart "presents a danger to the community." ECF No. 40 at 3. But Mr. Stewart is currently subject to pretrial release conditions, which have been deemed sufficient to secure the safety of the community. And Mr. Stewart has been complying with these conditions. Should any pretrial release issues arise, even if this Court grants the stay pending appeal, this Court will retain jurisdiction to adjust pretrial release conditions if necessary.

<div align="center">6</div>

<div align="center">**A208**</div>

Wherefore, the defendant, Kevontae Stewart asks this Court to stay its order, ECF No. 37, pending the resolution of Mr. Stewart's appeal.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
MICHELLE M. PETERSON
MATTHEW L. FARLEY
Assistant Federal Public Defenders
625 Indiana Ave., N.W.
Washington, D.C.  20004
(202) 208-7500

7

**A209**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 25-MJ-225 (ZMF)** |
| | : | |
| **KEVONTAE STEWART,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION**
**FOR STAY PENDING APPEAL**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this opposition to the Defendant's Motion for Stay Pending Appeal. (ECF 42). The factors enumerated under *Nken v. Holder*, 556 U.S. 418 (2009), do not militate in favor of a stay in this case. Therefore, the Court should deny the defendant's Motion and schedule a hearing to accept the indictment return. The government also respectfully requests that the Court issue a minute order excluding the time under the Speedy Trial Act relating to these motions and any stay of the proceedings in the event this Court grants the defendant's motion..

**ARGUMENT**

Under *Nken*, a court should consider four factors in considering whether to grant a stay including: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). None of the factors warrant a stay in the instant case.

1

**A210**

First, the defendant has not shown a likelihood of success on the merits.[1] The Chief Judge's opinion engaged with each of the defendant's arguments and came to a reasoned conclusion. (ECF 38). The fact that there is a possibility that a defendant may succeed on appeal does not justify a stay in and of itself. "[I]f any showing of likelihood of success would tip the scales on the other factors in favor of granting the stay, then courts would always stay their judgments pending appeal. There is, after all, always some possibility of a successful appeal." *Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt*, 704 F. Supp. 2d 50, 53 (D.D.C. 2010).

The defendant nonetheless contends that a stay is warranted here because there is a "fair ground for litigation." (ECF 42 at 3 (citing *Pan Am Flight 73 Liaison Grp. v. Dave*, 711 F. Supp. 2d 13, 37 (D.D.C. 2010)). This is an oversimplification of the standard. "[A] stay pending appeal might be warranted if there are 'serious, substantial, and difficult' questions going to the merits, *which make them* 'fair ground for litigation and thus for more deliberative investigation.'" *Scotts Valley Band of Pomo Indians v. United States Dep't of the Interior*, No. CV 19-1544 (ABJ), 2021 WL 9849254, at *2 n.2 (D.D.C. Jan. 11, 2021) (emphasis in original) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).

The defendant further contends that "Mr. Stewart's case is the first to directly pose the question of whether a federal criminal case can be initiated with a charging document obtained from the grand jury established by the Superior Court of the District of Columbia." (ECF 42 at 3).

---

[1] The government incorporates by reference and reiterates its arguments in ECF 40. Further, the government renews its argument that the Chief Judge's order, (ECF 37), is not a final order in the case and therefore the Defendant does not have an appeal as of right. A final order is one which disposes of all issues in dispute as to all parties. It "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). Additionally, "interlocutory appeals are generally disfavored as 'disruptive, time-consuming, and expensive' for both the parties and the courts[.]" *See In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 105 (D.C. Cir. 2002). Thus, "criminal defendants cannot [even] appeal constitutional violations on an interlocutory basis, but must wait until after they are convicted[.]" *In re Larson*, 466 B.R. 147, 150 (B.A.P. 10th Cir. 2012).

**A211**

We respectfully disagree. As the defense acknowledges (ECF 42 at 3), courts have addressed whether an indictment by a Superior Court grand jury may be returned in federal court. The Chief Judge acknowledged in his analysis the Circuit's opinion in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997), stating, "Our Circuit has concluded, albeit in *dicta*, that Section 11-1916(a) does indeed authorize a local grand jury to return a federal indictment." (ECF 38 at 8). In *Seals*, the defendant moved to dismiss the indictment on the basis that section 11-1916 was unconstitutional and that it "deprive[d] them of the constitutional safeguards associated with Article III supervision of federally-indicting grand juries." *Id.* at 456 n.3. The D.C. Circuit rejected this argument. The court acknowledged that "section 1916(a) is applicable only to the unique federal enclave." *Id*. at 457 (internal quotation marks omitted). But the court reasoned that "the power to supervise a federally-competent grand jury cannot fairly be described as an essential attribute of the judicial power of the United States." *Id*. at 459 (internal quotation marks omitted). The court concluded, "While the grand jury arrangement in the District of Columbia may be unique, 'our constitutional principles of separated powers are not violated . . . by mere anomaly or innovation.'" *Id*. at 460 (quoting *Mistretta v. United States*, 488 U.S. 361, 385 (1989)). Thus, it cannot be said that the use of a Superior Court grand jury to return an indictment in federal court is truly an issue of first impression.

In any event, "whether a case poses a novel legal question is not the test for a stay pending appeal; only this Circuit's traditional four-factor test is that which applies here." *United States v. Navarro*, No. CV 22-2292 (CKK), 2023 WL 2663014, at *3 (D.D.C. Mar. 28, 2023). Thus, the fact that the Circuit has not addressed this exact question in this exact posture is not enough to warrant a stay. Thus, the defendant cannot satisfy the first prong under *Nken*. The defendant's "failure to satisfy this stringent standard for demonstrating a likelihood of success on the merits is

an arguably fatal flaw for a stay application. *Comm. on the Judiciary v. McGahn*, 407 F. Supp. 3d 35, 38–39 (D.D.C. 2019).

Second, the defendant will not be irreparably harmed if he is not granted the stay. The defendant has already been charged and is under the Court's supervision. The defendant is in the community and has received accommodations to facilitate his daily life, including permission to travel out of state for the Thanksgiving holiday. And it has already been widely publicized that the defendant was charged with a federal crime and that a Superior Court grand jury voted to indictment him. The only issue here is whether this court has the power to go to trial on this indictment. Further, the defendant would not be irreparably harmed because, if convicted, he may appeal any final judgment of conviction to the Circuit. *See Barrientos v. United States*, 668 F.2d 838, 842 (5th Cir. 1982) ("[E]very person has an absolute right to an appeal from a trial court conviction[.]") While the defendant is correct that indictments are by their nature serious matters, (ECF 42 at 4), the inherent pressures of a criminal prosecution are not sufficient to show irreparable harm. *See Perlmutter v. Blanche*, No. 25-5285, 2025 WL 2627965, at *6 (D.C. Cir. Sept. 10, 2025) (Pan J., concurring) (loss of employment not usually irreparable harm); *Rivera-Zayas v. Our Lady of Consolation Geriatric Care Ctr.*, 2021 WL 4776610, at *4 (E.D.N.Y. Oct. 13, 2021) (litigation expenses are not irreparable harm). The defendant cannot show any additional irreparable harm that would occur by allowing the criminal proceeding to continue in the normal course.

As to the third factor, granting a stay would adversely impact the judicial process. A stay would frustrate the Superior Court grand jury's Congressionally granted right to return indictments to the U.S. District Court. *See* D.C. Code § 11-1916. Further, additional delay raises the risk, even if slight, that the necessary grand jurors may become unavailable to return the indictment.

The fourth factor, the interests of the public, also weighs against granting the stay. The

4
**A213**

public has an interest in this case proceeding because, as this court found at the initial detention hearing in this matter, the defendant presents a danger to the community. Further delaying the resolution of this case extends that risk to the residents of this community. The defendant's proffered public interest in "assuring that the government be held to the strict structures of the law in initiating criminal prosecutions," (ECF 42 at 6), has been vindicated by the thoughtful review and order of the Chief Judge.

Finally, should the Court grant the Defendant's Motion, the government would respectfully request that the Court enter a minute order excluding time under the Speedy Trial Act. Because of the current litigation and filing of an interlocutory appeal, such an order would be appropriate under 18 U.S.C. §§ 3161(h)(1)(C) and (h)(7).

<div align="center">

**CONCLUSION**

</div>

Accordingly, this Court should deny the Defendant's Motion (ECF 42), and set a hearing to accept the grand jury return as soon as possible. In the alternative, the government respectfully requests that the Court enter a minute order excluding time under the Speedy Trial Act.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    /s/ Caelainn Carney
        CAELAINN CARNEY
        NY Bar No. 5751672
        Special Assistant United States Attorney
        601 D Street, N.W.
        Washington, D.C. 20530
        202-714-6433
        Caelainn.carney@usdoj.gov

<div align="center">

5

**A214**

</div>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,

v.

KEVONTAE STEWART,

Defendant.

MJ No. 25-225

## ORDER

Defendant Kevontae Stewart seeks a stay pending his appeal of this Court's decision that he could be presented here on an indictment that was returned by a Superior Court grand jury. See ECF No. 42 (Def. Mot. to Stay). The Court will grant the Motion.

Both sides agree that the factors the Court should weigh are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 434 (2009) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987).

As the Court explained in its prior Opinion, the merits issue Defendant raises on appeal — namely, the ability of the Government to present in District Court a federal indictment obtained in Superior Court — is a close and challenging one. See ECF No. 38 (Mem. Op.) at 1. He has thus raised "serious legal questions going to the merits" sufficient for a stay. Population Inst. v. McPherson, 797 F.2d 1062, 1078 (D.C. Cir. 1986). In addition, Stewart could well be irreparably harmed if his prosecution moves forward on an indictment ultimately held invalid.

1

**A215**

Third, the Government will not be substantially injured because the strict conditions of release imposed remain in effect, and the Speedy Trial Act will be tolled pending appeal.  Finally, the public interest lies in letting the Court of Appeals decide this issue before the Government moves forward both on this case and in similar fashion on other cases.  It would benefit all parties if such review were conducted on an expedited basis, but that is a decision for that court, not this one.

The Court, accordingly, ORDERS that:

1.  Defendant's [42] Motion to Stay is GRANTED; and

2.  The case is STAYED pending the issuance of the Mandate from the Court of Appeals.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: December 9, 2025

2

**A216**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
      vs.                        )  CASE NO. 1:25-mj-00225-ZMF
                                 )
KEVONTAE STEWART,                )
                                 )
            Defendant.           )
_____  )


TRANSCRIPT OF STATUS HEARING
**BEFORE THE HONORABLE MATTHEW J. SHARBAUGH, U.S. MAGISTRATE**
September 29, 2025
12:40 p.m. - 12:57 p.m.
Washington, DC

**FOR THE GOVERNMENT:**
Office of the United States Attorney
BY:  JACOB GREEN
601 D Street, NW
Washington, DC 20004

**FOR THE DEFENDANT:**
Law Offices of H. Heather Shaner
BY:  H. HEATHER SHANER
1702 S Street, NW
Washington, DC 20009


Pretrial Officer: Da'Shanta Lewis


_____
**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Digital Record


**A217**

(Call to Order of the Court at 12:40 p.m.)

DEPUTY CLERK:  Good afternoon, Your Honor.  This is 25-mj-225, the *United States of America versus Kevontae Stewart.*

This matter is set for a status hearing.

Parties, please introduce yourself to the Court, starting with the government.

MR. GREEN:  Good afternoon, Your Honor.  Jacob Green for the United States.

THE COURT:  Mr. Green, good afternoon.

MS. SHANER:  Good afternoon, Your Honor.  Heather Shaner with Kevontae Stewart.

THE COURT:  Ms. Shaner, good afternoon.

And Mr. Stewart, good afternoon to you, sir.

THE DEFENDANT:  Good afternoon, Your Honor.

PRETRIAL OFFICER:  Good afternoon, Your Honor.  Da'Shanta Lewis, Pretrial Services Agency.

THE COURT:  All right.  Good afternoon, Ms. Lewis.

THE COURT:  All right.  So I set this for a status conference this afternoon.  We had a hearing Friday afternoon following a development in the case, specifically the grand jury's return of a no bill on a proposed indictment.

So in light of that development, the Court heard arguments from counsel, and concluded that it would be appropriate to modify Mr. Stewart's bond status because of the

**A218**

grand jury's failure to indict, at least to this point.

So I fashioned on Friday conditions of release so that Mr. Stewart could be out on bond pending further proceedings in this case, whatever that might look like, and so I outlined those conditions on Friday. I issued the release order on Friday so that he could be home over the weekend, even though he wasn't here on Friday to be sworn in to those conditions.

So that's really the purpose of today, was to bring Mr. Stewart in, advise him explicitly of what the Court's conditions are. I'm sure Ms. Shaner has explained them to you, Mr. Stewart, but I want to make sure you hear them from me, and I have to advise you about what the consequences will be if you fail to comply with those conditions.

So that's where we are at this point. I guess, Ms. Shaner or Ms. Lewis, can one of you just confirm that Mr. Stewart did in fact appear for GPS installation and orientation earlier today?

PRETRIAL OFFICER: That is correct, Your Honor. Mr. Stewart did report for GPS orientation today with myself, with me.

THE COURT: Okay. Thank you.

All right. Mr. Stewart, so the upshot of all of this is that, at least at this point in time, the Court has concluded that you should be released from jail pending further proceedings in your case. All right. That's subject to

**A219**

concern conditions. You should have received those -- or you will at least today receive those in writing, but I'm going to walk through them with you now.

Number one, you're required to submit to supervision with the pretrial services agency, that's Ms. Lewis and her office;

To continue or actively seek employment;

To surrender any passport you may have to pretrial and not obtain another passport or international travel document;

You will be required to reside at the address on First Street, Southeast, I think with your cousin;

To avoid any contact directly or indirectly with anyone who may be a victim or witness in the investigation or prosecution;

To not possess a firearm, destructive device or other weapon;

To not use or unlawfully possess a narcotic drug or other controlled substance unless prescribed by a licensed medical practitioner. That includes marijuana. It is legal locally; it is not legal federally. And this is a federal case, and, therefore, you are prohibited from using or possessing marijuana. I just want to be abundantly clear about that.

You will be subject to a curfew at your residence from 10:00 p.m. every night until 6:00 a.m. the next morning, so

**A220**

you've got to make sure you're home by 10:00, and you can't leave the next day until 6:00.

You will be subject to GPS monitoring. As we heard, you have had that installed, you have gone through the orientation with that.

You will be required to report any contact with law enforcement personnel to pretrial, whether an arrest, questioning, traffic stop, anything like that.

Verify your address with pretrial, and notify pretrial in advance of any change of address or phone number so that they can stay in contact with you.

So those are the conditions that the Court has fashioned. Do you understand all of those conditions?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions about any of those conditions?

THE DEFENDANT: (No audible response.)

THE COURT: All right. So it's important that you comply with all of these conditions, Mr. Stewart. If you fail to do so, a warrant can be issued for your arrest, your conditions can be revoked, and then you can be held pending trial. You may also face a charge of contempt of court for having violated court-ordered conditions.

Your most important condition of release is to not commit a federal, state or local crime while on release. If

**A221**

you were to do so, a warrant can be issued for your arrest, your conditions can be revoked, and you can be held pending trial.  You may also face a longer sentence for having committed a crime while on release.

In a moment, we'll confirm the next court date for you in this case.  It's imperative that you appear for that court date and all future court dates that are set in this case.  If you fail to do so, again, a warrant can be issued for your arrest, your conditions can be revoked, and you can be held pending trial, and you may also face an additional criminal charge for failing to appear in court.

Finally, I'll remind you, as I do everyone, that it's a crime to try to influence a juror or to threaten or attempt to bribe a witness or anyone else who might have information about your case or to otherwise obstruct the administration of justice.

So do you understand everything that I have just said?

THE DEFENDANT:  Yes.

THE COURT:  All right.  So having heard the conditions of release that the Court is imposing and the consequences of what would happen if you fail to comply, are you prepared to comply with your conditions?

THE DEFENDANT:  (No audible response.)

THE COURT:  All right.  Can we please swear Mr. Stewart in to compliance now.

**A222**

DEPUTY CLERK:  Will you stand and raise your right hand.

Do you solemnly swear to abide by the conditions of your release as set forth by this Court, so help you God?

THE DEFENDANT:  Yes.

THE COURT:  Thank you.  Please be seated.

THE COURT:  All right.  So to the extent we haven't already done so, if we can get a hard copy of the conditions of release for Mr. Stewart to take with him.

All right.  Where are we in terms of next steps in the case at this point?  Have counsel conferred about what you all want to do?

MR. GREEN:  Yes, Your Honor.  We discussed moving the preliminary hearing to October the 9th.

THE COURT:  All right.  Ms. Shaner, is there any objection to that?

MS. SHANER:  No, Your Honor.

THE COURT:  Okay.  So the preliminary hearing I think is currently set for tomorrow; is that right, Mr. Green?

MR. GREEN:  Yes, Your Honor.

THE COURT:  All right.  Okay.  So at the parties' joint request then, the Court will agree to continue the preliminary hearing until October 9th.  Do we have a time for that, Ms. Pierre-Lewis?

DEPUTY CLERK:  11:30.

**A223**

THE COURT: Did you all talk about that ahead of time, 11:30?

MR. GREEN: Yes, Your Honor.

THE COURT: All right. So we'll set it for a preliminary hearing on October 9th at 11:30.

Anything else from the government, Mr. Green?

MR. GREEN: No, Your Honor. Thank you.

THE COURT: Ms. Shaner?

MS. SHANER: Good afternoon, Your Honor. I wondered if during the pendency of this case, while Kevontae is in Washington, pretrial services could provide him with a mental health referral for treatment of his posttraumatic stress disorder.

THE COURT: All right. Ms. Lewis, any issue with that from pretrial's perspective?

PRETRIAL OFFICER: That is something that needs to be added to the release order.

THE COURT: All right. Well, given the request by the defense that that be undertaken, if possible, I'm amenable to it, so I'm happy to add that to the conditions so that that can be accomplished, that that's something pretrial can take care of.

Anything else on the conditions, Ms. Shaner, before Ms. Lewis takes another pass at them?

MS. SHANER: No, not on the conditions. His mother

**A224**

has recently relocated to North Carolina, and she drove up from North Carolina and she is in court today.

THE COURT: Good afternoon, ma'am.

MS. SHANER: I would ask that she be interviewed as a possible custodian, and if it becomes appropriate, if this case goes on, I would be asking to transfer his physical location to her home in North Carolina and have him supervised by pretrial services down there. I'm not asking that today.

THE COURT: All right. But she's here, she came up, so you're saying you want to present her to the Court so that she doesn't have to come back, if that's something that you all want to pursue?

MS. SHANER: Bring her to pretrial services to have her interviewed as a third-party custodian.

THE COURT: I mean, I understand the thinking from an efficiency perspective, but, Ms. Lewis, did you have thoughts on this?

PRETRIAL OFFICER: Because Mr. Stewart is already out on release, unless someone -- the Court is inclined to put him in the third-party custody of someone, that's not needed for his supervision to be courtesy supervised by North Carolina, should he be allowed to move there.

THE COURT: Yeah. I mean, I guess that's a good point, Ms. Shaner. I didn't require him to be overseen by a third-party custodian here, so I don't know -- I mean, I

**A225**

appreciate her traveling up.  Thank you for being here.  I appreciate it.  I'm sure your son appreciates it too.  But I didn't appoint -- he lives with his cousin now.  I did hear from her at the original hearing.  I did not on Friday deem fit to appoint a custodian here.  I mean, he's released on a curfew and monitoring, but I guess if, you know, if you all -- if you think that, whether today or at some point in the future, you may just want to change his residence to be with his mother in North Carolina, you're free to make that request.

At least, at this point, I haven't appointed anyone as a custodian though, so I think that would just be a matter of working, you know, with pretrial to ensure that they can arrange courtesy supervision and then coming back to the Court for a modification of the conditions so that he can reside in North Carolina instead of at the address in southeast.

MS. SHANER:  I'll just get the address in North Carolina verified with pretrial services and we'll let things remain as they are today.

THE COURT:  I mean, I'm also open -- this wasn't something that was on my radar on Friday.  If this is something that you would like to request now, I mean, I'm open to talking about that further.

MS. SHANER:  Let me consult with his mom.

THE COURT:  All right.

(Pause)

**A226**

THE COURT:  I mean, look, my goal is to put Mr. Stewart in whatever environment folks think is going to be most successful for him, so I know -- if I remember correctly, he's sleeping on the couch at his cousin's house or something, right.  So I mean, you all tell me what you think.

MS. SHANER:  Your Honor, I would ask then to have his address in North Carolina verified and to allow him to go there today.

THE COURT:  All right.  Ms. Lewis, do you need to do anything with -- where does she live in North Carolina, city?

UNIDENTIFIED SPEAKER:  (Inaudible response.)

THE COURT:  So western district?

PRETRIAL OFFICER:  We would just have to request --

THE COURT:  I'm impressed that you know that off the top of your head.

UNIDENTIFIED SPEAKER:  I have lived there for a while.

THE COURT:  That's right outside Charlotte, ma'am?  Okay.  So that's going to be the western district, I think.

PRETRIAL OFFICER:  So would just need to prepare a courtesy supervision packet, assuming that the conditions are going to remain basically the same, and then that should be not an issue.

Well, what I would ask is that he continues to keep this GPS on.  Once he gets to Charlotte and he gets situated with them, they can take that GPS off and mail it back to us.

**A227**

THE COURT:  Okay.

PRETRIAL OFFICER:  I'm going to update this order to reflect the courtesy supervision in North Carolina.

THE COURT:  I'm going to try to make this a little easier.  All right.  So the key point is that Mr. Stewart is on the monitoring and he's subject to the curfew.  All right.

I was prepared to release him to where he was living with his cousin.  I'm also prepared to release him to live with you in North Carolina.  So, you know, I guess -- sounds like your preference would be to stay here, try to get things together, rather than having to go back and make another trip.

UNIDENTIFIED SPEAKER:  (Indiscernible).

THE COURT:  I mean, look, here is what I'll do.  I'm prepared to make an exception to the curfew for the one-time travel with his mother to North Carolina, whenever he makes that trip with her.  So what I'll say is he needs to reside either at the address here in DC that the Court has already specified or at his mother's address in North Carolina.  It sounds like for the long term, that's going to be North Carolina, so, really, you know, the next week or ten days or so, if he needs to be here while you get things situated, he just needs to be compliant with that curfew.

And then whenever you're ready to transfer, just be in touch with pretrial when that happens and then they can work on the courtesy supervision with North Carolina at that point.

**A228**

Does that work for you, Ms. Lewis?

PRETRIAL OFFICER:  (No audible response.)

THE COURT:  Ms. Shaner?

MS. SHANER:  Yes, Your Honor.

THE COURT:  Okay.  Everybody clear on all of that?  All right.

Okay.  Very good.  So then the next date for you all will be here October 9th for the preliminary hearing, unless something changes in the meantime.

Unless there is anything further -- thank you.  We'll stand adjourned.  You all may be excused.  Thanks.

(Proceedings concluded at 12:57 p.m.)


CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the digital record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of October, 2025.


                              /s/ Sonja L. Reeves
                              SONJA L. REEVES, RDR-CRR
                              FEDERAL OFFICIAL COURT REPORTER


**A229**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
       vs.                         )   CASE NO. 1:25-mj-00225-ZMF
                                   )
KEVONTAE STEWART,                  )
                                   )
            Defendant.             )
_____   )

TRANSCRIPT OF GRAND JURY RETURN
**BEFORE THE HONORABLE ZIA M. FARUQUI, U.S. MAGISTRATE JUDGE**
September 29, 2025
2:29 p.m. - 3:36 p.m.
Washington, DC

**FOR THE GOVERNMENT:**
Office of the United States Attorney
BY:  CAELAINN CARNEY
601 D Street, NW
Washington, DC 20004

_____

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Digital Record

**A230**

(Call to Order of the Court at 2:29 p.m.)

DEPUTY CLERK:  Good afternoon, Your Honor.  We have one grand jury return before you today.  This is grand jury September 4.  The foreperson is present in the courtroom.

Please refer to defendants by initials only.  Will the assistant introduce themselves to the Court.

MS. CARNEY:  Good afternoon, Your Honor.  Caelainn Carney for the United States.

THE COURT:  All right.  We have a grand jury return today.

(Pause)

THE COURT:  Okay.  So I understand you have gone to a Superior Court grand jury.  This is a case for which the docket reflects that the federal grand jury refused to charge the case, and so can you please remind me of the authority to bring matters from a Superior Court grand jury.

MS. CARNEY:  Yes.  It is DC Code 11-1916.

THE COURT:  19 --

MS. CARNEY:  -- 16.  And I have a couple of cases that I can provide to the Court if they are helpful as well.

THE COURT:  That would be great.  Can you -- that would be super helpful.  Can you go ahead, but talk slowly.  Go ahead.

MS. CARNEY:  Okay.  First case for Your Honor is *United States versus Allen*, 729 F. Supp 120.

**A231**

THE COURT:  729 F. Supp 120.

MS. CARNEY:  Uh-huh.  And then from the Court of Appeals, *United States versus Seals*, 130 F.3d --

THE COURT:  Hold on.  130 F.3d, got it.

MS. CARNEY:  -- 451.

THE COURT:  451.

MS. CARNEY:  Yes, Your Honor.

And then not squarely on point, but I think illustrative is *United States versus Brown*.  I can give the Westlaw or Lexis cite.

THE COURT:  Westlaw.  I don't do Lexis.

MS. CARNEY:  2007 WL 2007513.

THE COURT:  200 --

MS. CARNEY:  -- 7513.

And then an example, Your Honor, of when this was done --

THE COURT:  Oh, I don't need an example.  I just want to read the cases.  That's fine for now.

I'm going to go review these cases and then return.

You can express my concerns to your management that it is troubling when federal grand juries are now, if they are returning no bills, if the solution is to just go to Superior Court.

Every day there is something new that I have not seen before this court in the decades that I have been in federal

**A232**

court, but that's fine.  You all have the right to do it.  I'll go check it, but I will express my concern and how troubled I am by the breaking down of norms that we're --

MS. CARNEY:  If I may cite one more matter, Your Honor.

THE COURT:  Please.

MS. CARNEY:  Just from the docket.  18-cr-338.

THE COURT:  Thank you.  We'll be back.  We're going to recess.  Let's come back about -- we'll come back at 3 o'clock.

MS. CARNEY:  All right.  Shall I ask the foreperson to remain?

THE COURT:  Yes.

MS. CARNEY:  Okay.

(Recessed from 2:34 p.m. to 3:29 p.m.)

DEPUTY CLERK:  Your Honor, recalling grand jury number September 4.

THE COURT:  Okay.  All right.  Ms. Carney, I reviewed the cases that you have presented, and I'm not going to return the indictment.  I'm going to issue a briefing.  I mean, it is at best -- at best I think that it is unseemly, but I am concerned that it is unlawful, what the United States Attorney's Office wants to do here, but it is certainly unseemly that they are taking, after there is a federal grand jury that said that there was not probable cause to go forward, to then take it to a Superior Court grand jury, that I can only

imagine did not know that, and then try to do it there.

We have never had federal grand juries -- I'm sorry, Superior Court grand juries return federal, other than, as you indicated, during COVID, and two of the cases you supported are ones where the superior court grand jurors were being threatened. So it makes some sense that in those cases there was unavailability of that grand jury potentially, but the law that you cited simply appears to indicate that a Superior Court matter can be returned in federal court for Superior Court charges. That is just the federal court charge. It's nothing else.

I have spoken to my colleagues. No one else can recall anything of this happening certainly in the last several years where -- and I can tell you this: It has never happened in this district, or I doubt certainly anywhere, that if it could, where it was after a no bill has happened, they forum shopped and went to another grand jury to have them bring back their case.

This desire to just at all costs get people charged and arrested is losing, every day, credibility before the court. There is a cost that happens when people are only -- when the ends justify the means. And if the ends here are simply to get more arrests and for people -- and the residents of DC have spoken in this grand jury. There are other federal grand juries. I'm not sure why you all didn't start with other

**A234**

grand juries here and get no billed by the other grand juries or return true bills, but that there was a run to the Superior Court grand jury separate and apart from that is extremely concerning, it's frightening, and seems to be part of an overall plan to just at all costs get charges and arrests and convictions -- well, not convictions, because we haven't gotten that far. In fact, you're getting further and further away from that. You can't even get grand juries returned now, because the public seems to have lost all faith in the process.

And so I'm going to set a briefing schedule. I'll issue a minute order today doing that. I will not return this. You all can do with that whatever you want and speak to your management. I will set a quick clock on this.

As I understand it from Judge Sharbaugh that he continued the preliminary hearing in this matter.

Is it your case, Ms. Carney?

MS. CARNEY: Yes, Your Honor.

THE COURT: When was the preliminary hearing continued until?

MS. CARNEY: The 9th.

I'll just note for the record, Your Honor, there is no grand jury sitting in this courthouse today.

THE COURT: Okay. What about tomorrow or the next day or any other day this week? You can't seriously say there is not another grand jury sitting, correct? What about before

**A235**

October 9th, is there another grand jury sitting, federal grand jury?

MS. CARNEY:  Yes, Your Honor.  It is our position, though, that they --

THE COURT:  I understand that it's your position.  You have that authority.  It is my position to both be frightened of what your office is doing and to seek briefing on it.

October 9th is when you have your next hearing, so we'll have this resolved before then.  You have until Friday to file whatever -- whatever points of authorities that you think support, and I will have his defense counsel file their response by the 7th.  So that gives me one day, the 8th.

What time is your hearing on the 9th?

MS. CARNEY:  I believe it's 11:00 a.m.  Let me check that, Your Honor.

THE COURT:  Great.  So you're going to need to have your foreperson available or a representative of that grand jury.  If we're going to return the indictment then, I'll go ahead and return the indictment, and, if not, then we'll have a preliminary hearing.

MS. CARNEY:  On the 9th?

THE COURT:  Yes, at 11:00 a.m.  So we'll have a hearing on this at that time.

MS. CARNEY:  It's 11:00, correct, Your Honor.

THE COURT:  There is a reason things have never been

**A236**

done before.  There are reasons there are norms.  And it's the job of supervisors and management to make sure that those norms that are appropriate and have occurred for generations don't get thrown out the window to go after one charge.

Before today, before three weeks ago, if this would have happened, I wouldn't even have given it a second thought, but I am now in the unfortunate situation, as I have said before, I no longer trust that when prosecutors are coming forward, they are doing things because their managers want the right thing to be done.

It has nothing to do with you, Ms. Carney.  I assume you do not make the decisions of what's being done in cases, because, as I have said, I had an AUSA had to run into the hallway to see if she could get permission to not object to a finding of indigency for a defendant.  As I understand it, everything has to go by management, which is baffling, because, as AUSAs, you should have the responsibility and discretion to do what you think is appropriate, but part of what is appropriate is what has happened for generations.

No one has ever, after a no bill, gone to Superior Court and then brought a case here.  The rules -- the good guys play by the rules.  That's what they are there for.  We don't need -- when you are a prosecutor, I was taught to go and just get a charge or get an arrest, because people always do bad stuff, they will keep doing bad stuff, and, you know what, you

**A237**

always take the high road.

So I'm just absolutely flummoxed as to why this is being done.  Why not wait for another grand jury in federal court and see what has happened.  If grand juries won't charge cases, the solution is not to run to other grand juries.  It's to then -- perhaps there is a message to be taken that the system has been set up by the founders in Congress that says this is not a charge to go forward on.

That's it.  You're excused.  Thank you for providing authority.  Have a good day, Ms. Carney.

MS. CARNEY:  Thank you.

(Proceedings concluded at 3:36 p.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the digital record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 2nd day of October, 2025.


                                    /s/ Sonja L. Reeves
                                    SONJA L. REEVES, RDR-CRR
                                    FEDERAL OFFICIAL COURT REPORTER

**A238**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                                        Criminal Case
                    Plaintiff(s),       No. 25-mj-00225

          v.
                                        Washington, D.C.
KEVONTAE STEWART,
                                        October 3, 2025
                    Defendant(s).

------------------------------------------------------------

                         HEARING
            BEFORE THE HONORABLE JAMES E. BOASBERG
               UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   Jonathan R. Hornok, Esquire
                        David Henek, Esquire
                        Gregg Maisel, Esquire
                        United States Department of Justice
                        145 N Street Northeast
                        Washington, D.C. 20530


FOR THE DEFENDANT(S):   Michelle Peterson, Esquire
                        Matthew Farley, Esquire
                        Public Defender's Office
                        625 Indiana Avenue Northwest
                        Suite 550
                        Washington, D.C. 20004



REPORTED BY:            Tammy Nestor, RMR, CRR
                        Official Court Reporter
                        333 Constitution Avenue Northwest
                        Washington, D.C. 20001
                        tammy_nestor@dcd.uscourts.gov

**A239**

The following proceedings began at 2:33 p.m.:

THE COURT: Good afternoon, everyone.

THE COURTROOM DEPUTY: Good afternoon. We are here for magistrate case 25-mj-225, the United States of America versus Kevontae Stewart.

Beginning with counsel for the government, if you could please approach the lectern and identify yourself for the record.

MR. HORNOK: Good afternoon, Your Honor. Jonathan Hornok on behalf of the United States of America. With me at counsel table is Gregg Maisel and Dave Henek.

THE COURT: Nice to see you folks.

MS. PETERSON: Good afternoon, Your Honor. Michelle Peterson on behalf of the defendant, Kevontae Stewart. For purposes of this hearing, we would waive his appearance. Also at counsel table is Matthew Farley.

THE COURT: Welcome to both of you.

Mr. Hornok.

MR. HORNOK: Your Honor, at the outset, I object to the presence of the federal public defender at this case. This is an ex parte -- the underlying proceeding at issue here is a proceeding that is not adversarial in nature. That proceeding did not complete. An indictment has not been returned, which would trigger the defendant's ability to be represented by counsel here.

**A240**

THE COURT: I thought that they were appointed as amicus as opposed to -- I thought Ms. Shaner was counsel, Ms. Peterson. Can you tell me?

MS. PETERSON: Your Honor, we were actually appointed as co-counsel, so we do represent the defendant, Mr. Stewart.

THE COURT: Okay. Thank you. Well, I appreciate that. So let me proceed, and we can discuss this.

As this case has drawn some public interest, I want to briefly explain its posture, and then I'll ask counsel to ensure that I'm correct.

So a federal grand jury issued a no bill on the government's felon in possession charge last Friday, September 26. The government then proceeded on Monday of this week, September 29, to Superior Court and obtained an indictment from a Superior Court grand jury on the same federal felon in possession charge.

The government then appeared before Magistrate Judge Faruqui on Monday afternoon, in other words, the same day, to return the indictment.

Judge Faruqui indicated that he did not know if he was legally permitted to accept an indictment of a federal charge from a Superior Court grand jury, and thus, before doing so, ordered expedited briefing on the question.

He also appointed FPD as amicus; although, now I

understand they are co-counsel.

The government then late yesterday afternoon filed a motion with me to vacate Judge Faruqui's order requiring briefing and to require him to accept the indictment issued by the Superior Court grand jury.

Mr. Hornok, do you believe that's an accurate recitation so far?

MR. HORNOK: Yes, Your Honor.

THE COURT: Okay. So I guess, Mr. Hornok, I guess what I would ask you is what the rush is here. In other words, Judge Faruqui's asked for expedited briefing. That briefing will be due on Tuesday. And then he has said that he will rule by Thursday. So if he decides to accept the indictment, if he decides that the law is as you say it is and that he must accept the indictment, then he would do so. And the question is, how are you prejudiced by this week-long delay?

On the other hand, if he decides he doesn't have the power to accept the document, then you can appeal to me.

Now, arguably, he could have accepted the indictment and invited the defendant to move to dismiss, which I think is what you propose in your pleading. But if he didn't believe he could legally accept it, what's the problem in proceeding this way?

In other words, there's no speedy trial question. So

tell me, where's the prejudice in letting him decide the question, and then if you disagree, you can come to me?

MR. HORNOK: Your Honor, the prejudice is -- there are multiple aspects of prejudice here.

First, Your Honor, is that Magistrate Judge Faruqui has infringed on the power of the executive to choose where and when and in what competent grand jury it should present a case. The infringement of that constitutional authority is a problem. Any infringement for a single day is prejudice.

Second, Your Honor, is that the United States has the right to litigate this matter in front of an Article III judge. The defendant has the right to litigate this matter in front of an Article III judge.

Judge Faruqui is not an Article III judge. So by doing that, he has usurped the power of Article III judges and has infringed our right to have this litigation under the Federal Rules of Criminal Procedure under the law that is applicable.

In this particular case, the litigation that Judge Faruqui is proposing that we engage in is completely devoid of legal basis under the rules. If there is a problem with this indictment, if there is a problem in the way that this indictment was obtained, the proper mechanism under Federal Rule of Criminal Procedure 12 is for a motion to be brought

by the defendant after the motion has been filed and for an Article III judge to make that determination.

That is why the proper function in this particular case was for Judge Faruqui to accept the indictment --

THE COURT: So let me ask you. Let's say the government brought an indictment with any old grand juror, not the foreperson, not the deputy, or handed up an indictment that was unsigned or that had some other technical defect. Are you saying he would have to accept that indictment even if it were flawed or even if it were improperly presented?

MR. HORNOK: I believe so, Your Honor. And in part, where I think the appropriate example of this is in the U.S. v. Thompson case. In that case -- it's a 1920 Supreme Court case. In that case, the judge had a problem with the indictment that was returned. And as I'm sure the Court has read that case, the facts there were an indictment -- or charges were presented to a grand jury. The grand jury returned a true bill on some, returned a no bill on others.

The government went back to another grand jury and obtained a true bill on all of the charges and then brought it before -- returned it to the court.

The court in that case, even though observing that the grand jury had reported a true bill, decided that it would be placed on file with the reservation of right to

**A244**

take such future action regarding it as might be deemed appropriate. That's the appropriate mechanism here.

The purpose -- Judge Faruqui's purpose in that hearing is to receive the indictment and prepare and tee up the litigation for an Article III judge to make that determination. If Judge Faruqui is able to insert himself --

THE COURT: I mean, I understand your points, and that is one way he arguably could have proceeded. But I guess I still don't understand how you are prejudiced by letting him decide. Again, if this issue is as obvious as you say it is, then he will rule for you and accept the indictment. And if he doesn't, then you can come to me on Thursday. I guess I just don't understand what's the --

MR. HORNOK: What's the rush?

THE COURT: Yeah, what's the rush?

MR. HORNOK: Your Honor, on this point, I think it is salient to look at the actual transcript of what happened in the events. Judge Faruqui on Friday afternoon was put on notice that the government intended to present an indictment and intended to return that indictment to the court on Monday under D.C. Code 11-1916.

When the hearing occurred on Monday afternoon, the government appeared and the government -- just right out of the gate, Judge Faruqui was teed up, he knew what was

happening, and he immediately, just almost immediately, raised this concern. The AUSA presented Judge Faruqui with the case law and the statute supporting the procedure, the D.C. Code provision, the case United States v. Seals, and some examples of where this had been done in the past.

Judge Faruqui then took a recess for an hour. So he took the circuit case law, the statute, the examples of how this had been done and why this was legal and spent an hour considering it.

And then he came back and he said, This is unlawful. I think it's unseemly. The government is breaking decades-long norms and is violating the rule of law, and all of these statements after having considered and having time to consider the legal basis for that.

What I would also --

THE COURT: But that sounds like you are saying that you don't agree with his legal reasoning. But again, he didn't say, you're wrong, I refuse to accept this indictment, dismissed, end of case. He said, I think it's unlawful, but let's have briefing on it.

So again, maybe he will decide in your favor. And if he doesn't, maybe you will come to me. But I'm not sure, again, that it's so improper for a judge to seek briefing on something that he's not certain of even if you disagree -- even if you think it's an easy call or even if you think

you're right.

Why is that such improper conduct as to ask for briefing on a matter that is certainly, you would agree, unusual?  You would agree with that?

MR. HORNOK:  I would agree that it is unusual, but it is not even remotely a breach of decades-long norms.  This has been practiced for decades.

THE COURT:  Okay.  But how many times has this office done it this year?

MR. HORNOK:  This is, to my knowledge, the first time this office --

THE COURT:  Right.

1234:  -- has done it this year.

THE COURT:  As I said, it's unusual.

MR. HORNOK:  It is.

THE COURT:  Right.  And I can't say I have ever heard of it.  Now, I'm not saying it's lawful or unlawful.  I'm just saying it's unusual.  And for a judge to then say I would like briefing on this so I can determine whether it's lawful or not seems perfectly appropriate.

MR. HORNOK:  Except he received the briefing.  He considered --

THE COURT:  No, no --

MR. HORNOK:  He received the legal authority.

THE COURT:  He spent an hour.  But again, some of us

may need more than an hour to determine whether complicated legal issues should be resolved one way or another.

So he asked for it, again, not weeks of briefing, but expedited briefing for him to decide it.

So I'm going to go back to the point, how does this have to do with prejudice to the government?

MR. HORNOK: Here's, I think, an additional element of prejudice here, and that is the inflammatory statements that Judge Faruqui has made. Those statements have already begun to prejudice the grand juries in this district.

THE COURT: All right. So here, it seems to me, is an easy resolution of that.

To the extent you claim that his comments prejudiced the Superior Court grand jury because the foreperson heard him say that he thought the return was unlawful, if he decides next week that he can accept the indictment, then he will so inform the foreperson that this is lawful.

And if he decides he can't accept it and you appeal to me and I disagree with him and say he can accept it, then we will also inform the foreperson, or we will have whoever, he or the other magistrate judge, inform the foreperson.

So if he ends up being right, then what he's told the foreperson was correct. And if he ends up being wrong, then the foreperson will so be informed.

So again, I don't see what the prejudice is.

MR. HORNOK: Every minute that that grand jury considers matters, they are sitting right now with the understanding and belief that the United States Attorney's Office has lied to them, and the belief that they have right now as they consider cases presented by the United States Attorney's Office comes not from something that they observed.

The reason they believe that is because Judge Faruqui, wearing the robe, wielding the power of this court, having considered the law, and nevertheless deciding to ignore the law that was presented to him, he did not engage at all.

If he had engaged with a legal discussion in the moment, perhaps. But he did not engage with the law at all. Instead, he ignored the law that had been presented to him and made these inflammatory comments which were immediately picked up and reported by the New York Times.

And so the prejudice, every time that grand jury -- and indeed, I would surmise that every other grand jury in this district has also probably read this New York Times article. It may --

THE COURT: The New York Times will be glad to hear that their circulation is so wide.

MR. HORNOK: I think it is -- certainly I don't have personal knowledge and we haven't researched that, but I

**A249**

would surmise that it is a nonzero number of grand jurors in this district who have read that article and have concluded that the U.S. Attorney's Office is misbehaving, is breaking the law.

THE COURT: As I said, if it turns out he was wrong and the indictment is accepted, then I'm sure the New York Times will report on that.

MR. HORNOK: You're sure that they will?

THE COURT: Again, I'm as sure of that as you are of the circulation that it has among grand jurors.

MR. HORNOK: And what of all of the indictments that our office is presenting to those grand jurors in the interim while this litigation works its way out, while this court waits to correct what is, I believe, a very clear misstatement of the law? All of those grand jurors, all of those indictments are now jeopardized because of their belief that the United States Attorney's Office has lied to them, lied to them, because a judge said that the U.S. Attorney's Office was flatly wrong.

THE COURT: Again, there are many cases in which judges disagree with what one party says or another party says. And there are at times members of the press at those hearings. But a judge disagreeing with the law is just not an outrageous act.

All right. Thank you, Mr. Hornok.

I will hear, Ms. Peterson, if you want to respond to any of what I have just said.

MS. PETERSON: Your Honor, I don't have a lot that I am going to add. Most of what I had intended to say the Court has already said, and I'm not going to repeat it. There is no emergency, obviously.

I also think it's important to note that the government's suggestion that the grand jury is being affected by the magistrate judge's comments is belied by the notion that the grand juries in this jurisdiction started no billing indictments well prior to Judge Faruqui's statements, and I suspect that the actions of the grand jury have had a lot more to do with their reaction to the actions of the government in this city than they have to the statements of a judge on the bench.

Second, I would note that Magistrate Judge Faruqui's comments from the bench were very similar to comments made by other members of the judiciary and certainly reflect perhaps the feeling of a number of the grand jurors having nothing to do with this case.

I think that the Court is exactly right, that anything -- any prejudice there is to the government is cured if the government is right on the law and it is fixed.

I would, however, note that I think the government has deliberately misstated the state of facts in this case.

We are aware -- the government only cited two cases where Superior Court grand jury returned an indictment in federal court over the course of -- and plus Seals. So over the course of the 34 years, we have three cases.

I believe there may have been one or two during COVID, but those cases were returned under very different circumstances. One, the COVID cases obviously were under different circumstances. We looked at the two cases that the government cited. One of them was during a snow storm in November, November 15th of 2018. The city was shut down because of a snow storm. And it is entirely possible, I don't know because we don't have the record of it, that the federal grand jury didn't sit because of that, and perhaps the Superior Court grand jury was able to come in.

Nobody declared that to be lawful. It just happened. Nobody challenged it.

The same with the other case that the government cited that happened, I believe, on the hottest day of the year in July. I don't know that the Court was shut down for that reason. I don't know why the grand jury --

THE COURT: Not under my watch.

MS. PETERSON: But I do note that those are the only two cases that they have cited where this happened.

So to suggest that less than a handful of cases is a decades-long history of doing this on a regular practice, I

would suggest that if that's, in fact, the case, they ought to be able to come up with more than two cases that they have cited.

I would also suggest, Your Honor, that, again, the actions and the tweets by the government have had a lot more to do with how our grand jury is acting than anything Magistrate Judge Faruqui has said.

I am happy to respond to any questions the Court has.

THE COURT: Thank you very much, Ms. Peterson.

Mr. Hornok, yes.

MR. HORNOK: Your Honor, Mrs. Peterson has cited the weather as an appropriate excuse for some of these indictments. I would direct you to the language that Congress enacted when it empowered Superior Court grand juries --

THE COURT: I think her point is only that it has not been a regular practice. It has been an exceedingly rare practice over the past decades. I think that's merely her point, which I trust you would concur with.

MR. HORNOK: Absolutely concur, except it's not legally relevant. It doesn't matter. Congress didn't think it mattered.

THE COURT: I'm not ruling on the issue today, so I appreciate the point. Just as I'm not engaging with Ms. Peterson on the merits of the issue, I don't want to

hear argument on the merits of the issue today.

MR. HORNOK: I understand that. I would only point out she did not say the merits go in her favor.

THE COURT: All right. Thank you.

So I will deny the motion without prejudice to act, and again, because I don't believe there is any prejudice to the government in waiting to permit Magistrate Judge Faruqui to rule on a full record and briefing that both sides will be filing on an expedited basis. Again, the government is free to return to me if the outcome is adverse to them.

And I should also say before adjourning today that it would be in everyone's interest to turn the temperature down a little bit here.

I know that the U.S. Attorney's Office takes issue with some of the things Judge Faruqui has said, but it might be helpful for me to take you back about 25 years.

So when I was an AUSA here in D.C., at that time I specialized in homicide cases, in other words, cases where more was at stake than in the gun and assault cases that are the source of the current controversy.

There were plenty of cases where judges ruled against me, for example, in regard to certain motions. And I certainly wasn't happy with some of those rulings, especially where I thought that defendants posed a real danger to the community. But I never would have filed a

**A254**

pleading accusing a judge of bloviating as you have done in yours.

So again, I would just ask everyone to please be mindful of the rhetoric you are employing in court and in filings. We all have an ethical and a professional obligation to remain civil to one another and to the court. I trust you will continue to fulfill that duty.

Thank you, everyone.

(The hearing concluded at 2:55 p.m.)

- - -

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

10/10/25

s/ Tammy Nestor
Tammy Nestor, RMR, CRR
Official Court Reporter
333 Constitution Avenue NW
Washington, D.C. 20001
tammy_nestor@dcd.uscourts.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                        Criminal Case
           Plaintiff(s),     No. 25-00225 JEB
   v.

                        Washington, D.C.
KEVONTAE STEWART,

                        October 28, 2025
          Defendant(s).

------------------------------------------------------------

MOTION HEARING
BEFORE THE HONORABLE JAMES E. BOASBERG
UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):  Jonathan R. Hornok, Esquire
                        United States Attorney's Office
                        District of Columbia
                        601 D Street Northwest
                        Washington, D.C. 20004

FOR THE DEFENDANT(S):  Matthew Farley, Esquire
                        Michelle M. Peterson, Esquire
                        Public Defender's Office
                        625 Indiana Avenue Northwest
                        Suite 550
                        Washington, D.C. 20004

REPORTED BY:           Tammy Nestor, RMR, CRR
                        Official Court Reporter
                        333 Constitution Avenue Northwest
                        Washington, D.C. 20001
                        tammy_nestor@dcd.uscourts.gov

**A256**

The following proceedings began at 2:30 p.m.:

THE COURTROOM DEPUTY:  We are here on magistrate case 25-225, the United States of America versus Kevontae Stewart.

Beginning with counsel for the government, if you would please approach the lectern and identify yourself for the record.

MR. HORNOK:  Good afternoon, Your Honor.  Jonathan Hornok on behalf of the United States of America.

THE COURT:  Good afternoon.

MR. FARLEY:  Good afternoon.  Matthew Farley for Kevontae Stewart, whose presence has been waived by the Court.  And with me at counsel table is Ms. Shelley Peterson.

THE COURT:  Thank you both.

We are here today on this interesting question of whether a superior court grand jury can return a federal indictment in federal -- district court.

I think there are interesting arguments on both sides, and I think it's a difficult question.  But let's see where we go and see what information and assistance you folks can render me.

Mr. Hornok, why don't you begin.

MR. HORNOK:  Your Honor, I'm happy to answer any specific questions that you may have, but I think it boils

**A257**

down as we set out in our most recent briefing, and that is this.  As a preliminary matter, the underlying magistrate judge's opinion and the defendant agree it's perfectly appropriate for the United States to present a matter to a grand jury and then to present a matter to another grand jury if the first grand jury does not concur with --

THE COURT:  Right.  And I don't think there's any question about that.

And similarly, I don't think you are really arguing, at least you didn't in the last briefing, that the magistrate judge doesn't have the power to refuse to accept an indictment that is plainly invalid.  You don't really argue that in your papers, right?

MR. HORNOK:  So I think we want to preserve that argument in the event that we were to find ourselves in front of an appellate court and having that discussion.

Given the procedural posture here, the fact that we asked for review before that process occurred and the Court made the decision to allow the magistrate judge to proceed, I think what we understood that to mean is that while that might be our position, it's a position with which you disagree.

And so we have raised that, kind of preserved that, put a pin in that, but really spread the majority of our time here, and I think it's appropriate to spend it, on the

**A258**

merits of this case.

THE COURT:  Right, which is, can a superior court grand jury return a federal indictment?

MR. HORNOK:  That is correct.

THE COURT:  So let me start -- I do have a number of questions for both sides.

So if D.C. Code Section 11-1916(a) did not exist, do you still think the government could return an indictment from the superior court to district court, or is the thrust of your argument a reliance on that statute?

MR. HORNOK:  It is wholly reliant on that statute. It's a unique statute.  Not aware of any other statute that has a kind of equivalent effect.  It's a unique district. And because of that statute, we are here today.

THE COURT:  Okay.  So no, I agree that if that statute didn't exist, you would have no outlet here.  So the question is the effect of that statute.

But you would also agree that, and this is what Judge Faruqui emphasized, that the plain text of the current Federal Rules of Criminal Procedure do exclude D.C. local courts from the definition of court, right?

MR. HORNOK:  Correct.

THE COURT:  But you would argue that the amendments, the 2002 amendments, were simply stylistic and do not change the underlying meaning of 11-1916?

**A259**

MR. HORNOK:  Absolutely, especially with respect to Rule 6.  So I think part of the issue with Judge Faruqui's and the defendant's reading of and reliance on the 2002 amendments to the federal rules is there's a lot of focus on Rule 1.  And there's some work that was done on Rule 1 in 2002 to add some substance there.

But when you get over to Rule 6, the advisory notes to the 2002 amendments kind of specifically say, look, this is basically stylistic except for, you know, these couple of things, none of which include this specific issue.

Additionally, I do not agree that the text of Rule 6 actually excludes -- has an exclusionary function or an exclusionary hook in the way that Judge Faruqui and the defendant have read it.

THE COURT:  Okay.  So if we go to 11-1916, what in the rule do you think requires a federal magistrate judge to except an indictment from a superior court grand jury?

So the statute says, A grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the federal or District of Columbia courts.

And so Judge Faruqui would say that, notwithstanding that statute, there's nothing that requires a federal magistrate judge to accept an indictment from superior court.  So why isn't that correct?

**A260**

MR. HORNOK: So this statute clearly does something. And what it says is that it really empowers grand juries in this district to do something. And it empowers them to take cognizance.

What is cognizance? We have cited Black's Law. I think, you know, cognizance under the definition could mean a number of things as they have set out in some of the other definitions there, but the first definition is to have jurisdiction or the right to power and try and determine a case.

And so if a grand jury is empowered by Congress to try and determine a case before it -- I mean, grand juries only really do one thing, and that is vote to return indictments. That's it. And so if they've got jurisdiction and the right to try and empower -- or to determine a case, that power is to return an indictment.

Then when you look at the last part of that statute, really the amplification or clarification, it's regardless of whether the indictment is returnable in federal or District of Columbia courts. And so it is Congress empowering the grand jury to do precisely this.

THE COURT: Go ahead. All right. But the argument in a nutshell is that the statute would be meaningless if the grand jury could return an indictment, but the magistrate judge couldn't accept it.

**A261**

MR. HORNOK:  I think that's exactly right.  I think, likewise, there's nothing in Rule 6 that would say that Judge Faruqui must accept a federal indictment that was returned.  It's just -- you look at Rule 6 and you look at Subsection (f), which is the -- it's all about what the grand jury may do.  A grand jury may indict only if 12 jurors concur.  The grand jury or its foreperson or deputy foreperson must return the indictment to a magistrate judge in open court.  There's nothing there that says that the judge must accept it.

So by this reasoning, then the magistrate judge is empowered to just at will decline to accept any indictment, federal or superior court, because there's nothing that says the judge must accept it.

THE COURT:  No, right.  I think it's a hard argument to say, if it's returnable, the magistrate judge can still decline to accept the return.

But if what you're saying -- and what's difficult here for both sides is the lack of a limiting principle.  So in other words, under your theory, a superior court grand jury could return absolutely any federal indictment, a capital case, treason, RICO, sedition, anything that your office could present to a federal grand jury, you could obtain indictment from a superior court grand jury on, correct?

**A262**

MR. HORNOK:  Correct.

THE COURT:  Right.  So no limit, right?

MR. HORNOK:  In terms of the kinds of federal crimes --

THE COURT:  Right.

MR. HORNOK:  -- apart from the standard limitation, which is that they should be returning crimes that occurred here and --

THE COURT:  Right.  In other words, you could decide, we will never take a case to a federal grand jury.  It's bad luck.  We don't like -- whatever reason you wanted.  You don't need any reason.  You could take absolutely any case to superior court to seek an indictment from that grand jury.  That's the position, right?

MR. HORNOK:  Yes.  Congress did not in any way require, does not require and I don't actually think could require, the government, you know, given options, to pick which of those options.

THE COURT:  So it's not a question of circumstances; it's just blanket you can do it, or you can't do it?

MR. HORNOK:  That's right.

THE COURT:  And would that be so if the superior court grand jury had rules that were distinctly different from a federal grand jury?

So let's say the superior court passed rules that

**A263**

said you only need ten people on a grand jury or indictments may be returned on any suspicion whatsoever, in other words, no probable cause, the numbers were different, in other words, none of the safeguards that exist under the federal rules for the grand jury, the superior court decided we are going to have different rules there, as long as 11-1916 still is on the books, that protects you from any -- I'm sorry, no matter what the rules were in the superior court grand jury?

MR. HORNOK:  So Congress has set out specific rules. And in fact, in the statute, the next statute says that the courts must consider the needs of each other in creating these grand juries.  So there's a specific -- actually, this court is obligated to consider the needs of the superior court to the extent feasible because Congress has said so in setting up its grand juries based on the needs of the superior court.  Likewise, the superior court is obligated to consider the needs of this court when establishing its grand juries.

Those grand juries in superior court, those rules, are governed by statute, how many people.  Likewise, all of the things in, say, Rule 12 that could be a basis for dismissing an indictment for some kind of failure in the process, for example, fewer than 12 concur, something like that, those rules do apply, they do apply in federal court,

**A264**

and they would apply and they could be a basis to dismiss the indictment.

THE COURT: But can the superior court change its criminal procedure rules absent an act of Congress or absent congressional approval? And if so and they change them to say -- to have considerably fewer, materially fewer, safeguards than the federal rules, is that still not a problem? That may be a constitutional problem, but it's not a problem under Section 1916?

MR. HORNOK: I think Congress set up a system which specifically was designed to do this, did do this for years after its initial -- because initially the court system was somewhat combined, and then eventually over stages, it started to kind of separate. So Congress has set up a system with those things in mind and has given us direction with respect to that.

What I would point out, though, we could sit and we could go through the permutations, what if the superior court did this, what if the superior court did that, but the problem is in this case, nobody has pointed to any of those things. We had 12 jurors concur.

THE COURT: Sure. And I don't think there's any argument that the superior court procedure is different. I'm just wondering, if it were, do you think that's okay as long as 1916 still exists?

**A265**

MR. HORNOK:  I think as long as the constitutional requirements for a criminal defendant and the procedure and due process that is due a criminal defendant in federal court are complied with with respect to what happens in a grand jury, then insofar as Congress has empowered a superior court grand jury to return an indictment and it has complied with those rules, then Congress has empowered that grand jury to return that indictment to this court and we have the right and power as the executive to go to that grand jury and seek an indictment -- seek to return an indictment.

THE COURT:  And you mentioned that the evolution of the grand jury and the division of courts -- and as you know, it's 1970 that our superior court is actually established, and Section 1903, which is the forerunner of Section 1916, is passed, which is the same language.  But so in 1986 is when the Congress splits the jury pools.  Why should -- and recodifies the language from 1903 into 1916, right?

So why shouldn't we view this as vestigial?  Why shouldn't we view 1916, that it's really a remnant from the 1970 period when there was just one jury pool, and now that there are two, 1916 doesn't really mean what it says?

MR. HORNOK:  I think there is lots of Supreme Court case law that says when Congress passes a statute and uses

**A266**

those words and in this case has recodified it in a different way, I think this Court is bound to assume that Congress meant what it says, to not just look at the statute that Congress passed and say, well, maybe there's some reason why time has given us better reflection, and that's not as good of a policy as we thought maybe Congress thought it was in 1986.

Congress spoke clearly here. And I think an important point here, neither Judge Faruqui nor the defendant have identified a single court other than Judge Faruqui who has read this as a problem. Instead, what we have is a litany of courts, starting in Seals and the others that we have identified in the briefing, where judge after judge has presided over cases where indictments were returned by the superior court, including yourself, and not seen this issue, not identified this as an issue.

So nobody is reading 1916 the way Judge Faruqui and the defendant seem to be reading it.

THE COURT: Well, certainly that may be a bit of an exaggeration. For example, in my case, I'm sure I had no idea that the indictment was returned by a superior court grand jury. All I knew is that it was a federal charge.

And Seals is a different issue. It was a constitutional issue. Now, I agree with you it assumed that this was a proper indictment, but I'm not sure it's quite a

litany of courts.

I mean, ultimately, don't you think that the question is where do you start from?  In other words --

MR. HORNOK:  Your Honor, may I approach on that point?

THE COURT:  Sure.

MR. HORNOK:  This is the indictment in Scott.  And there's a footnote that says it was returned by the superior court, so --

THE COURT:  It sure does.  And again, I have had many cases.  This was a 2020 case.  Do I have any recollection that I read that footnote and thought, well, that's interesting, but of course, it's permissible?  I can't imagine I ever did.  But I think that's really neither here nor there.

I think ultimately it's really sort of where we start, whether the defense wants to start in 2002 with a criminal -- with an amendment to the rules and asks me to look at that text.  You want me to start with 11-1916 back in 1970 recodified in 1986.  And really, ultimately, where that begins is where it ultimately ends.

All right.  Thank you.

Let me talk to Mr. Farley.

MR. FARLEY:  Thank you, Your Honor.  Having to respond to just a few of the questions that you raised with

**A268**

the government, and I will take anything else you would like, you mentioned in passing about the superior court changing their rules and if they are able to do so without an act of Congress.  I don't know if that was quite a question, but they are able to do so and they are able to do so without an act of Congress.

And they actually -- there is an interesting change that I discovered last night that is relevant to this case, which is before 2015 and when cases like Hackney, which is cited by the government, from the D.C. Court of Appeals was considering whether they could take an indictment from a federal court, they relied on the comment in the superior court rules that basically said that they could.

That language was removed in 2015 -- or sorry, 2016, and it was -- the language it's exchanged with says that it was removed to -- it doesn't -- it says, This rule has been modified to reflect the amendments in 2002 to the federal rules.

I brought a copy of that if anyone would like --

THE COURT:  No, we have been looking for some rules history, so I would be happy to take a look at that.

So that amendment, you are saying, says that you would argue that it supersedes Hackney then?

MR. FARLEY:  I would say -- well, and to be clear, the amendment I am talking about is in the comment to the

**A269**

rules, so there's a question of binding and comment.  But in Hackney where they stated this principle, the footnote cites to that comment.  That comment doesn't exist anymore.  It was replaced with a comment saying, This rule has been modified to reflect the changes in the federal rules in 2002 and 2011.

THE COURT:  But didn't you argue, though, in your papers that everyone agrees that a federal grand jury can return a superior court indictment?

MR. FARLEY:  I like to think I hedged more than that. I might not have hedged as much as I should have, and especially with what -- when I was looking into the superior court rules last night, I certainly -- I don't agree that that's the case anymore.

THE COURT:  So your position is that neither grand jury can return an indictment to the other court?

MR. FARLEY:  I do believe that's the case.  I don't have the -- I can't cite to the letter of every superior court rule that would say that, but I would say the permissive language that permitted it has been removed.

THE COURT:  So that would be in any -- so again, I talked to Mr. Hornok about the limiting principle.

MR. FARLEY:  Yes.

THE COURT:  So the lack of a limiting principle for you is that your position is that never, ever can this

**A270**

happen, in other words, not during a snow storm, not during COVID, never can a superior court grand jury return an indictment in federal court or vice versa?

MR. FARLEY:  I would pitch two limiting principles. Roads diverge sometimes.  And so one is when we have raised, almost I would say a little bit in passing, maybe 1916 means something completely different.  And it talks about the investigative function of a grand jury.  In that case, that's what it means.  And yes, it doesn't permit returning indictments in the other court.

The other option, I think, would be how you referred to it as vestigial.  And perhaps it's an option that is left open.  But the superior court rules and the federal rules have now both shut that valve off.  The courts can amend their rules through Congress.  Superior court can amend their rules as they choose and open the valve back up, but they haven't done so.

THE COURT:  But the federal rules specifically say that they are stylistic rules, that the comment specifically says that the 2002 amendment is stylistic, not substantive as it relates to district -- as it relates to grand juries. It may relate to magistrate judges, but you would agree with that?

MR. FARLEY:  So that is in the comment to the amendment notes for Rule 6.  The amendment notes for Rule 1

**A271**

are actually that this is a complete overall. So if -- I mean, the defense's argument hinges on both Rule 1 and 6, and the comment note to Rule 1 is that this is a -- I forget the exact language, but like, complete revamping of the rule, not that it's stylistic.

THE COURT: So, therefore, 1916 now has no weight whatsoever?

MR. FARLEY: It remains there. It can be used by revising the rules in the future. Perhaps it does just speak to an investigative function now. Maybe the meaning of 1916 completely changed in 1986 when it was moved to Section 1916, and all of the contextuary language around it also changed.

As the government noted about that there's case law about recodifying, there's similarly a number of cases that say you have to read statutes in their context, and the context completely changed in 1986.

THE COURT: So your argument is that the statute which states a grand jury serving the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the federal District of Columbia courts.

What does that empower a grand jury to do as an investigative matter that it can't do already?

MR. FARLEY: It speaks -- it's a clarifying provision

**A272**

that no one should feel that they can escape the purview of a superior court grand jury by arguing that this is a matter -- that this is going to ultimately end up in federal court and that they have to respond to a superior court grand jury just as they would a federal court grand jury, by responding to its subpoena power and such.

THE COURT:  If the indictment is not ultimately returnable in the opposite court, doesn't that essentially rob the statute of any real meaning?

MR. FARLEY:  I don't think it does.  If we are operating in a world where cognizance speaks to the investigative function, then it's just talking about where that investigation will ultimately land and whether that lands with that superior court grand jury returning an indictment or the U.S. Attorney's Office deciding to take the information it's learned and go to a federal court grand jury to get a federal indictment.  It's just saying that it shouldn't --

THE COURT:  Why would it ever then, in your example, present evidence on a federal crime to a superior court grand jury if that grand jury couldn't return the indictment in federal court?

MR. FARLEY:  I have never worked in the U.S. Attorney's Office, but it's my understanding that, especially in our unique jurisdiction, that whether to

**A273**

charge crimes locally in superior court or in federal court is an ongoing process that -- and I certainly know in our office, we receive cases over from the Public Defender Service where the government has decided, oh, we learned this is more serious, we are going to take it to federal court.

THE COURT: Right. But then you would have to present -- in your example, then you would have to present evidence of the federal crime in a federal grand jury and obtain an indictment from a federal grand jury.

MR. FARLEY: Yes, absolutely, which I think is a matter of practice. That happens every day. Well, not every day.

THE COURT: But you are not achieving anything in superior court unless you are arguing that --

MR. FARLEY: If the superior court grand jury is conducting an investigation, it's gathering information that the U.S. Attorney's Office will be able to use to present to get an indictment. Whether they present that evidence back to that superior court grand jury or to a federal court grand jury, that superior court grand jury still served a purpose.

And 1916, under the meaning we are giving it in this conversation, made sure that everyone who was subject to that grand jury knew that they couldn't try to weasel out of

**A274**

providing documents or testifying by saying, oh, well, actually, this is going to be a federal matter.

THE COURT:  No, I see your point.  So let me ask you.  So the argument has to be then for you, right, that the 2002 amendments render 1916, in terms of returning indictments, a nullity, in terms of returning indictments in the opposite court, a nullity?

MR. FARLEY:  Without conceding that it ever meant that after 1986, yes.

THE COURT:  Okay.  But you also agree that Congress can carve out exceptions to the federal rules if it wishes to?

MR. FARLEY:  Certainly.  I mean, the federal rules are passed by Congress.  I would typically assume they would carve out an exception in the rules themselves.

THE COURT:  So if Congress tomorrow passed a rule -- passed a law that said notwithstanding the Federal Rules of Criminal Procedure, any indictment returned by a properly constituted grand jury in the D.C. superior court may be returned in a federal district court of the District of Columbia, they could do that, right?

MR. FARLEY:  It would be very hard to argue that Congress wouldn't have the power to do so.

THE COURT:  Okay.  So why isn't 1916 that statute?

MR. FARLEY:  I would say 1916 perhaps was that

**A275**

statute in 1970, but when it got recodified in 1986 with the severing of these jury systems, I would say that 1917, which speaks to the interaction of the jury system, actually weighs in our favor of saying that that's how the jury system should interact, not by sending indictments back and forth.

I'm sorry.  I thought you were --

THE COURT:  No.  Go ahead.

MR. FARLEY:  -- beginning to speak.

The 2002 amendments which could not be more clear that D.C. has been excised from the definitional court in Rule 1 and I think also followed by the amendments that we have to the D.C. superior court rules show that this is an acknowledgment that that's no longer the case if it ever was.

THE COURT:  That's 2015 superior court?

MR. FARLEY:  Yes.  I have a copy if you would like it.

THE COURT:  Sure.  I'll take that.

So point me to what you are --

MR. FARLEY:  So if you look at the December 2015 rules, if you flip to what at the top is page 2327, I have highlighted the comment, it's highlighted in all of our versions, where it says that, This rule recognizes that a grand jury summoned by the superior court may return

**A276**

indictments in either superior court or the United States District Court, accordingly, modifications are made.

And then if you turn to the 2016 rule, you turn to what at the top is page 2357, the comment says, This rule has been redrafted to conform to the general restyling of the federal rules in 2002 and the minor stylistic changes made in 2006.

And that language about that it can be returned in either court is no longer there, and it is not in the rules as they exist to date.

THE COURT:  Okay.  So the argument previously, according to the prior superior court rules, after Hackney -- I guess, would you argue that pre the 2002 rules, there would -- either grand jury could return an indictment in either court?

MR. FARLEY:  I would like to lean on our argument that in 1986, 1916 became about investigative functions.  So I'm not trying to avoid your question, but that's --

THE COURT:  That's your position.

MR. FARLEY:  That's my position.  But I am happy to discuss --

THE COURT:  As a fallback, were that not the case, do you agree -- is your fallback argument that it -- that prior to 2002, the grand jury could return an indictment in either court?

**A277**

MR. FARLEY:  I will say prior to 2002, the rules of neither court offered any sort of indication that it wasn't permitted, so I think I would agree with Your Honor.

THE COURT:  But you would also say then that today -- for you to win, do I have to find you're right that 1916 does not permit either grand jury to return an indictment in the other court?

In other words, are you today saying there's any distinction between a federal grand jury returning an indictment in superior court and a superior court grand jury returning an indictment in federal court?

MR. FARLEY:  I don't think Mr. Stewart would need you to find that to win.  I think to win, you would -- for Mr. Stewart to win in the cleanest, most simple way possible, you would simply need to find that the federal rules as they were amended in 2002 to whatever extent 1916 permitted returning a superior court indictment negated that ability.

Whether you need to find that -- make any finding or holding whatsoever on the direction of indictments from this court to superior court, it's not necessary.  But in our argument that 1916 speaks to investigations, we clearly would say that holding that to be so would also support our interpretation of 1916 as investigative.

THE COURT:  Okay.  Thank you very much, Mr. Farley.

**A278**

Mr. Hornok, let me just get you back to talk about this last point, which is a new point for me, which is the change in the superior court rules.

Essentially, the position of the defense, although let's put aside 1916 as purely an investigative statute, don't you have a harder argument if the -- part of your position is it can't be asymmetrical, that shouldn't have -- a federal grand jury can return an indictment in superior court and not the opposite, but if the defense is taking the position now that it is symmetrical, neither grand jury can return an indictment in the other court. Why isn't that a stronger argument for them?

MR. HORNOK: Because I think you have to start with the text of the statute. And in 1970, Congress enacted some words which the defendant now agrees means that grand juries, any grand juries, superior or district court grand jury, in the District of Columbia could return a federal or superior court indictment to either court.

So it's the first in time. I think that's where you have to start. It's also the first in authority, right? I mean, Congress sets the rules. It sets the Federal Rules of Criminal Procedure. It creates the superior court. That's the place from which the power flows. So I think you have to start there.

THE COURT: Sure. And they do. But they then say

**A279**

the 2002 amendments changed this.  And your argument has been, understandably, no, that was stylistic.  But what they are saying is superior court doesn't think it's stylistic.  In fact, it now -- it's changed its comments to the rules to show it's not stylistic and to, in fact, find it's substantive.  So why shouldn't we follow that?

MR. HORNOK:  So by a comment to a rule passed not by Congress, we have now abrogated congressional language.  That doesn't make sense.

Additionally, it's the comment to the rule.  And I looked at the rules, and I can't actually see anything that would suggest that whatever this comment to the rule, whatever the change was here, actually caused a reverse in the ability to do that.

The 2016 rules, looking at Subsection (f), which is really the operative rule or subsection here, it appears to me to just -- 2016, they just kind of realigned the superior court rules with the federal rules.

THE COURT:  No, I think they did, but I think it's the definition of court, and the federal rules does not include the superior court, and the superior court doesn't include the federal court.

MR. HORNOK:  But his point is look to the comment of Rule 6.  All right?  And his point is, look, there's something specific in here about the superior court getting

**A280**

indictments from federal grand juries, and look, in 2016, the comments to Rule 6 don't have that language. But if you look at the substance of the rules, I am not actually seeing a difference that matters. There is a difference, but it's not a difference that precludes federal grand juries from returning indictments to the superior court.

And in any event, if it's the superior court that has the authority to change its own rules, that's a very different ball game from the 2002 amendment to the Federal Rules of Criminal Procedure which are enacted by congressional acquiescence. Right?

That's a very different thing because we start -- we have to start with the first in power, first passed, which is 1916 in its original form in 1970. And this whole argument ignores all of the Supreme Court case law which tells us how to harmonize congressional enactments which may be conflicted by two different ways, both as to the general and specific canon and as to the repeal by implication canon.

Both would suggest that we need to find a reading that harmonizes both 1916 as what we have all agreed it meant in 1970 with the federal rules as amended in 2002.

THE COURT: Right, unless they are superseding it without explaining that they have so done, which I would understand in that sometimes they don't always pay as much

**A281**

attention to D.C.

MR. HORNOK:  They do, but the Supreme Court has said we assume that they don't do that.  We assume that they know the case law, which Seals was passed before 2002.  We assume that they, that Congress chooses words advisedly, and so Congress doesn't -- the Supreme Court has made clear that we -- that this court should not assume that Congress was trying to slip by a repeal without telling anybody and doing it in a way that nobody discovered for decades.  Many, many courts and attorneys have looked at this, and none of them have found this issue including this court.

THE COURT:  All right.  Well, thank you, everyone.  Very interesting question.  I will do my best and get out an opinion explaining my position.  Thanks, everyone.

(The hearing concluded at 3:12 p.m.)

- - -

**A282**

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

10/29/25                    s/ Tammy Nestor
                            Tammy Nestor, RMR, CRR
                            Official Court Reporter
                            333 Constitution Avenue NW
                            Washington, D.C. 20001
                            tammy_nestor@dcd.uscourts.gov

**A283**